## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

------------------------------------------------------------------------- x

NEW YORK SHIPPING ASSOCIATION, INC., :
on behalf of its members; METROPOLITAN MARINE :
MAINTENANCE CONTRACTORS' ASSOCIATION, INC., :
on behalf of its members; INTERNATIONAL :    **Document Filed**
LONGSHOREMEN'S ASSOCIATION, AFL-CIO, on behalf :    **Electronically**
of its members and affiliated locals in the Port of New York :
and New Jersey; LOCAL 1804-1, INTERNATIONAL :
LONGSHOREMEN'S ASSOCIATION, AFL-CIO, on behalf :
of its members; and LOCAL 1814, INTERNATIONAL :    **AMENDED**
LONGSHOREMEN'S  ASSOCIATION, AFL-CIO, on behalf :    **COMPLAINT**
of its members, :
  :
  :
                       Plaintiffs, :    Civil Action No.:
  :    2:13-CV-7115-
       -against- :    SDW-MCA
  :
WATERFRONT COMMISSION OF NEW YORK :
HARBOR, :
  :
                       Defendant. :

------------------------------------------------------------------------- x

Plaintiffs New York Shipping Association, Inc. (NYSA), on behalf of its members; Metropolitan Marine Maintenance Contractors' Association, Inc. (MMMCA), on behalf of its members; International Longshoremen's Association, AFL-CIO (ILA), on behalf of its members and affiliated locals in the Port of New York and New Jersey (NY-NJ Port); Local 1804-1, International Longshoremen's Association, AFL-CIO (ILA Local 1804-1), on behalf of its members; and Local 1814, International Longshoremen's Association, AFL-CIO (ILA Local 1814), on behalf of its members, by their respective attorneys, as and for their Amended Complaint, respectfully allege as follows:

### INTRODUCTION

The Port of New York and New Jersey (the NY-NJ Port) is the hub of a vast system of national and international commerce.  Longshoremen working in three different crafts play an

indispensable role in that commerce. Deep-Sea longshoremen load and unload cargo from ocean-going vessels, including goods shipped in interstate and international commerce. Deep-Sea checkers and clerks perform clerical work involving, *inter alia*, the receipt and delivery of containers, the location of containers on the terminal, and the implementation of the plan for the sequence of containers to be loaded and off-loaded from the vessels. Longshoremen engaged in the separate craft of maintenance and repair (M&R) maintain and repair containers, chassis, and cargo-handling equipment, which are essential to the flow of commerce. These M&R workers are referred to as "A" Register longshoremen.

To assure the availability of skilled longshoremen to keep commerce flowing, now and into the future, employer associations, such as NYSA and MMMCA, have been formed to enter into collective bargaining agreements with labor organizations representing the longshoremen. Thus, the roles of employers, longshoremen, and their bargaining representatives are vital to the NY-NJ Port and therefore vital to the economy of the United States.

Recently, a threat has arisen to the future of these roles and the commerce that flows therefrom. That threat consists of unauthorized and unlawful activities by Defendant Waterfront Commission of New York Harbor (Commission), which was created in 1953 by the Waterfront Commission Compact, Pub. L. 252, ch. 407, Sec. 1, 67 Stat. 541 (Aug. 12, 1953).[1] During the past several months, in defiance of the limitations on its authority in the statute that created it, the Commission has gone off the rails to pursue a future role for itself that is well outside the purposes and goals that led to its creation.

The Commission has issued a regulation that changes the requirements for hiring "A" Register longshoremen that have been in effect for more than 40 years and has issued a

---

[1] Unless otherwise noted, all citations to the Waterfront Commission Compact (Compact) are to the terms of the Compact enacted by 67 Stat. 541 (Aug. 12, 1953).

determination that seeks to impose hiring procedures for Deep-Sea longshoremen, clerks, and checkers that are contrary to those set forth in its governing statute.  Both actions unlawfully interfere with collective bargaining agreements in contravention of the Compact and federal labor law.  Plaintiffs bring this action to rein in the Commission's unauthorized actions and ensure that commerce continues to flow through the NY-NJ Port.

### JURISDICTION

1.      This is an action for declaratory, injunctive, and other appropriate relief brought by Plaintiffs under 29 U.S.C.A. § 185 (West 1998); 28 U.S.C.A. §§ 1331 and 1337 (West 2006); and the Labor Management Relations Act (LMRA), 29 U.S.C.A. §§ 141-187 (West 1998 & Supp. 2013).

2.      This Court has federal-question jurisdiction over this action pursuant to 28 U.S.C.A. § 1331 (West 2006) in that (1) the Waterfront Commission Act (WCA), *see* N.J. STAT. ANN. §§ 32:23-1 — 32:23-121 (West 1990 & Supp. 2013); N.Y. UNCONSOL. LAWS §§ 9801 – 9937 (McKinney 2002 & Supp. 2013), which is the enabling statute for Defendant Commission, was approved by an Act of Congress, *see* Pub. L. No. 252, 67 Stat. 541 (1953), and is, therefore, federal law and (2) the action involves questions of federal law.

### VENUE

3.      This Court is one of proper venue pursuant to 28 U.S.C.A. § 2201 (West 2006) and 28 U.S.C.A. § 1391(b) (West Supp. 2013), since the Commission does business in and may be found in this district and the impact of the Commission's actions is felt in this district.

### PARTIES

4.      Plaintiff NYSA is a New York, not-for-profit, incorporated membership association with its principal office located at 333 Thornall Street, Suite 3A, Edison, New Jersey

08837.  NYSA is an association of marine terminal operators, stevedore companies, and ocean carriers engaged in international trade and commerce in the NY-NJ Port.  NYSA negotiates and administers collective bargaining agreements establishing the terms and conditions of employment of longshore workers represented by Plaintiff ILA.  NYSA administers these labor contracts on behalf of ocean carriers, marine terminal operators, stevedore companies, and other companies that employ approximately 3,500 of the approximately 6,000 workers who are required to be registered by the Commission in order to work in the NY-NJ Port.

5.      Plaintiff MMMCA is a not-for-profit corporation duly registered under and by virtue of the laws of the State of New York with its principal office located at 301 Route 17 North, Rutherford, New Jersey 07070.  The MMMCA is an association of maintenance-contractor employers that negotiates and administers on their behalf collective bargaining agreements establishing the terms and conditions of employment of M&R workers and lashers represented by Plaintiffs ILA Local 1804-1 and ILA Local 1814 (MMCA-ILA CBA).  The MMMCA's members employ approximately 1,000 workers who are required to be registered by the Commission in order to work in the NY-NJ Port.

6.      Plaintiff ILA is an unincorporated association and labor organization within the purview of LMRA § 2(5), 29 U.S.C.A. § 152(5) (West 1998), which represents employees in an industry affecting commerce.  Its principal office is located at 5000 West Side Avenue, North Bergen, New Jersey 07047.  The ILA is the exclusive collective-bargaining representative certified by the National Labor Relations Board for all longshoremen and other waterfront workers employed by NYSA's members.  The ILA, on behalf of its affiliated locals, negotiates, enters into, and administers with NYSA the NYSA-ILA Collective Bargaining Agreement

4

(NYSA-ILA CBA), which prescribes the terms and conditions of employment for longshoremen and checkers/clerks in the NY-NJ Port who are on the Deep-Sea Register.

7.     Plaintiff ILA Local 1804-1 is an unincorporated association and a labor organization within the purview of LMRA § 2(5), 29 U.S.C.A. § 152(5) (West 1998), with its principal office located at 5000 West Side Avenue, North Bergen, New Jersey 07047.  ILA Local 1804-1 represents M&R workers who are employed by NYSA's and MMMCA's members in the maintenance and repair of containers, chassis, and cargo-handling equipment predominately on the New Jersey side of the NY-NJ Port.  ILA Local 1804-1 is a party to collective bargaining agreements with NYSA and MMMCA prescribing the terms and conditions of employment for M&R workers, the overwhelming majority of whom are on the "A" Register.

8.     Plaintiff ILA Local 1814 is an unincorporated association and a labor organization within the meaning of Section 2(5) of the LMRA, 29 U.S.C.A. § 152(5) (West 1998), with its principal office located at 70 20th Street, Brooklyn, New York 11232.  ILA Local 1814 represents M&R workers who are employed by NYSA's and MMMCA's members on the New York side of the NY-NJ Port.   ILA Local 1814 is a party to collective bargaining agreements with NYSA and MMMCA prescribing the terms and conditions of employment for M&R workers, the overwhelming majority of whom are on the "A" Register.  ILA Local 1814 also represents Deep-Sea longshoremen covered by the NYSA-ILA CBA.

9.     Defendant Commission is a body corporate and politic created in 1953 by Section 1 of Pub. L. No. 252, 67 Stat. 541, which was enacted by Congress to "grant[] the consent of Congress to a compact between the State of New Jersey and the State of New York known as the Waterfront Commission Compact, and for other purposes." The Commission has its headquarters

at 39 Broadway, 4th Floor, New York, New York 10006.  The Commission also has field offices

located in Brooklyn, New York; Port Newark, New Jersey; and Edison, New Jersey.

## THE WATERFRONT COMMISSION ACT

**1953 Waterfront Commission Compact**

10.     In 1953, the States of New York and New Jersey each adopted laws that would

form the Compact.

11.     The consent of Congress was necessary for the Compact to go into effect.

Without the consent of Congress, the 1953 laws of New York and New Jersey cited above would

have been ineffective because of the prohibition of Article I, Section 10 of the Constitution of the

United States, commonly known as the Compacts Clause.

12.     No other port in the country is subject to the provisions of the Compact or any

similar law.

13.     In *Waterfront Commission of N.Y. Harbor v. Construction & Marine Equip. Co.,*

928 F. Supp. 1388 (D.N.J. 1996), the District Court held that Article I, Section 10 of the

Constitution of the United States required the submission of the Compact to Congress for its

consent.

14.     As a result of Congressional consent, the Compact constitutes federal law.  As a

result of Congressional consent in the form of Pub. L. No. 252, 67 Stat. 541 (1953), the Compact

constitutes federal statutory law.

15.     The Compact provides for the delegation of certain regulatory powers to the

Commission, including those related to the registration of longshore workers as set forth in

Articles VIII and IX of the Compact.  The Compact establishes regulatory mechanisms to

regularize longshore employment.  It empowers the Commission to maintain a register of

individuals eligible for employment on the waterfront and to remove from the register, or decasualize, in compliance with standards established by the Commission individuals who do not apply regularly for work.   *See* N.J. STAT. ANN. §§ 32:23-27 — 32:23-38 (West 1990); N.Y. UNCONSOL. LAWS §§ 9827 — 9838 (McKinney 2002).

16.   The text of the Compact provides for limitations on the use of powers delegated to the Commission, including those set forth in Article XV, Sections 1 and 2 of the Compact.

17.   Article XV, Section 1 states:

> This compact is not designed and shall not be construed to limit in any way any rights granted or derived from any other statute or any rule of law for employees to organize in labor organizations, to bargain collectively and to act in any other way individually, collectively, and through labor organizations or other representatives of their own choosing.

67 Stat. at 557.

18.   Article XV, Section 2 states:

> This compact is not designed and shall not be construed to limit in any way any rights of longshoremen . . . . or their employers to bargain collectively and agree upon any method for the selection of such employees by way of seniority, experience, regular gangs or otherwise; provided, that such employees shall be licensed or registered hereunder and such longshoremen . . . . shall be hired only through the employment information centers established hereunder and that all other provisions of this compact be observed.

67 Stat. at 557.

## POST-CONSENT LEGISLATION

### 1966 Legislation

19.   From its inception in 1953 the Commission exercised its powers under the Compact to eliminate the tremendous oversupply of longshore labor.  By 1965, the Commission

had removed from the register more than 25,000 casual workers.  There still remained, however, a workforce numbering in the tens of thousands.

20.     In the 1964 NYSA-ILA CBA, the ILA agreed to allow reductions in manning because of productivity gains made possible by the new technology of containerization in exchange for management's promise to adopt a Guaranteed Annual Income (GAI) Program to compensate displaced workers.

21.     The legislative response to the GAI Program was the adoption in 1966 by each of the States of New York and New Jersey of the closed-register statute, often referred to as section 5-p, *see* N.J. STAT. ANN. § 32:23-114 (West 1990 & Supp. 2013); N.Y. UNCONSOL. LAWS § 9920 (McKinney 2002).  On its face, the closed-register statute delegated power to the Commission to open and close the longshoremen's register, thereby regulating the size of the waterfront labor force.  The register was promptly closed in 1966, and but for two openings in the late 1960's and one in 1978, it remained closed for more than three decades.  By keeping the register closed no new employees could be brought into the industry.  This assured that current members of the workforce would perform the work rather than receive GAI benefits, while new members of the workforce performed the work.

**1969 Legislation**

22.     In 1969 New York and New Jersey passed statutes to broaden the definition of longshoreman to include a new class of registered longshoremen known as "A" registrants.  *See* N.J. STAT. ANN. § 32:23-85(6) (West 1990); N.Y. UNCONSOL. LAWS § 9905(6) (McKinney 2002).  The overwhelming majority of "A" registrants are M&R workers.

23.     The closed-register statute does not apply to "A" registrants.  On its face, it applies only to those employed at marine terminals to perform work involving the loading and

off-loading of ships, known as Deep-Sea longshoremen.  Indeed, in *Bozzi v. Waterfront Comm'n of N.Y. Harbor*, No. 90 CIV 926, 1994 WL 606043, at *7-8 (S.D.N.Y. 1994), the Commission successfully argued that the closed-register statute did not apply to the "A" Register and represented that the Commission had "administratively excluded" "A" registrants from the closed-register statute.

**1999 Legislation**

24.    At the request of the stevedoring industry, labor shortages were repeatedly remedied by resolutions adopted by the Commission, which authorized temporary workers, who were later permanently admitted to the longshoremen's register by legislative amendments.  *See, e.g.,* N.J. STAT. ANN. § 32:23-114(4)(c),(d),(e),(f),(g) (West 1990 & Supp. 2013); N.Y. UNCONSOL. LAWS § 9920(5)(c),(d),(e),(f),(g) (McKinney 2002).    In 1999, each of the Legislatures of New York and New Jersey amended section 5-p to permit controlled openings to include in the register individuals sponsored by stevedore-company employers of Deep-Sea longshore workers.

25.    Under the terms of the 1999 legislation, however, stevedore-company employers cannot hire any new employee until the Commission has reviewed and approved the joint recommendation of the employers' collective-bargaining representative and the labor organization representing their employees, namely NYSA and the ILA, respectively.    This recommendation must indicate the number of new registrants sought by job category (*e.g.,* checker, container-equipment operator) and the number of new registrants to be allocated to each sponsoring employer.

26.    The Commission's sole statutory role, once it has determined the number of additional workers needed by the industry, is to register the workers selected by the employers

provided these workers have passed criminal background checks administered by the Commission.

27.     The 1999 legislation contained a certification provision requiring the sponsoring employer to certify that the selection of the sponsored persons "was made in a fair and non-discriminatory basis in accordance with the requirements of the laws of the United States and the states of New York and New Jersey dealing with equal employment opportunities." *See* N.J. STAT. ANN. § 32:23-114(1) (West Supp. 2013); N.Y. UNCONSOL. LAWS § 9920(4) (McKinney 2002).

28.     From 2000 through 2010 there were nine openings of the Deep-Sea Register that added approximately 2,000 new employees.  All those employees were referred by the ILA. Not once did the Commission ever reject any of the section 5-p certifications made by sponsoring employers with respect to those employees.

29.     The terms of the 1999 legislation do not purport to cause section 5-p to apply to "A" registrants and for the next 14 years the Commission did not apply section 5-p to them.

### BACKGROUND FACTS

**The NYSA-ILA Collective Bargaining Agreement**

30.     Earlier this year NYSA and the ILA agreed upon a new six-year collective bargaining agreement.  The focal point of the contract negotiations was getting the NY-NJ Port prepared to handle increased cargo volumes, so that ocean carriers would be assured that stevedore companies in the NY-NJ Port would be able to offer efficient and cost-effective stevedoring services and thus the carriers would continue to utilize the NY-NJ Port as the preeminent port on the East Coast.  Under the auspices of the Federal Mediation and Conciliation Service, NYSA and ILA agreed upon increased productivity standards, a new relief-gang system,

and the adoption of a recruitment and hiring program that would provide the additions to the workforce needed to handle the increased volumes.  To save costs, the new NYSA-ILA CBA provides for an enhanced window-pension package for longshore workers with more than 25 years in the industry.  To be eligible for that package, the workers must cease employment in the industry by the earlier of April 1, 2014, or when replacement workers are found and they have been released from employment.  Approximately 250 workers will be retiring under this window package.  In addition to replacing these retirees, the industry requires another 290 replacements for the workers who retired between 2007 and 2012.

**NYSA-ILA Recruitment & Hiring Plan**

31.    In the new NYSA-ILA CBA, NYSA and the ILA agreed to a new Recruitment and Hiring Plan (Hiring Plan) for Deep-Sea longshoremen and checkers/clerks.  A copy of that plan is attached as **Exhibit 1**.  Under that plan, 51% of the new workers to be hired will be comprised of honorably discharged military veterans, 25% of ILA referrals, and 24% of referrals from NYSA and its members.

**Request for an Opening of the Deep-Sea Register**

32.    On September 9, 2013, NYSA and the ILA submitted by letter from the NYSA-ILA Contract Board the industry's request to add 682 employees to the Deep-Sea Register: 532 longshoremen and 150 checkers and clerks. A copy of that letter is attached as **Exhibit 2.**  In furtherance of prior discussions between NYSA and the Commission, the collective-bargaining parties accepted the Commission's suggestion that the Commission open the register on its own initiative, so that a public hearing would be obviated and the industry could hire new employees quickly.

33.     The Contract Board's letter (Exhibit 2) provided an explanation of (a) the number of employees required by each employer by craft, (b) the need for new workers due to the net loss of 245 workers between 2007 and 2012 and the anticipated retirement of an additional 250 workers by April, (c) the average daily shortage of approximately 298 list employees, with an additional shortage of 68 gang positions and 16 gang-driver positions, (d) the need for the industry to hire new workers in a metered sequence of 150 longshoremen and 25 checkers per month to allow for proper training without creating a backlog of individuals waiting to be trained, and (e) the need to have the Commission grant temporary registrations to the new employees so that the employers can evaluate the job performance of the new employees and determine whether replacements are necessary.

**The Commission's Determination 35**

34.     On December 3, 2013, the Commission issued its Determination 35, a copy of which is attached as **Exhibit 3**, in which the Commission states that it will accept a total of only 150 applications for longshore positions and only 75 applications for checker positions, compared to the requested and previously accepted numbers of 532 longshoremen and 150 checkers, that the Commission will review the applications "to determine their appropriate referral source [] and to ensure that the new hires are in accordance with the goals and percentages set forth in the Hiring Plan," that a representative of the NYSA-ILA Contract Board must "certify[] that: (1) he or she has personal knowledge of the facts concerning the recruitment, referral, selection and sponsorship of [the applicant] and (2) the selection of the person so sponsored was made in a fair and nondiscriminatory basis in accordance with the requirements of the laws of the United States and the States of New York and New Jersey dealing with equal employment opportunities," that "the offering of a false sponsorship letter for

filing shall be punishable under N.Y. Penal Law § 175.35," that the new hires "shall be assigned 'V' seniority," that no new hires "may be offered employment opportunities" until all previously registered longshoremen have been offered employment, and that a new hire "shall not be eligible for permanent inclusion in the Longshoremen's Register until such time as he or she is approved by the Commission for addition to and placement on a regular list."

35.    Before the Commission issued Determination 35, NYSA had submitted to the Commission sponsorship letters from its members that are stevedore-company employers, which included the sponsoring employers' section 5-p certifications, for seven military veterans whom the Commission had previously "prequalified."  After issuing Determination 35, the Commission informed NYSA that it was rejecting the certifications for those veterans because the certifications do not comply with the requirements of Determination 35.  Upon information and belief, some of these veterans had resigned their employment, expecting that they would be brought into the industry, once the Commission received the sponsorship letters.

**Commission Amends Hiring Regulations for M&R Workers**

36.    Over the years many of NYSA's stevedore-company members had established separate maintenance-contractor subsidiaries to employ "A" registrants for M&R work because the Commission maintained a policy that did not permit NYSA's members to hire "A" registrants.  These subsidiaries became members of MMMCA and are parties to the MMMCA-ILA CBA.   There are currently approximately 600-700 "A" registrants employed by the maintenance-contractor subsidiaries of NYSA's members.

37.    The MMMCA-ILA CBA establishes the terms and conditions of employment for all M&R employees and lashers in the NY-NJ Port employed by members of MMMCA.  For many decades the agreement has provided that the union is the exclusive source of new referrals.

13

38.     In May 2013 the Commission mentioned to NYSA that it had determined on its own that NYSA's members would now be permitted to hire "A" registrants.

39.     On July 23, 2013, after collective-bargaining negotiations between NYSA and the ILA, the NYSA-ILA CBA was amended to adopt virtually the same hiring procedure contained in the MMMCA-ILA CBA that has been used for many decades for the hiring of "A" registrants. The provision in the NYSA-ILA CBA states as follows:

> With respect to new employees, the Employer shall notify the Union of the number and classifications of employees required.  It shall be the responsibility of the Union to furnish the necessary employees requested by the Employer.  The Employer shall have the right to determine the competency and qualifications of the employees referred.  In the event that the Union is unable to supply qualified employees within thirty (30) days, then the Employer may secure the employees from any available source provided they abide by the Union Security Clause and Checkoff provisions set forth in Article II, section 3 of this Agreement.

40.     On August 26, 2013, the Commission sent NYSA an e-mail advising that a proposed amendment to Section 4.4(d) of the Commission's Rules and Regulations (hereinafter Rule 4.4(d)) would be presented to the Commissioners for adoption on September 9, 2013.  Rule 4.4(d) prescribes the procedure for the inclusion of new employees into the "A" Register.  The e-mail attached the text of the following  proposed amendment:

> The sponsoring employer shall submit a letter setting forth the name and address of the person, and the labor service(s) to be performed, and shall certify that the selection of the persons so sponsored was made in a fair and nondiscriminatory basis in accordance with the requirements of the laws of the United States and the States of New York and New Jersey dealing with equal employment opportunities.

41.     By letter dated September 6, 2013, NYSA through its counsel, The Lambos Firm, LLP, submitted comments in opposition to the certification requirement in the Commission's proposed amendment.  In sum, NYSA's comments stated that the certification requirement (a) would alter the longstanding methodology for the hiring and registration of "A" registrants that

has prevailed in the industry since 1969, (b) lacks statutory authority, and (c) conflicts with the NYSA members' obligations under the NYSA-ILA CBA.

42.     In an effort to permit its members to comply with both their obligations under the NYSA-ILA CBA and the Commission's proposed new rule, NYSA proposed the following amendment as an alternative to the Commission's proposed amendment:

> The sponsoring employer shall submit a letter setting forth the name and address of the employee, and the labor service(s) to be performed, and shall certify that to the extent of its involvement the hiring of the employee was fair and nondiscriminatory in accordance with the requirements of the laws of the United States and the States of New York and New Jersey dealing with equal employment opportunities.

43.     Since 1966 MMMCA's members have hired "A" registrants pursuant to the MMMCA-ILA CBA and after registration of the sponsored employees by the Commission and not once were any of them required to submit a certification to the Commission in connection with their hiring of "A" registrants.  They were certainly affected by the Commission's proposed amendment.  Yet, the Commission did not notify MMMCA of the pending adoption of the proposed new regulation.  Instead, MMMCA was informed of the pending rule by NYSA. MMMCA submitted comments by letter dated September 9, 2013, in which it also opposed the certification requirement and proposed an amendment substantially similar to NYSA's alternative.

44.     Notwithstanding the comments from the representatives of the affected employers, the Commission adopted its proposed amendment without any change on September 9, 2013.  The Commission stated that it had already adopted the amendment before it had received MMMCA's comments.

45. The Commission informed employers of "A" registrants that in order to hire individuals for the "A" register they must provide a certification that does not deviate from the language of the amended regulation and for that certification to be accepted by the Commission the employers could not continue to select applicants for "A" registration through the union-referral system set forth in their collective bargaining agreements.

46. By letter dated October 16, 2013, the Commission informed NYSA and ILA of two resolutions.  One of them, which is attached as **Exhibit 4**, recites that the Commission previously had determined that contract provisions set forth in the NYSA-ILA and MMMCA-ILA collective bargaining agreements relating to the hiring procedures for "A" registrants "promote various conditions . . . including . . . the lack of a systematic method of hiring, irregularity of employment, the lack of adequate information regarding the availability of employment, and the selection of employees by those who are neither responsive nor responsible to the employers" (the Secret Determination).

47. The Secret Determination was made without notice to any of the Plaintiffs and without any opportunity for them to be heard.

48. Subsequent to the filing of the original Complaint in this action, Plaintiffs NYSA and ILA finally obtained a copy of the Secret Determination on December 16, 2013.  It was attached as an exhibit in support of the Commission's motion to dismiss the original Complaint. This document is the Commission's resolution dated September 9, 2013 adopting the amendment to Rule 4.4(d).  A copy of this resolution is attached as **Exhibit 5** to this Amended Complaint.

## COUNT I

### The Statutory Authority For The Commission's
### Amendment To Rule 4.4(d) Lacks Congressional
### Consent And Is Therefore Unconstitutional

49.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 48**,** inclusive, of this Amended Complaint, as though fully set forth at length herein.

50.     The members of Plaintiffs NYSA and MMMCA have been and will continue to be impeded and impaired in their business operations by the Commission's amendment to Rule 4.4(d).

51.     The amendment to Rule 4.4(d) is derived almost *verbatim* from the certification provision in section 5-p.  It has no counterpart in the Compact.

52.     The term "compact" in the Compact is defined to mean "this compact and rules or regulations lawfully promulgated thereunder."  67 Stat. at 543.

53.     Article XVI of the Compact provides as follows:

> Amendments and supplements to this compact *to implement the purposes thereof* may be adopted by the action of the Legislature of either State concurred in by the Legislature of the other.

67 Stat. at 557 (emphasis added).

54.     Article IV, Section 7 of the Compact delegates to the Commission limited rulemaking authority:

> To make and enforce such rules and regulations as the commission may deem necessary to effectuate *the purposes of this compact* or to prevent the circumvention or evasion thereof . . . .

67 Stat. at 544 (emphasis added).

55.     Thus, any amendment or supplement to the Compact to be valid must implement a purpose that appears in the Compact, Pub. L. 252, ch. 407, Section 1 (Aug. 12, 1953).  If it does not, it lacks congressional approval.

56.     And any regulation that the Commission issues must effectuate a purpose appearing in the Compact, Pub. L. 252, ch. 407, Section 1 (Aug. 12, 1953).  If it does not, it is not a valid regulation.

57.     The purposes of the Compact did not include requiring employers to certify that the selection of longshoremen to be registered complied with federal and state laws dealing with equal employment opportunities, nor did the purposes of the Compact include enhancement of the diversity of the registered workforce of longshoremen.

58.     Unlike the original legislation in 1966 enacting section 5-p, neither the certification provision in the 1999 Legislation amending section 5-p nor the language of the Commission's September 9, 2013 amendment to Rule 4.4(d) implement or effectuate the purposes of the Compact. Accordingly, the certification provision in the 1999 Legislation and the amendment to Rule 4.4(d) lack Congressional consent and are unconstitutional.

59.     Accordingly, Plaintiffs are entitled to (1) injunctive relief preventing any attempt by the Commission to continue to enforce the certification provision of section 5-p and to a declaration that the certification provision is void and of no effect and (2) injunctive relief preventing any attempt by the Commission to continue to enforce the amendment to Rule 4.4(d) and to a declaration that the amendment to Rule 4.4(d) is void and of no effect.

## COUNT II

### The Commission's Amendment To
### Rule 4.4(d) Lacks Statutory Authority

60.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 59, inclusive, of this Amended Complaint, as though fully set forth at length herein.

61.     The Commission's purported authority for its amendment to Section 4.4(d) of its Rules and Regulations is section 5-p.

62.     But neither section 5-p nor any other provision of law authorizes the Commission to require employers to submit a certification with respect to the hiring of "A" registrants.

63.     Indeed, when the Legislatures of the States of New York and New Jersey adopted their wholesale amendment and restatement of section 5-p in 1999, they expressly stated that section 5-p is limited to the Deep-Sea Register.

64.     Moreover, for decades the Commission has consistently maintained the position that section 5-p does not apply to "A" registrants.  Indeed, in *Bozzi v. Waterfront Comm'n of N.Y. Harbor*, No. 90 Civ. 0926, 1994 WL 606043, at *5, *7-10 (S.D.N.Y. Nov. 3, 1994), the court accepted the Commission's representation that "it has consistently interpreted [section 5-p] as applying only to the Deep-Sea longshoremen's register and not to the A Register."

65.     The amendment to Rule 4.4(d) lacks statutory authority because the certification requirement of section 5-p does not apply to "A" registrants, who are the sole subject of Rule 4.4(d).

66.     Plaintiffs are entitled to injunctive relief preventing any attempt by the Commission to continue to enforce the amendment to Rule 4.4(d) and to a declaration that the amendment to Rule 4.4(d) is void and of no effect.

## COUNT III

**The Commission Has Violated The
Compact By Interfering With Plaintiffs'
Collective-Bargaining Rights In Connection
With The Certification Requirement
In The Amendment To Rule 4.4(d)**

67.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 66, inclusive, of this Amended Complaint, as though fully set forth at length herein.

68.     Article XV of the Compact expressly prohibits the Commission from interfering "in any way [with] any rights of longshoremen . . . or their employers to bargain collectively and agree upon any method for the selection of such employees by way of seniority, experience, regular gangs or otherwise."  *See* 67 Stat. at 557, *codified at* N.J. STAT. ANN. § 32:23-68 (West 1990) *and at* N.Y. UNCONSOL. LAWS § 9868 (McKinney 2002).

69.     The Commission interprets the certification provision of the amendment to Rule 4.4(d) to permit the Commission to outlaw the formation of an employer-employee relationship for work as a longshoreman between any employer and any individual unless the employer can certify that the selection of the individual "was made in a fair and nondiscriminatory basis in accordance with the requirements of the laws of the United States and the States of New York and New Jersey dealing with equal employment opportunities."

70.     Under the Commission's interpretation the certification is invalid unless the employer is involved in both the recruitment and selection of the individual.  Thus, under the Commission's interpretation, the certification is invalid if the labor union refers the applicants from which the employer selects the person to be hired.

71.     It is the Commission's position that in order to hire individuals for the "A" Register employers must provide a certification that does not deviate from the amendment to

Rule 4.4(d) and for that certification to be accepted by the Commission the employers cannot continue to select applicants for "A" registrants through the union-referral system set forth in the NYSA-ILA and MMMCA-ILA collective bargaining agreements.

72.    Since the Compact does not give the Commission jurisdiction over any union, the Commission is seeking to remove Plaintiffs ILA, ILA Local 1804-1, and ILA Local 1814 from the employee-referral process by refusing to allow employers to hire new workers referred by them, thereby requiring employers to choose between breaching their collective bargaining agreements or seeking to renegotiate them.  The consequences of either course of action will cause employers, including the members of NYSA and MMMCA, to suffer irreparable injury in the form of unfair labor practice charges, actions for breach of contract, concessions during renegotiations, or other injuries that cannot be quantified.

73.    The effect of the Commission's interpretation of the certification requirement in the amendment to Rule 4.4(d) would be to interfere with the right to bargain collectively established by the Compact and other federal statutory law and is based on a construction of the Compact that is expressly prohibited by Article XV, Section 2 of the Compact.

74.    Based on each of the foregoing, the Commission has violated the Compact's express safeguards of Plaintiffs' collective-bargaining rights by interfering with their right to bargain collectively and to administer the terms of the NYSA-ILA CBA and the MMMCA-ILA CBA.

75.    Plaintiffs are entitled to a declaration that the Commission's interpretation of the certification requirement in the amendment to Rule 4.4(d) violates its own Compact and to temporary and permanent injunctive relief prohibiting application of that interpretation.

## COUNT IV

**The Commission's Interpretation Of The Amendment To
Rule 4.4(d) Violates National Labor Policy By Attempting
To Dictate The Substantive Terms Of Plaintiffs'
Collective Bargaining Agreements**

76.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 75, inclusive, of this Amended Complaint, as though fully set forth at length herein.

77.     The well-established labor policy of the United States prohibits both state governments and the federal government from attempting to influence or dictate the substantive terms of collective bargaining agreements.

78.     The Commission's application of the amendment to Rule 4.4(d) requires the members of Plaintiffs NYSA and MMMCA to eschew the union-referral systems of their labor contracts in order to employ "A" registrants.

79.     Plaintiffs are entitled to injunctive relief preventing any attempt to continue to enforce the Commission's interpretation of the amendment to Rule 4.4(d), and to a declaration that its interpretation attempts to influence and dictate the substantive terms of Plaintiffs' collective bargaining agreements, thus violating the public policy of the United States.

## COUNT V

**The Primary And Exclusive Jurisdiction Doctrine
Precludes The Commission From Attempting
To Decide And Remedy Perceived Violations Of
Federal And State Employment-Discrimination Laws**

80.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 79, inclusive, of this Amended Complaint, as though fully set forth at length herein.

81.     Since the inclusion of the certification in section 5-p in 1999, the Commission has never questioned the validity of the certifications submitted by the employers.  The certification

was first adopted by the Commission itself in a resolution issued in 1978 providing for the temporary registration of 750 deep-sea longshoremen to be selected and referred to the Commission by the NYSA-ILA Contract Board "on a fair and non-discriminatory basis and in accordance with the requirements of the laws of the United States and the States of New York and New Jersey dealing with equal employment opportunities."  This certification was designed to shield the Commission from liability in third-party lawsuits against the Commission for employment discrimination.

82.     Now the Commission is attempting to use the certification as a sword to deny registration to new applicants chosen in a manner the Commission believes violates the equal-employment-opportunity laws.

83.     Federal and state governments have established agencies that are statutorily mandated to determine purported violations of the equal-employment-opportunity laws.  These agencies have exclusive and primary jurisdiction to decide employment-discrimination charges.

84.     If the Commission believes that there has been a violation of federal or state equal-employment-opportunity law, the Commission should refer the matter to the appropriate agency created to enforce the particular law that in the Commission's opinion has been violated.

85.     Plaintiffs are entitled to an injunction prohibiting the Commission from using federal or state equal-employment-opportunity laws, which it is not authorized to enforce, to deprive members of NYSA or MMMCA of their right to hire workers that they desperately need, and a declaration that the Commission lacks jurisdiction to determine violations of federal or state equal-employment-opportunity laws.

**COUNT VI**

**Determination 35 Is Arbitrary, Capricious, And An
Abuse Of Discretion And Provides No Basis For
Reducing The Number Of Longshoremen And
Checkers That Will Be Hired By NYSA's Members**

86.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 85, inclusive, of this Amended Complaint, as though fully set forth at length herein.

87.     Section 5-p of the Act specifies procedures for adding persons to the Deep-Sea Register.  *See* N.J. STAT. ANN. § 32:23-114 (West Supp. 2013); N.Y. UNCONSOL. LAWS § 9920 (McKinney 2002).

88.     Pursuant to Section 5-p, the Commission is empowered to issue "determinations" to accept applications to the Deep-Sea Register.  *See* N.J. STAT. ANN. § 32:23-114 (West Supp. 2013); N.Y. UNCONSOL. LAWS § 9920 (McKinney 2002).

89.     Pursuant to Section 5-p, the Commission's determinations may be made by the Commission either on the Commission's own initiative, or upon joint recommendation of the NYSA and the ILA, or by a petition from an individual employer who is not represented by NYSA.   *See* N.J. STAT. ANN. § 32:23-114(1) (West Supp. 2013); N.Y. UNCONSOL. LAWS § 9920(1) (McKinney 2002).

90.     Pursuant to Section 5-p(3), any determination by the Commission as to the number of persons to be added to the Deep-Sea Register  must be made upon a record and is subject to judicial review for being "arbitrary, capricious and an abuse of discretion."  *See* N.J. STAT. ANN. § 32:23-114(3) (West Supp.  2013); N.Y. UNCONSOL. LAWS § 9920(3) (McKinney 2002).

91.     On September 9, 2013, Plaintiffs NYSA and ILA jointly recommended that 532 longshoremen and 150 clerks and checkers be added to the Deep-Sea Register.  At that time,

NYSA and the ILA further advised the Commission that the industry needed to add these additional employees on a metered basis at the rate of 150 longshoremen and 25 checkers per month in order to allow for proper training without creating a backlog of individuals waiting to be trained.

92.     On December 3, 2013, the Commission issued Determination 35, announcing that it will approve a total of 150 longshoremen and 75 checkers.

93.     The Commission had no record and therefore no factual basis for its decision to reject the joint recommendation of NYSA and ILA.

94.     Accordingly, the Commission's Determination 35 is arbitrary, capricious, and an abuse of discretion.

95.     Plaintiffs NYSA and ILA are entitled to injunctive relief directing the Commission to accept for inclusion in the Deep-Sea Register 532 longshoremen and 150 checkers and to rescind that portion of Determination 35 that concludes otherwise.

**COUNT VII**

**Determination 35 Violates Article XV Of The Compact By
Interfering With Plaintiffs' Collective-Bargaining Rights**

96.     Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 95, inclusive, of this Amended Complaint, as though fully set forth at length herein.

97.     Article XV of the Compact expressly prohibits the Commission from limiting "in any way any rights of longshoremen . . . or their employers to bargain collectively and agree upon any method for the selection of such employees by way of seniority, experience, regular gangs or otherwise."  *See* 67 Stat. at 557, *codified at* N.J.S.A. § 32:23-68 (West 1990) *and at* N.Y. UNCONSOL. LAWS §9868 (McKinney 2002).

98.    Determination 35 contains the following orders:

- The Commission will for all new hires "determine their appropriate referral source, and to ensure that the new hires are in accordance with the goals and percentages set forth in the Hiring Plan";

- Any individual temporarily included in the Deep-Sea Register, whether as a longshoremen or a checker, "shall be assigned 'V' seniority";

- Any individual temporarily included in the Deep-Sea Register, whether as a longshoremen or a checker, "may be offered employment opportunities" only after all previously registered longshoremen have been offered employment; and

- Any individual temporarily included in the Deep-Sea Register, whether as a longshoremen or a checker, shall not be eligible for permanent inclusion in the Deep-Sea Register until that employee is approved by the Commission for addition to and placement on an employer's Regular List.

99.    The provisions in Determination 35 dealing with interpretation, application, and implementation of the collectively-bargained Hiring Plan, the assignment of seniority, and the formulation of hiring rights and priorities are matters of collective bargaining, which Article XV of the Compact prohibits the Commission from limiting in any way.

### COUNT VIII

### The Certification Required By
### Determination 35 Violates Section 5-p

100.    Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 99, inclusive, of this Amended Complaint, as though fully set forth at length herein.

101.    Section 5-p specifies as follows:

Upon the granting of any joint recommendation or petition under this section for the acceptance of applications for inclusion in the

> longshoremen's register, the commission shall accept applications upon written sponsorship from the prospective employer of longshoremen.   The sponsoring employer shall furnish the commission with the name, address and such other identifying or category information as the commission may prescribe for any person so sponsored.  The sponsoring employer shall certify that the selection of the persons so sponsored was made on a fair and non-discriminatory basis in accordance with the requirements of the laws of the United States and the states of New York and New Jersey dealing with equal employment opportunities.

N.J. STAT. ANN. § 32:23-114(1) (West Supp. 2013); N.Y. UNCONSOL. LAWS § 9920(1) (McKinney 2002).

102.   In contravention of the express language of the statute, Determination 35 orders that the certification should be submitted by "a representative of the NYSA-ILA Contract Board directly involved with the administration of the Hiring Plan" instead of by the sponsoring employer.

103.   The Commission has already begun rejecting applications containing certifications by the sponsoring employers as required by the statute because they were not being submitted by Contract Board representatives as prescribed in Determination 35.

104.   The Commission has no authority to require a certification from the Contract Board, since the statute specifically requires such certifications only when the Commission's determination is not on its own initiative but rather upon a joint recommendation or petition and since the statute authorizes certifications only when submitted by the sponsoring employers.

105.   Neither NYSA nor ILA, both of which comprise the Contract Board, is subject to the jurisdiction of the Commission.

106.   Based on the foregoing, the Commission is exceeding its statutory authority by insisting that the certification should come from Contract Board representatives, who also are not subject to the jurisdiction of the Commission.

27

107.    Plaintiffs are entitled to a declaration that the certification in Determination 35 exceeds the Commission's statutory authority and is void and of no effect.

## COUNT IX

### The Commission Lacks Authority To
### Impose A Criminal Penalty For A
### "False Sponsorship Letter"

108.    Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 107, inclusive, of this Amended Complaint, as though fully set forth at length herein.

109.    Determination 35 orders that "such sponsorship letter shall be filed at the offices of the Waterfront Commission [in New York City] . . . and that the offering of a false sponsorship letter for filing shall be punishable under N.Y. PENAL LAW § 175.35."

110.    N.Y. PENAL LAW § 175.35 (McKinney 2010) states,

A person is guilty of offering a false instrument for filing in the first degree when, knowing that a written instrument contains a false statement or false information, and with intent to defraud the state or any political subdivision, public authority or public benefit corporation of the state, he offers or presents it to a public office, public servant, public authority or public benefit corporation with the knowledge or belief that it will be filed with, registered or recorded in or otherwise become part of the records of such public office, public servant, public authority or public benefit corporation.

111.    The Compact provides that a person who violates the provisions of the Compact may be  punished in a manner  provided by the Legislatures of both states.  *See* N.J. STAT. ANN. § 32:23-64 (West 1990); N.Y. UNCONSOL. LAWS § 9864 (McKinney 2002).

112.    The Legislatures of the States of New York and New Jersey have not imposed a criminal sanction for the submission of a "false sponsorship letter."

113.    The certification provision of section 5-p does not include a criminal sanction for the submission of a false certification.  *See* N.J. STAT. ANN. § 32:23-114 (West Supp. 2013); N.Y. UNCONSOL. LAWS § 9920 (McKinney 2002).

114.    The Commission lacks legislative authority to impose a criminal sanction for a purported violation of one of its determinations.

115.    Plaintiffs are entitled to a declaration that the Commission is prohibited from imposing a criminal sanction for the submission of a "false sponsorship letter" and lacks authority to determine that "the offering of a false sponsorship letter for filing shall be punishable under N.Y. Penal Law § 175.35."

## COUNT X

### The Commission's Issuance Of Its Resolution
### Concerning Its Amendment To Rule 4.4(d) Violates
### The Due-Process Rights Of Plaintiffs And Their Members

116.    Plaintiffs repeat and reallege each and every allegation in paragraphs 1 through 115, inclusive, of this Amended Complaint, as though fully set forth at length herein.

117.    On August 26, 2013, the Commission sent NYSA an e-mail advising that the Commission was contemplating amending Rule 4.4(d).  That e-mail attached the text of the proposed amendment but failed to include any information concerning the questions to be determined by the Commission in connection with its consideration of that amendment.

118.    By letters dated September 6, 2013, and September 9, 2013, NYSA and MMMCA, respectively, submitted comments to the Commission in opposition to the proposed amendment.  Those comments addressed the fact that the certification requirement (a) would alter the longstanding methodology for the hiring and registration of "A" registrants that has prevailed in the industry since 1969, (b) lacks statutory authority, and (c) conflicts with the NYSA members' obligations under the NYSA-ILA CBA.

119.    The Commission adopted its amendment to Rule 4.4(d) on September 9, 2013.  In doing so, it issued a resolution in which it states that it had reviewed the hiring procedures for

"A" registrants under the Plaintiffs' collective bargaining agreements and that it had concluded that (a) those hiring procedures purportedly promote conditions enumerated in the Findings and Declarations set forth in Part I, Article I of the Waterfront Commission Act, such as the lack of a systematic method for hiring, irregularity of employment, the lack of adequate information as to the availability of employment, and the selection of employees by those who are neither responsive nor responsible to the employers and (b) the amendment to Rule 4.4(d) is purportedly needed to prevent the circumvention or evasion of the Waterfront Commission Act by ensuring that the hiring procedures in the Plaintiffs' collective bargaining agreements are consistent with the provisions of the Waterfront Commission Act.

120.    The Commission's resolution penalizes the Plaintiffs and constitutes an adjudicatory determination invalidating provisions in the NYSA-ILA CBA and the MMMCA-ILA CBA for which the Commission failed to provide notice to the interested parties of its intent to determine the validity of those collectively-bargained provisions, hold hearings at which the interested parties could provide evidence and argument in defense of their collective bargaining agreements, or otherwise provide notice of its consideration under the Waterfront Commission Act of the purported unlawfulness of the hiring procedures contained in the NYSA-ILA CBA and the MMMCA-ILA CBA.

121.    The hiring procedures set forth in Plaintiffs' collective bargaining agreement constitute a property right for purposes of the Fifth and Fourteenth Amendments to the Constitution of the United States.

122.    The procedure used by the Commission to issue the resolution amending Rule 4.4(d) fails to comport with the due-process rights guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States.

123.    Plaintiffs are entitled to a declaration that the resolution amending Rule 4.4(d) issued by the Commission does not comport with the due-process rights guaranteed by the Fifth and Fourteenth Amendments to the Constitution of the United States and is, therefore, null and void.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs request that this Court issue a judgment:

a.    Granting the declaratory and injunctive relief requested in each of the Counts;

b.    Retaining jurisdiction over this action to the extent necessary to ensure compliance with this Court's orders; and

c.    Granting such other and further relief as this Court may deem just and proper.

**Dated:** January 6, 2014

THE LAMBOS FIRM, LLP

By:    s/ James R. Campbell
       James R. Campbell
       599 Avenue C
       Bayonne, New Jersey 07002
       (201) 823-1000

          and

       Donato Caruso
       The Lambos Firm, LLP
       303 South Broadway, Suite 410
       Tarrytown, New York 10591
       (212) 943-2470

       *Counsel for Plaintiff*
       *New York Shipping Association, Inc.,*

MARRINAN & MAZZOLA MARDON, P.C.

By:    s/ John P. Sheridan
       Kevin Marrinan
       John P. Sheridan
       26 Broadway, 17th Floor
       New York, New York 10004
       (212) 425-3240

       *Counsel for Plaintiffs*
       *International Longshoremen's*
       *Association, AFL-CIO and*
       *Local 1814, International*
       *Longshoremen's Association, AFL-CIO*

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By:    s/ Edward Cerasia II
       Edward Cerasia II
       Ronald Kreismann
       1745 Broadway, 22nd Floor
       New York, New York 10019
       (212) 492-2500

       *Counsel for Plaintiff*
       *Metropolitan Marine Maintenance*
       *Contractors Association, Inc.*

DAGGETT, KRAEMER & GJELSVIK

By:    s/ George T. Daggett
       George T. Daggett
       328 D Sparta Avenue
       Sparta, New Jersey 07871
       (973) 729-2117

       *Counsel for Plaintiff*
       *Local 1804-1, International*
       *Longshoremen's Association, AFL-CIO*

*A0025572*

**EXHIBIT 1**

# MEMORANDUM OF SETTLEMENT
# OF LOCAL CONDITIONS IN THE
# PORT OF NEW YORK AND NEW JERSEY

This **MEMORANDUM OF SETTLEMENT** entered into this 28th day of August, 2013, by and between **NEW YORK SHIPPING ASSOCIATION, INC.** ("NYSA") on behalf of its members and the **INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO** ("ILA") on behalf of itself and its affiliated locals representing longshoremen, clerks, checkers, maintenance workers and all other craft employees in the Port of New York and New Jersey ("PONY-NJ") settles all local conditions under the NYSA-ILA Collective Bargaining Agreement on the following basis effective, except where otherwise provided herein, on October 1, 2012, and together with the Master Contract between the ILA and the UNITED STATES MARITIME ALLIANCE LIMITED ("USMX") that will go into effect on October 1, 2012, establishes for the six-year period ending September 30, 2018, the terms and conditions of employment for all craft employees in the PONY-NJ covered by NYSA-ILA Collective Bargaining Agreement:

The following provisions shall be incorporated into the NYSA-ILA Collective Bargaining Agreement (NYSA-ILA CBA):

I.   PENSIONS

    A.   SPECIAL WINDOW PENSION

       1.   Working pensioners and employees who have a minimum of 25 years of credited service as of April 1, 2014, and who are actively employed under the NYSA-ILA CBA as of April 12, 2013, shall be entitled to receive a special window pension in the amount of One Hundred Sixty ($160.00) dollars per month for each year of credited service provided (a) they give written notification to the NYSA-ILA Pension Trust Fund (PTF) of their selection of the special window pension by June 11, 2013, (b) they remain employed in the longshore industry until the earlier of April 1, 2014, or the date upon which they are released from employment by NYSA, and (c) they actually retire and terminate their employment in the longshore industry.

       2.   Former hiring agents who return to active employment in the longshore industry under the NYSA-ILA CBA prior to January 1, 2014, and who have a minimum of 25 years of credited service as of April 1, 2014, shall be entitled to receive a special window pension in the amount of One Hundred Sixty ($160.00) dollars per month for each year of credited service provided (a) they give written notification to PTF of their selection of the special window pension by December 31, 2013, (b) they remain employed in the longshore industry until the earlier of April 1, 2014, or the date upon which they are released from employment by NYSA, and (c) they actually retire and terminate their employment in the industry. Effective January 1, 2014, Hiring Agents are removed from the definition of "Employee" in Article II, section 1(b)(1)

C.   PRODUCTIVITY COMMITTEE

1.   The NYSA-ILA Productivity Committee shall establish processes and procedures to achieve the productivity standard and the implementation of the new Relief Gang System and to consider any alternative methods to achieve the productivity standard.

2.   The NYSA-ILA Productivity Committee shall also have the authority to determine what actions would be appropriate when individuals or gangs fail to meet the productivity standard.

3.   When an Employer and an ILA local cannot mutually agree on filling gang vacancies, the NYSA-ILA Productivity Committee shall resolve the dispute.

V.   RECRUITMENT AND HIRING

A.   RECRUITMENT

1.   The selection process for new hires will include three designated referral sources: Military Veterans (51%), ILA (25%), and NYSA/Employers (24%). With respect to military veterans, recent efforts to recruit and hire veterans who served in the War on Terror have succeeded in hiring a number of new employees in the Port. Experience has shown that returning veterans already possess many of the skills that are crucial to longshore work. Moreover, veterans are used to working under adverse weather conditions — another essential requirement for longshore work in the Port.

2.   A Recruitment Committee will be established to create the pool of veterans from the NY-NJ-PA Metropolitan Area, the region where most of the current longshore workers reside (hereinafter "Relevant Area"). To be eligible, veterans must have been honorably discharged and must be capable of performing the required job functions based upon prior experience or completion of a training program designated by the ILA and NYSA. No government or private agency will be used as a source of referrals unless it has been approved in advance by the Recruitment Committee.

3.   NYSA will create its pool of potential candidates by soliciting in the Relevant Area its direct-employer members and their employees and community-based organizations, such as churches, schools, including vocational schools and truck-driver and heavy-equipment-operator schools, and employment centers.

4.   The ILA's pool will consist of individuals referred by the Executive Board of the relevant ILA local and by union members. The ILA locals will notify their members of the job opportunities through discussions at membership meetings, mailings, and postings.

4

**B.   SCREENING OF EACH OF THE THREE POOLS**

1.   Every applicant from each of the three pools will be vetted by a tri-partite committee ("Employment Screening Committee") consisting of the terminal-operator Employer, the ILA Director of Safety, and the NYSA Director of Workforce Development.

2.   Applicants will be interviewed and evaluated by the Employment Screening Committee pursuant to Candidate Scoring Matrices (CSM) that contain uniform and job-related criteria to be established by the Employment Screening Committee based upon the essential functions of longshore work adduced from standard industry job descriptions.  Each member of the Employment Screening Committee will score the applicant for each of the criteria on a scale of 0 to 5.  The screeners' scores will be added together for each applicant.

**C.   PREEMPLOYMENT PROCESSING**

1.   Applicants approved by the Employment Screening Committee will be referred for pre-employment drug and physical agility testing.

2.   A designated number of candidates from each referral source who pass a drug test and who have successfully completed the physical agility test will be directed to the Waterfront Commission for registration in the rank order of their CSM scores.

3.   In the event of undue delays in processing the registration of any referrals by any governmental agency, the NYSA and the ILA agree to join in an appropriate legal action to restrain this or any other discriminatory conduct.

**VI.   RELIEF GANG SYSTEM**

**A.   STRUCTURE OF GANGS**

1.   The basic ten-person gang will remain in place until the implementation of the Relief Gang System and the new starting times and guarantees set forth in Section VI (D) of this Memorandum of Settlement.

2.   At the commencement of the Relief Gang System, all gangs will be reduced by one (1) hold position.  At such point the basic gang will consist of nine (9) persons.

3.   If a gang is projected to work sixteen (16) hours or fewer, the gang will work to completion and the minimum guarantees contained in the 2004-2012 NYSA-ILA CBA will continue to apply.

4.   A gang is not permitted to work for more than sixteen (16) continuous hours.  If due to unforeseen circumstances, a gang needs to work beyond sixteen (16) hours, an appropriate penalty differential will be applied as determined by the NYSA-ILA Productivity Committee.

5

**EXHIBIT 2**

# NYSA-ILA
## CONTRACT BOARD

77 WATER STREET – 16TH FLOOR
NEW YORK, NEW YORK 10005-4401

**N.Y.S.A.**
333 THORNALL STREET • SUITE 3A
EDISON, NEW JERSEY 08837-2220

(212) 208-0220

September 9, 2013

**I.L.A.**
5000 WEST SIDE AVENUE
NORTH BERGEN, NJ 07047

**Via E-mail**

Commissioner Ronald Goldstock
Commissioner Jan Gilhooly
The Waterfront Commission of New York Harbor
39 Broadway, 4th Floor
New York, New York 10006

Re:   **Opening of the Longshoremen's Register**

Dear Commissioners:

The International Longshoremen's Association, AFL-CIO ("ILA"), and New York Shipping Association, Inc. ("NYSA") request an opening of the Longshoremen's Register in the Port of New York and New Jersey ("PONY-NJ") by the Waterfront Commission on its own initiative pursuant to § 5-p of the Waterfront Commission Act. This opening is necessary to add 532 longshore employees and 150 checkers/clerks in order to alleviate substantial, persistent shortages of labor in the Port.

Section 5-p permits the Commission to make determinations to accept applications for inclusion in the Longshoremen's Register upon the Commission's own initiative without the necessity of public hearings when there is a need to expedite the addition of needed labor for the Port. In determining whether to accept additional registrants, the Commission is required "to encourage as far as practicable the regularization of the employment of longshoremen," "to bring the number of eligible longshoremen into balance with the demand for longshoremen's services within the Port of New York District without reducing the number of eligible longshoremen below that necessary to meet the requirements of longshoremen in the Port of New York District," and "to encourage the mobility and full utilization of the existing work force of longshoremen."

682 additional employees are needed to ameliorate the current imbalance between the supply and demand for labor in the Port. These additional employees will replace those who have or who will retire, and alleviate the current labor shortages in the Port. The breakdown of employees sought for each terminal operator is as follows:

|                              | Longshore | Clerical |
|------------------------------|-----------|----------|
| Maher Terminals              | 150       | 51       |
| Port Newark Container Terminal | 33      | 27       |
| APM Terminals                | 80        | 25       |
| Global Terminals             | 21        | 11       |
| New York Container Terminal  | 60        | 15       |
| Red Hook Terminal Brooklyn   | 25        | 5        |
| Red Hook Terminal Newark     | 10        | 3        |
| Ceres Cruise Terminal        | 36        | 1        |
| Metro Cruise Terminal        | 15        | 2        |
| Ports America New York City  | 40        | 2        |
| Ports America Bayonne        | 21        | 3        |
| Ports America Newark         | 41        | 4        |
| Bulk Operations              | 0         | 1        |
| **TOTAL**                    | **532**   | **150**  |

### The Need to Replace Retirees

In determining the employment needs in the PONY-NJ, NYSA and the ILA undertook a thorough review of the labor demand for the longshore and clerical crafts in the PONY-NJ over the past few years. Since 2007 there has been a steady attrition of labor in the Port, primarily as a result of retirements. During the period from 2007 to 2012, 197 longshoremen and 93 checkers retired. During that same time period only 53 new workers (baggage handlers and car drivers) were added of which only 45 remain employed in the industry.

This attrition is about to be exacerbated by the special Retirement Window Program recently negotiated as part of the NYSA-ILA collective bargaining agreement. This program has led to the voluntary retirement of approximately 250 longshoremen and checkers, who will be leaving the industry between now and April 2014. The following chart quantifies the number of retirees by local:

### Pensions 2007-2012 & Window Applications

| Local           | Window Pensioners | Pensions 2007-2012 | Total |
|-----------------|-------------------|--------------------|-------|
| Local 1         | 89                | 93                 | 182   |
| Local 824       | 10                | 5                  | 15    |
| Local 920       | 24                | 17                 | 41    |
| Local 1233      | 40                | 53                 | 93    |
| Local 1235      | 57                | 72                 | 129   |
| Local 1588      | 8                 | 15                 | 23    |
| Local 1814      | 19                | 35                 | 54    |
| L/S Total       | 158               | 197                | 355   |
| Checker Total   | 89                | 93                 | 182   |
| ALL Total       | 247               | 290                | 537   |

It is vital for the PONY-NJ that the labor force is augmented to replace these retirees. The new replacements must begin employment as soon as possible, since the training period and the probationary period for new employees under the terms of the NYSA-ILA collective bargaining agreement is one year, which may be extended for an additional six months. The retirement date for those individuals opting for the Window Retirement is April 2014, which is fewer than eight months from now.

## The Need to Fill Shortages

Daily shortages of available labor in the longshore and clerical crafts have resulted in operational delays and additional costs to ocean carriers and terminal operators in the PONY-NJ. Historically it has been difficult to quantify shortages of a casual workforce. To assist with solving this problem, in January 2013 NYSA implemented a new "work order based" hiring system to quantify demand and any resultant daily shortages in the workforce. Under this new hiring system, the employers submit their daily needs on work orders, and then NYSA and the ILA are able to see the demand that was filled and the demand that was not filled. Exhibit 1 reflects both the daily shortages (not including gang shortages) documented at the end of daily hiring for the following day and the actual shortages (not including gang shortages) that materialize the next morning.

Exhibit 1 shows that there is an average daily shortage in the PONY-NJ of approximately 298 list employees, with an additional shortage of 68 gang positions and 16 gang-driver positions. Employers have not been able to utilize their full gang complement with these shortages. Often workers from one gang are used to fill out shortages of another gang. The objective in filling the gangs is to be able to fully deploy all gangs, thereby maximizing employer assets. Exhibit 2 shows the daily checker requirement as calculated by the employers less the upcoming Window retirees to determine number of additional checkers to be hired. The number per company is prorated since the checkers are a port wide local.

## The Need for a Trained and Committed Workforce

The associated training which goes along with developing labor today is much more complex and requires a significant investment in these people by the terminal operators. Training individuals to perform stevedoring work requires a substantial amount of time to teach them properly the means to operate equipment safely and to enhance productivity. In order to ensure that the employers do not train people only to lose them to other companies in the Port, NYSA and the ILA have agreed to require new employees to remain with their sponsoring employers for a minimum of three years. They will be added to their sponsoring employers' lists and will be required to accept job orders for those list positions. If work is not available at their assigned facilities, they will be able to seek employment elsewhere in accordance with the seniority and hiring provisions of the NYSA-ILA collective bargaining agreement, but they must accept work first in their primary category with their sponsoring employers. If subsequent labor requests are made beyond this request, the NYSA-ILA Seniority Committee will meet to discuss relaxing the 3-year restriction based upon the labor demand and training considerations.

September 9, 2013

The hiring of 682 new employees satisfies the purposes of Section 5-p. Through the replacement of retiring employees and the filling of current shortages, the number of eligible longshoremen will be brought into better balance with the demand for longshore services.

The new employees must be brought into the industry in a metered sequence of 150 longshoremen per month and 25 checkers per month. This pace will allow for proper training without creating a backlog of individuals waiting to be trained. NYSA, the ILA, and the terminal operators will recruit, hire, and train as per the terms of the Recruitment and Hiring Plan of the new NYSA-ILA collective bargaining agreement. The new employees should be granted temporary registrations during their probation period under the collective bargaining agreement. Temporary registrations would permit the employers to evaluate the job performance of the new employees and replace any employees who during their training display that they are not capable of fulfilling the standards of the job. Temporary registrations would also prevent these employees from having priority under the labor contract over the existing workforce in the filling of lists. Temporary registrations would thus fulfill the section 5-p standard of assuring regularization of employment and full utilization of the existing workforce.

Time is of the essence. We urge the Commission to grant this request so that the Port has an adequate supply of labor.

Very truly yours,

John Nardi, President
New York Shipping Association, Inc.
333 Thornall Street, Suite 3A
Edison, New Jersey 08837

Harold J. Daggett, President
International Longshoremen's
Association, AFL-CIO
5000 West Side Avenue
North Bergen, New Jersey 07047

Co-Chairmen of the
NYSA-ILA Contract Board

Enclosure (Exhibit 1)
cc:    Walter M. Arsenault
        Phoebe S. Sorial, Esq.
        Kevin J. Marrinan, Esq.
        Donato Caruso, Esq.

A0023933

### Exhibit 2: Terminal Longshore Labor Requirements – September 6, 2013

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Terminal | * L/S Labor needs as per Company | L/S retirees | Total L/S required as per Company | Daily shortage range at Hiring Conclusion | Daily shortage range at start-up | Daily shortage range at morning start-up | # of gangs | Current Gang Openings | Additional Gang Manning | Associated Gang Drivers | Sponsored by Employer | Local | Relief Gangs Addtl |
| Maher | 323 | 47 | 370 | 40 to as high as 60 SC | 60 | as high as 90 or more SC | 19 | 27 | | 16 | 190 | 1233/1235 | |
| PNCT | 130 | 12 | 142 | 5 to 25 NC | 20 | 10 to 30 NC | 8 | 1 | | | 31 | 1233/1235 | |
| APM | 171 | 34 | 205 | 10 to 40 DH | 34 | 15 to 50 DH | 10 | 12 | | | 80 | 1233/1235 | |
| Global | 35 | 6 | 41 | 2 to 5 DH | 5 | 5 or more DH | 5 | 10 | | | | 1588 | |
| NYCT | 60 | 24 | 84 | NA | 30 | NA | 7 | 8 | | | | 920 | |
| Red Hook - Br | 25 | 11 | 36 | 2-3 DH | 7 | 2-3 DH | 7 | 12 | | | | 1814 | |
| Red Hook-Nwk | 25 | 3 | 28 | 2-3 DH/HO | 7 | 2-3 DH/HO | | | | | | 1233/1235 | |
| Ceres Cruise | 73 | 1 | 74 | 40+ BH | 35 | 40+ BH | | | | | | 1588 | |
| Metro Cruise | 30 | 1 | 31 | sporadic | 14 | sporadic | | | | | | 1814 | |
| PAG NYC | 100 | 9 | 109 | sporadic | 31 | sporadic | | | | | | 824 | |
| PAG Bayonne | 40 | 1 | 41 | 20 to 50 | 20 | 20 + | | | | | | 1588 | |
| PAG Newark | 120 | 1 | 121 | 50 to as high as 150 CD | 40 | 50 to 150 CD | | | | | | 1233/1235 | |
| No List | | 5 | 5 | | 0 | | | | | | | | |
| Bulk | | 3 | 3 | | 0 | | | | | | | | |
| TOTAL | 1132 | 158 | 1290 | 126 to 361 | 298 | 184 to 371 | 56 | 68 | 0 | 16 | 532 | | |

| | Retirees | Daily Shortages | Gang Vacancies | | Gang Drivers | Total |
|---|---|---|---|---|---|---|
| Initial Labor Request | 150 | 298 | 68 | 0 | 16 | 532 |

Notes: car ship shortages are very high on days with multiple car ships and on busy container ship days. Cruise ship shortages are heightened during holiday weekends and on very busy weekends with multiple container ships and car ships working. There are 305 car ships per year

* This is the demand stated by each operator for a self sufficient operation with little reliance on a casual work force.

| Local | Retirees |
|---|---|
| 1233 | 40 |
| 1235 | 57 |
| 1588 | 8 |
| 920 | 24 |
| 824 | 10 |
| 1814 | 19 |
| Total | 158 |

| Local | # of New Hires |
|---|---|
| 1233/1235 | 314 |
| 1588 | 78 |
| 920 | 60 |
| 824 | 40 |
| 1814 | 40 |
| Total | 532 |

**Exhibit 2: Port Checker New Hire Requirements September 6, 2013**

| Terminal | Total checkers active | Window Retirees | Actives Less Retirees | Daily Number of Checkers Required | 17.3% Unavailability Factor * | Portwide checker requirement | New Hires Required ** | | Current List |
|---|---|---|---|---|---|---|---|---|---|
| Maher | | 31 | | 210 | 36 | 246 | 51 | | 62 |
| PNCT | | 15 | | 110 | 19 | 129 | 27 | | 34 |
| APM | | 23 | | 120 | 21 | 141 | 25 | | 52 |
| Global | | 5 | | 50 | 9 | 59 | 11 | | 14 |
| NYCT | | 8 | | 60 | 10 | 70 | 15 | | 46 |
| Red Hook Brooklyn | | 3 | | 22 | 4 | 26 | 5 | | 21 |
| Red Hook Newark | | 3 | | 5 | 1 | 6 | 3 | | 5 |
| Ceres- Bayonne | | 1 | | 3 | 1 | 4 | 1 | | 3 |
| Brooklyn Cruise | | 2 | | 2 | 0 | 2 | 2 | | 4 |
| MCT | | 2 | | 3 | 1 | 4 | 2 | | 3 |
| PAG-Newark | | 0 | | 17 | 3 | 20 | 4 | | 9 |
| PAG-Bayonne | | 0 | | 12 | 2 | 14 | 3 | | 5 |
| Bulk Operations | | 1 | | | | | 1 | | |
| sub-total | 664 | 94 | 570 | 614 | 104 | 720 | 150 | | |

| | | | | | |
|---|---|---|---|---|---|
| Total actives | 664 | | | | |
| Window Retirees | 94 | | | | |
| Total actives less window retirees | 570 | | | | |
| Checker Retirements Since 2006 | 112 | | | | |
| Tot Checker Retirement Reduction since 2006 | 206 | | | | |
| * Unavailability Factor Takes into account Vacations and Holidays Out/Other | | | | | |

| | |
|---|---|
| Vacation Weeks | 6 |
| Holidays weeks | 2 |
| Out/Other (ie -sick) weeks | 1 |
| Total Weeks Unavailable | 9 |
| 9 week of 52 weeks | 17.3% |

** New Hire Required numbers are based on a Port Wide demand of 150 Checkers prorated based on the Port Wide requirement and having retirees replaced at each facility

**EXHIBIT 3**

# WATERFRONT COMMISSION OF NEW YORK HARBOR

At a meeting of the Waterfront Commission of New York Harbor
held in the City of New York, State of New York, on the 3rd day of December 2013.

COMMISSIONERS PRESENT:

Ronald Goldstock
Jan Gilhooly

**DETERMINATION 35**

In the Matter of Determining, Pursuant to
Section 5-p of the Waterfront Commission Act,
To Include Persons in the Longshoremen's
Register.

_____

WHEREAS, the Commission, having suspended the acceptance of applications for

inclusion in the Longshoremen's Register until further order by the Commission; and

WHEREAS, the Commission is empowered by Part I, Article IX, Section 5-p(1)(a) of the

Waterfront Commission Act ("Act') to determine, on its own initiative, whether to accept or

suspend the acceptance of applications for inclusion in the Longshoremen's Register; and

WHEREAS, the Commission has independently recognized that there is a need for an

increase in labor in the Port of New York-New Jersey and has determined to open the deep sea

Longshoremen's Register on its own initiative; and

WHEREAS, Part I, Article IX, Section 5-p(2) of the Waterfront Commission Act

enumerates certain standards that the Commission must observe in administering the provisions

of the Act pertaining to the opening of the register, including, *inter alia*: encouraging as far as

practicable the regularization of the employment of longshoremen; bringing the number of

eligible longshoremen more closely into balance with the demand for longshoremen's services

within the Port of New York district without reducing the number of eligible longshoremen

below that necessary to meet the requirements of longshoremen in the Port of New York district; encouraging the mobility and full utilization of the existing work force of longshoremen; eliminating oppressive and evil hiring practices injurious to waterfront labor and waterborne commerce in the Port of New York district including, but not limited to, those oppressive and evil hiring practices that may result from either a surplus or shortage of waterfront labor; considering the effect of technological change and such other economic data and facts as are relevant to a proper determination; and protecting the public interest in the Port of New York district; and

WHEREAS, on September 9, 2013, the Contract Board of the New York Shipping Association, Inc. (NYSA) and the International Longshoremen's Association, AFL-CIO (ILA)(collectively, "NYSA-ILA Contract Board") requested that the Commission, on its own initiative pursuant to Part I, Article IX, Section 5-p(1)(a) of the Waterfront Commission Act, open the deep sea Longshoremen's Register for the addition of 532 longshore employees (craft 5) and 150 checker/clerks (craft 6) to fill current shortages and to replace the expected retirements of longshore employees and checkers who will be leaving the industry in April 2014; and

WHEREAS, pursuant to Part I, Article IX, Section 5-p(4) of the Waterfront Commission Act, where the Commission determines to accept applications for inclusion in the Longshoremen's Register on its own initiative, such acceptance shall be in such manner deemed appropriate by the Commission; and

WHEREAS the Commission has consulted with industry representatives of management and labor concerning their request for longshore employees, and has determined that the immediate addition of 150 longshore employees is appropriate in light of current shortages and

2

that the future addition of 382 longshore employees is appropriate in light of the expected retirements in April 2014; and

WHEREAS the Commission has consulted with industry representatives of management and labor concerning their request for checkers, and has determined that the immediate addition of 75 checkers is appropriate in light of current shortages and that the future addition of checkers is appropriate in light of the expected retirements in April 2014; and

WHEREAS, the NYSA-ILA Contract Board has advised that new additions to the longshore force will be recruited, referred and selected in accordance with the terms of the collectively bargained NYSA-ILA Recruitment and Hiring Plan ("Hiring Plan"), which provides that the referral process for new hires which is designed to increase diversity and employment possibilities to qualified individuals will include three designated sources: Military Veterans (51%), ILA (25%) and NYSA/Employers (24%); and

WHEREAS, the Commission has determined that the Hiring Plan is, in fact, appropriate if it is (1) implemented according to its terms; (2) not utilized as a means by which to deny particular groups of persons the opportunity to become longshore workers; and (3) not utilized as a subterfuge to permit a referral source to exceed the percentages allotted to it by the Hiring Plan through the inclusion of its referrals in other referral pools; and

WHEREAS, the NYSA-ILA Contract Board has referred to the Commission individuals from the three designated referral sources and has requested that such individuals be prequalified as to meeting the standards for inclusion in the Longshoremen's Register; and

WHEREAS, the Commission has reviewed the Requests for Prequalification to Make Application to the Longshoremen's Register submitted by the individuals referred by the NYSA-ILA Contract Board to the Commission, and has prequalified eligible individuals;

NOW, THEREFORE, be it hereby

ORDERED, that the Commission accept a total of 150 applications from persons recommended by the NYSA-ILA Contract Board and prequalified by the Commission for temporary inclusion in the Longshoremen's Register as longshore employees (craft 5), and from those individuals recommended by the NYSA-ILA Contract Board who, on or before January 31, 2014, have submitted a Request for Prequalification to Make Application to the Longshoremen's Register and who have been prequalified by the Commission; and it is further

ORDERED, that the Commission accept at total of 75 applications from persons recommended by the NYSA-ILA Contract Board and prequalified by the Commission for temporary inclusion in the Longshoremen's Register as checkers (craft 6), and from those additional individuals recommended by the NYSA-ILA Contract Board who, on or before January 31, 2014, have submitted a Request for Prequalification to Make Application to the Longshoremen's Register and who have been prequalified by the Commission; and it is further

ORDERED, that such individuals who have been recommended by the NYSA-ILA Contract Board and prequalified by the Commission will be reviewed by the Commission to determine their appropriate referral source, and to ensure that the new hires are in accordance with the goals and percentages set forth in the Hiring Plan; and it is further

ORDERED, that prior to the Commission's acceptance of any application for inclusion in the Longshoremen's Register pursuant to this Determination, a representative of the NYSA-ILA Contract Board directly involved with the administration of the Hiring Plan shall submit a letter setting forth the name and address of the recommended individual, and certifying that: (1) he or she has personal knowledge of the facts concerning the recruitment, referral, selection and sponsorship of that individual and (2) the selection of the person so sponsored was made in a fair

and nondiscriminatory basis in accordance with the requirements of the laws of the United States and the States of New York and New Jersey dealing with equal employment opportunities; and it is further

ORDERED, that such sponsorship letter shall be filed at the offices of the Waterfront Commission of New York Harbor, 39 Broadway, New York, New York 10006 and that the offering of a false sponsorship letter for filing shall be punishable under N.Y. Penal Law §175.35; and it is further

ORDERED, that any individual temporarily included in the Longshoremen's Register pursuant to this Determination shall be assigned "V" seniority; and it is further

ORDERED, that any individual temporarily included in the Longshoremen's Register pursuant to this Determination may be offered employment opportunities for any category of employment (including but not limited to, car driver and container equipment operator) in accordance with the hiring procedures set forth in Section 7 of the *Rules and Regulations of the Waterfront Commission*, only after all longshore workers permanently included in the Longshoremen's Register have been offered employment in accordance with the hiring procedures set forth in Section 7 of the *Rules and Regulation of the Waterfront Commission*; and it is further

ORDERED, that any individual temporarily included in the Longshoremen's Register pursuant to this Determination shall not be eligible for permanent inclusion in the Longshoremen's Register until such time as he or she is approved by the Commission for addition to and placement on a regular list in accordance with, and pursuant to, Section 7 of the *Rules and Regulations of the Waterfront Commission*; and it is further

5

ORDERED, that the Commission will accept applications for inclusion in the Longshoremen's Register for individuals pursuant to this Determination until December 3, 2014.

By the Commission,

Meralis Lopez
Secretary

**EXHIBIT 4**

<u>RESOLUTION</u>

**Deep Sea Longshoremen's Register**

WHEREAS, on September 9, 2013, the International Longshoremen's Association, AFL-CIO (ILA) and New York Shipping Association, Inc. (NYSA) requested the Commission, on its own initiative pursuant to Part I, Article IX, Section 5-p(1)(a) of the Waterfront Commission Act, to open the deep sea Longshoremen's Register for the addition of 532 longshore employees and 150 checker/clerks in order to alleviate shortages of labor in the Port of New York-New Jersey; and

WHEREAS, the Commission has independently recognized that there is a need for additional labor and has determined to open the deep sea Longshoremen's Register on its own initiative; and

WHEREAS, pursuant to Part I, Article IX, Part I, Section 5-p(4) of the Waterfront Commission Act, where the Commission determines to accept applications for inclusion in the Longshoremen's Register on its own initiative, such acceptance shall be in such manner deemed appropriate by the Commission; and

WHEREAS, Part I, Article IX, Section 5-p(2) of the Waterfront Commission Act enumerates certain standards that the Commission must observe in administering the provisions of the Act pertaining to the opening of the register, including, *inter alia*: encouraging as far as practicable the regularization of the employment of longshoremen; bringing the number of eligible longshoremen more closely into balance with the demand for longshoremen's services within the Port of New York district without reducing the number of eligible longshoremen below that necessary to meet the requirements of longshoremen in the Port of New York district; encouraging the mobility and full utilization of the existing work

force of longshoremen; eliminating oppressive and evil hiring practices injurious to waterfront labor and waterborne commerce in the Port of New York district including, but not limited to, those oppressive and evil hiring practices that may result from either a surplus or shortage of waterfront labor; considering the effect of technological change and such other economic data and facts as are relevant to a proper determination; and protecting the public interest in the Port of New York district; and

WHEREAS, the NYSA and ILA have advised that the NYSA and ILA will recruit, hire and train these new individuals in accordance with the terms of the Recruitment and Hiring plan of the new NYSA-ILA collective bargaining agreement, which provides that the selection process for new hires will include three designated referral sources: Military Veterans (51%), ILA (25%) and NYSA/Employers (24%); and

WHEREAS, Part I, Article XII, Section 1 of the Waterfront Commission Act eliminated the method of employment of longshoremen and port watchmen commonly known as the "shape-up," a method which, *inter alia*, resulted in a loss of fundamental rights and liberties of labor, impaired the economic stability of the Port of New York district, and weakened law enforcement therein; and

### "A" or "1969 Amendment" Longshoremen's Register

WHEREAS, Part I, Article IX, Section 5-p of the Waterfront Commission Act provides that the Commission may, under such terms and conditions as the Commission may prescribe, include in the "A" or "1969 Amendment" longshoremen's register certain longshoremen who perform, *inter alia*, maintenance and other tasks involving, or incidental to, cargo handling pursuant to the 1969 amendments of the Waterfront Commission Act, and

whose employment is not subject to the guaranteed annual income provisions of any collective bargaining agreement relating to longshoremen; and

WHEREAS, the hiring procedures for "A" registrants set forth in the collective bargaining agreement between the NYSA and the International Longshoremen's Association (ILA), and the hiring procedures set forth in the collective bargaining agreement between the Metropolitan Marine Maintenance Contractors' Association, Inc. (MMMCA) and the ILA provide, with respect to new employees, that the employers shall notify the ILA of the number and classifications required and it shall be the responsibility of the ILA to furnish the necessary employees requested by the NYSA or MMMCA employer; and

WHEREAS, the Commission has determined that the hiring procedures set forth in those collective bargaining agreements with regard to "A" registrants promote various conditions that are expressly enumerated in the Findings and Declarations set forth at Part I, Article I of the Waterfront Commission Act, including, *inter alia*, the lack of a systematic method of hiring, irregularity of employment, the lack of adequate information as to the availability of employment, and the selection of employees by those who are neither responsive nor responsible to the employers; and

### Public Hearings

WHEREAS, the Commission is empowered under Part I, Article IV, Section 12 of the Waterfront Commission Act to advise and consult with representatives of labor and industry and with public officials and agencies concerned with the effectuation of the purposes of the Act, upon all matters which the Commission may desire, including but not limited to the form and substance of rules and regulations, the administration of the Act, maintenance of the longshoremen's register, and issuance and revocation of licenses; and

3

WHEREAS, the Commission is empowered under Part I, Article IV, Section 11 of the Waterfront Commission Act to make investigations, collect and compile information concerning waterfront practices generally within the Port of New York district and upon all matters relating to the accomplishment of the objectives of the Act; and

WHEREAS, the Commission is empowered under Part I, Article IV, Section 8 of the Waterfront Commission Act by its members and its properly designated officers, agents and employees, to administer oaths and issue subpoenas to compel the attendance of witnesses and the giving of testimony and the production of other evidence; be it hereby

RESOLVED, that a public hearing be held on the record to determine the number of individuals that would be appropriate to add to the deep sea Longshoremen's Register, and to determine the appropriate manner for the recruitment, referral, selection, hiring and training of individuals to be included in that Register; and

FURTHER RESOLVED, that a public hearing be held on the record to determine the appropriate manner for the recruitment, referral, selection, hiring and training of individuals to be included in the "A" or "1969 Amendment" Longshoremen's Register; and

FURTHER RESOLVED, that a public hearing shall commence on November 14, 2013 at 9:30 a.m. at 39 Broadway, Fourth Floor, New York, New York and continue on November 18, 2013 and November 25, 2013, and any other adjourned dates(s) that may be set by the Commission.



ADOPTED
BY THE
COMMISSION
ON
10/08/13

4

**EXHIBIT 5**

WHEREAS, pursuant to Chapter I, Part 4, Section 4.4 of the Rules and Regulations of the Waterfront Commission of New York Harbor, the "A" or "1969 amendment" longshoremen's register includes all persons registered by the Commission as longshoremen to perform, *inter alia*, maintenance and other tasks involving, or incidental to, cargo handling pursuant to the 1969 amendments of the Waterfront Commission Act; and

WHEREAS, Chapter I, Part 4, Section 4.4(d) of the Rules and Regulations of the Waterfront Commission of New York Harbor provides that no application shall be accepted from any person seeking inclusion in the "A" register unless that person is sponsored for employment by a stevedore or any person, within the meaning of those terms contained in the 1969 amendments to the Waterfront Commission Act (NY Laws 1969, ch. 953; NJ Laws 1969; ch. 128); and

WHEREAS, several New York Shipping Association, Inc. (NYSA) employers have declared a desire to hire individuals directly to perform maintenance and other tasks incidental to cargo handling, as memorialized in the NYSA-ILA Contract Board Resolution executed on July 25, 2013; and

WHEREAS, Part I, Article IX, Section 5-p of the Waterfront Commission Act grants the Commission the authority to make determinations to suspend or accept applications for inclusion in the longshoremen's register; and

WHEREAS, Part I, Article IX, Section 5-p of the Waterfront Commission Act provides that where the Commission determines to accept applications for inclusion in the longshoremen's register on its own initiative, such acceptance shall be accomplished in such manner deemed appropriate by the Commission; and

WHEREAS, Part I, Article IX, Section 5-p of the Waterfront Commission Act provides that the Commission may, under such terms and conditions as the Commission may prescribe, include in the longshoremen's register certain longshoremen who perform, *inter alia*, maintenance and other tasks involving, or incidental to, cargo handling pursuant to the 1969 amendments of the Waterfront Commission Act, and whose employment is not subject to the guaranteed annual income provisions of any collective bargaining agreement relating to longshoremen; and

WHEREAS, the Commission has reviewed the hiring procedures for "A" registrants set forth in the collective bargaining agreement between the NYSA and the International Longshoremen's Association (ILA), and the hiring procedures set forth in the collective bargaining agreement between the Metropolitan Marine Maintenance Contractors' Association, Inc. (MMMCA) and the ILA; and

WHEREAS, the hiring procedures set forth in those collective bargaining agreements with regard to "A" registrants provide, with respect to new employees, that the employers shall notify the ILA of the number and classifications required and it shall be the responsibility of the ILA to furnish the necessary employees requested by the NYSA or MMMCA employer; and

WHEREAS, the Commission has determined that the hiring procedures set forth in those collective bargaining agreements with regard to "A" registrants promote various conditions that are expressly enumerated in the Findings and Declarations set forth at Part I, Article I of the Waterfront Commission Act, including, *inter alia*, the lack of a systematic method of hiring, irregularity of employment, the lack of adequate information as to the availability of employment, and the selection of employees by those who are neither responsive nor responsible to the employers; and

WHEREAS, the Commission has determined that Chapter I, Part 4, Section 4.4(d) of the Rules and Regulations of the Waterfront Commission of New York Harbor needs revision and amendment to prevent the circumvention or evasion of the Waterfront Commission Act by the NYSA-ILA and the MMMCA-ILA hiring procedures with regard to the "A" register, and to ensure that such hiring procedures are consistent with the provisions of the Waterfront Commission Act; and

WHEREAS, these revisions and amendments are attached and identified as Exhibit A; and

WHEREAS, these revisions and amendments were forwarded to the NYSA on August 26, 2013, and receipt of these revisions and amendments was thereafter acknowledged by counsel for the NYSA-ILA Contract Board;

WHEREAS, these revisions and amendments were made available for public review on the Commission's website prior to the date of this Resolution; and

WHEREAS, the Commission has considered the comments submitted on behalf of the NYSA on September 6, 2013 in opposition to proposed revisions and amendments; and

NOW, THEREFORE, be it hereby

RESOLVED, that effective September 9, 2013, Chapter I, Part 4, Section 4.4(d) of the Rules and Regulations of the Waterfront Commission of New York Harbor shall be revised and amended as set forth in the attachment identified as Exhibit A; and, be it further

RESOLVED, that a copy of the revisions and amendments of Chapter I, Part 4, Section 4.4(d) of the Rules and Regulations of the Waterfront Commission of New York Harbor shall be sent forthwith to the Secretary of State of New York and the Secretary of State of New Jersey for appropriate filing.



ADOPTED
BY THE
COMMISSION
ON
9/4/13

2

# EXHIBIT A

Grey Highlight = Additions

**Section 4.4  Longshoremen's register; division into sections;
designation and sponsorship of "1969 amendment"
longshoremen.**

(a) A longshoremen's register shall be maintained in the offices of the commission. Copies shall be kept and exhibited at each commission employment information center.

(b) The register shall be divided as follows:

(1) A "deep-sea" register which shall include all persons registered by the commission as longshoremen and checkers except those persons registered as longshoremen pursuant to the 1969 amendments to the Act (NY Laws 1969, ch. 953; NJ Laws 1969, ch. 128).

(2) An "A" or "1969 amendment" register which shall include all persons registered by the commission as longshoremen pursuant to the 1969 amendments to the Act (NY Laws 1969, ch. 953; NJ Laws 1969, ch. 128).

(c) No application shall be accepted from any person seeking inclusion in the deep-sea register unless the commission at such time has determined to accept such applications.

(d) No application shall be accepted from any person seeking inclusion in the "A" register unless that person is sponsored for employment by a stevedore or by any person, within the meaning of those terms contained in the 1969 amendments to the Act (NY Laws 1969, ch. 953; NJ Laws 1969, ch. 128). The sponsoring employer shall submit a letter setting forth the name and address of the person, and the labor service(s) to be performed, and shall certify that the selection of the person so sponsored was made in a fair and nondiscriminatory basis in accordance with the requirements of the laws of the United States and the States of New York and New Jersey dealing with equal employment opportunities.