UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____

NEW YORK SHIPPING ASSOCIATION, INC.,
on behalf of its members; METROPOLITAN MARINE
MAINTENANCE CONTRACTORS' ASSOCIATION, INC.,
on behalf of its members; INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION, AFL-CIO, on behalf
of its members and affiliated local in the Port of New York
and New Jersey; LOCAL 1804-1, INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION, AFL-CIO, on behalf
Of its members; and LOCAL 1814, INTERNATIONAL
LONGSHOREMEN'S ASSOCIATION, AFL-CIO, on behalf
of its members,

                                        Plaintiffs,


        v.                                                      Civ. Action No. 13-7115(SDW)(MCA)


WATERFRONT COMMISSION OF NEW YORK                    *Motion Day:  February 18, 2014*
HARBOR,                                                               *Oral Argument Requested*


                                Defendant.


_____


_____

**MEMORANDUM OF LAW OF DEFENDANT WATERFRONT COMMISSION OF NEW YORK HARBOR
IN SUPPORT OF MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT
FOR FAILURE TO STATE A CLAIM**
_____


                        Phoebe S. Sorial, General Counsel
                        Waterfront Commission of New York Harbor
                        39 Broadway – 4th Floor
                        New York, New York 10006
                        (212) 905-9202
                        psorial@wcnyh.gov


Of Counsel and On the Brief:
Phoebe S. Sorial, Esq.

TABLE OF CONTENTS

PRELIMINARY STATEMENT…………………………………………………………………...1

STATEMENT OF FACTS AND PROCEDURAL HISTORY………………………………………2

I.     The Parties……………………………………………………………2

II.    The Waterfront Commission Act………………………………………...3

    A.  Enactment………………………………………………...............3

    B.  Regulation of Longshoremen and Stevedores…………………………………4

    C.  1966 Legislation – Section 5-p and the
         Deep Sea Longshoremen's Register……………………………...............5

    D.  1969 Legislation – "A" Register…………………………………………6

    E.  1982 Amendment to Section 5-p – Clarification of
         "A" Registrants……………………………….....................................7

    F.  1999 Amendment to Section 5-p – Certification by Employers
         that Selection is Made in a Fair and Non-Discriminatory Basis……..........................7

III.   NYS Division of Human Rights Charges Against the
       NYSA, ILA and ILA Locals……………………………………………10

IV.   The Commission's Amendment to Regulation 4.4(d)………………………12

V.    Request To Open The Deep Sea Longshoremen's Register And
       The Commission's Issuance of Determination 35………………………….14

VI.   Current Proceedings……………………………………………………16

LEGAL ARGUMENT……………………………………………………….......16

    I.     Standard Of Review For Motions To Dismiss
        For Failure To State A Claim……………………………...…………………17

    II.    Count I Should Be Dismissed Because The Certification Provision
        In Regulation 4.4(d) And Section 5-P Is A Valid Amendment
        Of The Compact And Was Therefore Made With Congressional Consent……...18

    III.   Count II Should Be Dismissed Because The Commission's
        Amendment To Rule 4.4(d) Was Within Its Statutory Authority………………..22

i

IV.    Counts III And IV Should Be Dismissed Because The Commission's
       Amendment To Rule 4.4(d) Is Not An Improper Interference With
       Plaintiffs' Collective Bargaining Rights And Does Not Violate National
       Labor Policy…………………….……………………………………….…26

V.     Count V Should Be Dismissed Because The Commission Is Not
       Precluded By The Primary And Exclusive Jurisdiction Doctrine
       From Ensuring That Hiring In The Port Is Done In A Fair And
       Non-Discriminatory Manner………………………………………………28

VI.    Count VI Should Be Dismissed Because The Commission Has
       Determined that the Inclusion of 532 Longshoremen and 150 Checkers
       In The Deep Sea Register Is Appropriate And Determination 35
       Is Not Arbitrary, Capricious And An Abuse Of Discretion…………………...31

VII.   Count VII Should Be Dismissed Because Plaintiffs Have Not
       Articulated How Determination 35 Limits Their Collective Bargaining
       Rights And Because Determination 35 Is Not An Improper Interference
       With Plaintiffs' Rights…………………………………………………...32

VIII.  Count VIII Should Be Dismissed Because The Certification
       Required By Determination 35 Does Not Violate Section 5-P
       Of The Act………………………………………………………………34

IX.    Count IX Should Be Dismissed Because The Commission Is
       Within Its Authority To Caution Plaintiffs That The Filing Of
       A False Sponsorship Letter Is Punishable By Applicable Penal Laws…………36

X.     Count X Should Be Dismissed Because The Commission's Issuance
       Of Its Resolution Concerning Its Amendment To Rule 4.4(d)
       Did Not Violate Plaintiffs' Due Process Rights……………………………38

CONCLUSION…………………………………………………………...................41

TABLE OF AUTHORITIES

## Cases

*Abbott v. Burke*, 100 N.J. 269 (1985) ............................................................... 30

*Alvin v. Suzuki,* 227 F.3d 107 (3d Cir.2000) ..................................................... 37

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ............................................. 17, 18, 32

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ...................................... 17

*Bowles v. Willingham*, 321 U.S. 503, 519 (1944)……………………………………39

*Bozzi v. Waterfront Commission of New York Harbor,*
1994 U.S. Dist. LEXIS 15664 (S.D.N.Y. 1994) ................................................. 5

*Caldwell Trucking PRP Group v. Spaulding Composites Co.,*
890 F. Supp. 1247 (D.N.J. 1995) ................................................................... 2, 20

*Cernadas v. The Waterfront Commission of New York Harbor,*
Index No. 22405/80, Sup. Ct. Sp. Term 1981) ................................................. 21

*Chainey v. Street*, 523 F.3d 200 (3d Cir. 2008) ................................................ 38

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,*
467 U.S. 837 (1984)......................................................................................... 25

*Connolly v. O'Malley,* 234 N.Y.S2d 889, 896 (App. Div. 1st Dept. 1962)................ 21

*De Veau v. Braisted*, 363 U.S. 144 (1960)..................................................... 4, 28

*Fenning v. Materio*, 1984 U.S. Dist. LEXIS 15215 (D.N.J. July 5, 1984)………………………39

*Gikas v. Washington School District,* 328 F.3d 731 (3d Cir.2003) ................. 37

*Greate Bay Hotel & Casino v. Tose,* 34 F.3d 1227 (3d Cir. 1994)................. 30

*In Re Application of Waterfront Commission*, 32 N.J. 323 (1960)................. 2

*In re Burlington Coat Factory Sec. Litig*., 114 F. 3d 1410 (3d Cir. 1997)...........2

*Jean Alexander Cosmetics, Inc. v. L'Oreal USA*, Inc.,
458 F. 3d (3d Cir. 2006)..................................................................................... 2

*McDonald v. Board of Election Comm'rs*, 394 U.S. 802 (1969). ................. 19

TABLE OF AUTHORITIES, CONT.

**Cases**

*New York Shipping Association, Inc., et al. v. Waterfront Comm'n of New York Harbor*, Civ. A. No. 78-995 (D.N.J. June 1, 1978), *aff'd* 582 F.2d 1275 (3d Cir. 1978).................. 27, 32

P*ace Resources, Inc. v. Shrewsbury Township*, 808 F.2d 1023 (3d Cir. 1987)........................... 38

*Parratta v. Taylor*, 451 U.S. 527 (1981)............................................................................... 38

*Parsons v. United States Postal Service*, 380 F. Supp. (D.N.J. 1974)…………………………..39

*Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.*, 998 F.2d 1192 (3d Cir. 1993)........................................................................................... 2

*People v. Armitt*, 762 N.Y.S.2d 222 (2nd Dep't 2003) .................................................. 35

*People v. Bel Air Equipment Corp.*, 39 NY 2d 48 (Ct. App. 1976)................................... 35

*People v. Jacob*, 248 AD 2d 638 (2nd Dep't, 1998).......................................................... 36

*People v. John E. Headley*, 960 N.Y.S.2d 51 (Sup. Ct. 2012) ...................................... 35

*Phillips v. County of Allegheny*, 515 F.3d 224 (3d Cir. 2008)....................................... 17

*Pittsburgh v. W. Penn Power Co.*, 147 F3d 256 (3d Cir. 1998) ............................... 2, 18

*Planned Parenthood of S.E. Pennsylvania v. Casey,* 505 U.S. 833 (1992)................................ 37

*Prometheus Radio Project v. FCC*, 373 F.3d 372 (3d Cir. 2004)................................... 38

*United States v. Western Pac. R. Co.,* 352 U.S. 59 (1956) ......................................... 30

*Waterfront Comm'n of New York Harbor v. Construction and Marine Equipment Co., Inc.*, 928 F. Supp. 1388, 1488 (D.N.J. 1996), *aff'd* 105 F.3d 115 (3rd Cir. 1996)................................................................. 19, 22, 39

*Waterfront Commission of New York Harbor v. Mercedes-Benz,* 99 N. J. 402 (1985)............... 21

*Waterfront Commission of New York Harbor v. Sea Land Service, Inc.,* 764 F.2d 961 (3rd Cir. 1985)…………………………………………………………………..28

iv

TABLE OF AUTHORITIES, CONT

**Statutes**

Administrative Procedures Act, 39 U.S.C. § 410…………………………………………………..39

Declaratory Judgment Act, 28 U.S.C.A. §§ 2201-2202 (West 2006) .......................................... 16

Waterfront Commission Act, N.J. STAT. ANN. § 32:23-1 et seq.,
N.Y. UNCONSOLIDATED LAWS § 9801 et seq. (McKinney). .................................................. passim

N.Y. Penal Law §175.00 (McKinney 2010). ............................................................................. 35

N.Y. Penal Law § 175.35 (McKinney 2010) ........................................................................ 16, 34

**Other Authorities**

5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*:
Civil 3d § 1357 (3d ed. 2007) ................................................................................................ 2, 18

MEMORANDUM IN SUPPORT OF AMENDING WATERFRONT COMMISSION ACT,
NEW YORK STATE SENATE, reprinted in 1999 N.Y. Laws (McKinney) ................................. 6,8,10

WATERFRONT COMMISSION OF NEW YORK HARBOR PUBLIC HEARING ON PROCEEDING TO
   DETERMINE WHETHER AND IN WHAT MANNER SECTION 5-P OF THE WATERFRONT
   COMMISSION ACT SHOULD BE AMENDED (April 28, 1998)................................................... 9, 10

**Court Rules**

Fed. R. Civ. P. 12(b)(6)................................................................................... 1, 2, 17, 18

Fed. R. Civ. P. 8(a)(2)........................................................................................ 17, 18

**Regulations**

Section 1.23 of the RULES AND REGULATIONS OF THE
WATERFRONT COMMISSION OF NEW YORK HARBOR .................................................... 36

Section 4.4(d) of the RULES AND REGULATIONS OF THE
WATERFRONT COMMISSION OF NEW YORK HARBOR ........................................................ passim

TABLE OF AUTHORITIES, CONT

**Miscellaneous**

*Longshoreman's Union Remains Defiant Over Diversity Plan*,
The New York Times, March 20, 2012,
http://www.nytimes.com/2012/03/21/nyregion/longshoremens-union-in-new-york-defiant-over-diversity-plan.html............................................................................................................. 11

*Told to Diversify, Dock Union Offers a Nearly All-White Retort*,

The New York Times, November 30, 2011, http://www.nytimes.com/2011/12/01/nyregion/told-to-diversify-dock-union-offers-nearly-all-white-list.html)................................................. 11, 24

FOURTH REPORT OF THE NEW YORK STATE CRIME COMMISSION,
New York State Leg.Doc.No. 70 .................................................................................................. 3

## Preliminary Statement

Defendant Waterfront Commission of New York Harbor submits this Memorandum of Law in support of its Motion to Dismiss Plaintiffs' Amended Complaint for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).  By statutory mandate, the mission of the Commission is to investigate, deter, combat and remedy criminal activity and influence in the Port of New York-New Jersey, and to ensure fair hiring and employment practices so that the Port and region can grow and prosper.  Since the enactment of the Waterfront Commission Act in 1953, Plaintiffs – disgruntled by its limiting effect on their perceived absolute collective bargaining rights to engage in conduct that promotes discriminatory hiring practices – have challenged virtually every attempt by the Commission to ensure that Plaintiffs abide by the spirit and the letter of the Act.

Recently, to combat continued discriminatory practices, the Commission amended its Rules and Regulations to require employers in the industry to submit a certification that the persons they select for hiring have been hired in a fair and non-discriminatory basis in accordance with state and federal equal employment opportunity laws.  In response, Plaintiffs filed this lawsuit, alleging that the Commission has "gone off the rails," and is improperly interfering with their collective bargaining process.  Not only are they challenging the Commission's recent amendment, but they are seeking to completely eradicate a critical provision of the Act, "Section 5-p," which empowers the Commission to safeguard fair and nondiscriminatory hiring in the Port.  Plaintiffs are also challenging the Commission's attempts to ensure that the hiring plan they promulgated and implemented is being fairly administered.

As argued below, the Amended Complaint is just another attempt by Plaintiffs to prevent the Commission from fulfilling its mandate to ensure the fair hiring of a diverse workforce in the Port.  For the reasons set forth below, the Amended Complaint should be dismissed in its entirety.

1

## STATEMENT OF FACTS AND PROCEDURAL HISTORY[1]

### I.  THE PARTIES

Defendant Waterfront Commission of New York Harbor ("Commission" or "Defendant") is a bi-state corporate and politic entity created by compact between the states of New York and New Jersey in 1953.  (N.J. STAT. ANN. § 32:23-1; N.Y. UNCONSOLIDATED LAWS § 9801; Complaint ¶ 9, attached to the Affidavit of Phoebe S. Sorial, Esq.["SORIAL AFFIDAVIT"], as Exhibit A))  "The Compact creates the Waterfront Commission as an agency of both states, with the authority to license or register workers, and, for good cause, to refuse licenses or registrations, and to regulate labor and hiring practices on the waterfront." *In Re Application of Waterfront Commission*, 32 N.J. 323 (1960).  The Commission is a fully recognized law enforcement agency, vested with licensing, regulatory and investigative powers.  (*Id*. at § 32:23-10; *Id*. at § 9811)

---

[1] In evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record.  *Pittsburgh v. W. Penn Power Co.*, 147 F3d 256, 259 (3d Cir. 1998); *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*: Civil 3d § 1357 (3d ed. 2007); *see also Pension Benefit Guar. Corp. v. White Consol. Indus. Inc.*, 998 F.2d 1192, 1196–97 (3d Cir. 1993)("a court may consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document.").  "Plaintiffs cannot prevent a court from looking at the texts of documents on which its claim is based by failing to attach or explicitly cite them."  *In re Burlington Coat Factory Sec. Litig*. 114 F. 3d 1410, 1426 (3d Cir. 1997).

Matters of public record have been understood to include "copies of pleadings and other materials filed in other courts." *Caldwell Trucking PRP Group v. Spaulding Composites Co*., 890 F. Supp. 1247, 1252 (D.N.J. 1995); *see also Jean Alexander Cosmetics, Inc. v. L'Oreal USA*, Inc., 458 F. 3d 244, 256 n. 5 (3d Cir. 2006) (finding that consideration of pleadings from other court proceedings did not require the district court to convert a motion to dismiss into one for summary judgment because, "to resolve a 12(b)(6) motion, a court may properly look at public records, including judicial proceedings, in addition to the allegations in the complaint.")(internal quotations and alteration marks omitted).

In this motion, the facts are derived from (1) Plaintiffs' Amended Complaint, (2) undisputedly authentic documents specifically referenced in the Amended Complaint; (3) exhibits attached to pleadings filed by Plaintiffs on December 11, 2013 in this litigation in support of their Motion for Preliminary Injunction; and (4) public records of which the Court may take judicial notice, including press releases, publicly available transcripts of public hearings, and copies of pleadings filed in other courts.

New York Shipping Association, Inc. ("NYSA") represents marine terminal operators, stevedoring companies and vessel operators in the Port of New York-New Jersey ("the Port"). (Compl. ¶ 4)   Metropolitan Marine Maintenance Contractors' Association, Inc. ("MMMCA") represents maintenance contractor employers. (Compl. ¶ 5) International Longshoremen's Association, AFL-CIO ("ILA") is the collective bargaining representative of longshoremen and other waterfront workers employed by the NYSA's members. (Compl. ¶ 6) The NYSA-ILA Collective Bargaining Agreement ("NYSA-ILA CBA") prescribes the terms of employment for longshoremen and checkers/clerks included in the deep-sea register, as discussed below. (*Id.*)

ILA Local 1804-1 represents maintenance and repair workers employed by NYSA and MMMCA members, predominantly on the New Jersey side of the Port.  (Compl. ¶ 7)  It is a party to the CBAs with NYSA and MMMCA pertaining to maintenance and repair workers, who mostly comprise the "A" register, as discussed below.  ILA Local 1814 represents maintenance and repair workers employed by NYSA and MMMCA members on the New York side of the Port. (Compl. ¶8)  It is a party to CBAs with NYSA and MMMCA pertaining to maintenance and repair workers, and represents deep sea longshoremen covered by the NYSA-ILA CBA.

## II. THE WATERFRONT COMMISSION ACT

### A. Enactment

In 1953, the New York State Crime Commission issued a report detailing pervasive crime and widespread corruption on the waterfront.  (FOURTH REPORT OF THE NEW YORK STATE CRIME COMMISSION, New York State Leg.Doc.No. 70)(1953)["CRIME COMMISSION REPORT"])  The Report described "skullduggeries on the waterfront [that] were largely due to the domination over waterfront employment gained by the International Longshoremen's Association, as then conducted.  Its employment practices easily led to corruption, and many of its officials participated in dishonesties." *De Veau v. Braisted*, 363 U.S. 144 (1960).   In the wake of that report, the

3

legislatures of the states of New York and New Jersey, with the consent of Congress, created the Commission by enacting the Waterfront Commission Compact. (N.J.S.A. 32:23-1; N.Y. UNCONSOL. 9801-9873) That Compact, along with the implementing provisions enacted by the two legislatures, is known as the Waterfront Commission Act (hereinafter, "Act"). (*Id.* at §32:23-1 *et seq*; *Id.* at §9801 *et seq*.)

As set forth in the Findings and Declarations of the Act, the legislatures found that:

[t]he conditions under which waterfront labor is employed with the Port of New York district are **depressing and degrading to such labor, resulting from the lack of any systematic method of hiring, the lack of adequate information as to the availability of employment, corrupt hiring practices** and the fact that persons conducting such hiring are frequently criminals and persons notoriously lacking in moral character and integrity and neither responsive nor responsible to the employers . . . **that as a result waterfront laborers suffer from irregularity of employment, fear and insecurity** . . .and a loss of respect for the law; that not only does there result a destruction of the dignity of an important segment of American labor, but a direct encouragement of crime which imposes a levy of greatly increased costs on food, fuel and other necessaries handled in and through the Port of New York district.

(*Id.* at §32:23-2; *Id.* at §9802)(Emphasis added)

The legislatures deemed that the occupation of longshoremen and stevedores, among others, are "affected with a public interest requiring their regulation and that such regulation shall be deemed an exercise of the police power of the two States for the protection of public safety, welfare, prosperity, health, peace and living conditions of the people of the two States." (*Id.* at §32:23-5; *Id.* at § 9805)

**B. Regulation of Longshoremen and Stevedores**

The Act required that all those longshoremen who loaded and unloaded cargo on and off vessels in the Port ("deep sea longshoremen") be hired through employment information centers operated by the Commission. (*Id.* at §§32:23-52; *Id.* at §§9852-9853) The Commission was required to maintain a list, known as the "longshoremen's register," of all individuals qualified to work as longshoremen. (*Id.* at §32:23-7; *Id.* at §9827) No person was to work as a longshoreman

in the Port unless included in the longshoremen's register. (*Id.*) The Act also delegated to the Commission the power to issue licenses to stevedoring companies that wish to operate in the Port. (*Id.* at §§32:23-19 to 32:23-23.1; *Id.* at §§9819-9823) A "stevedore" was originally defined as "a contractor engaged by a carrier of freight by water to move waterborne freight on ships berthed at piers, on piers, or at other waterfront terminals." (N.J.S.A. 32:23-06; N.Y. UNCONSOL. 9806) Stevedores who employ deep-sea longshoremen, as defined above, are known as "general stevedores." *Bozzi v. Waterfront Commission of New York Harbor*, 1994 U.S. Dist. LEXIS 15664 at *6 (S.D.N.Y. 1994)

### C. 1966 Legislation – Section 5-p and the Deep Sea Longshoremen's Register

When the Act was first adopted, any individual who was qualified to become a longshoreman was entitled to be registered by the Commission. *Bozzi,* 1994 U.S. Dist. LEXIS 15664 at *6. However, with the advent in the early 1960's of a new method of transporting freight by containers, the need for labor in the Port drastically reduced. *Id.* In 1964, in order to avoid having the existing workforce bear the entire cost of containerization and the concomitant elimination of jobs, a CBA was entered into between the NYSA and ILA. *Id.* According to the terms of that agreement, employers were permitted to reduce the number of employees in exchange for their promise that registered displaced longshoremen would receive a Guaranteed Annual Income (GAI), whether or not there was work available.

In 1966, these developments led to the enactment of Section 5-p of the Act, referred to as the "closed-register" statute.[2] *Bozzi, supra* at *6. Under Section 5-p, the Commission is empowered to close and open the register in order to "balance the longshoreman's workforce with the demand for

---

[2] In 1965, the ILA and NYSA sought legislation for a closed register which could only be opened under their joint control. (MEMORANDUM IN SUPPORT, NEW YORK STATE SENATE, reprinted in 1999 N.Y. Laws (McKinney) at 1842) This bill was vetoed by New York Governor Nelson A. Rockefeller, since it gave control of the register to private parties and not to the Commission. *Id.*

waterfront labor." When Section 5-p was first adopted, once the Commission determined that additional longshoremen were needed, applications were required to be processed in the order that they were filed (i.e., on a first-come first-served basis).  In determining whether to open or close the register, the Commission is required, *inter alia*:

> [t]o encourage as far as practicable the regularization of the employment of longshoremen . . .[t]o eliminate oppressive and evil hiring practices injurious to waterfront labor and waterborne commerce in the Port of New York district including, but not limited to, those oppressive and evil hiring practices that may result from either a surplus or shortage of waterfront labor [and] . . .[t]o protect the public interest in the Port of New York district.

(N.J.S.A. 32:23-114; N.Y. UNCONSOL. 9920)

### D.  1969 Legislation – "A" Register

In 1969, as a result of the technological advances described above, the statutory definitions of a stevedore and longshoreman were further expanded to include a new class of longshore workers.[3]  *Bozzi, supra* at \*5.  These longshoremen do not load and unload ships, but perform services incidental to the loading and unloading operations. (*Id.*)  These longshoremen that are registered by the Commission pursuant to the 1969 amendments to the Act are known as "1969 longshoremen" or "A registrants," and are distinguished from "deep-sea longshoremen." *Id*.  "A" registrants are not permitted to perform work involving the discharge or loading of general cargo vessels, and are not eligible to receive the GAI payments described above. (*Id*.)

The amendments also expanded the definition of stevedore to include contractors that were involved in the loading and unloading of containers, cargo storage, cargo repairing, coopering, general maintenance, carpentry, mechanical and miscellaneous work.  *Id*.  These contractors included in the 1969 amended definition of a stevedore are known as "1969 stevedores," as distinguished from the "general stevedores" defined earlier.  *Bozzi, supra at* 5.  The industry

---

[3] The term "A" registrants is derived from the "A" prefix before the multi-digit number that appears on licenses issued by the Commission to those registrants.  *Bozzi, supra* at \*5.

adapted to the 1969 legislation by creating separate workforces.  As set forth above, NYSA members employ the deep-sea longshoremen and checkers/clerks, and MMMCA members employ the "A" registrants.

### E. 1982 Amendment to Section 5-p – Clarification of "A" Registrants

In the early 1980's, the Commission proposed legislation that would clarify the status of "A" registrants as they related to the closed register statute, and provide an exception for certain classes of individuals to the existing statute.  *Bozzi, supra* at *10.  In the Commission's Memorandum in Support of the Bill, the background of the bill was presented, in relevant part, as follows:

> [This] class of persons the Commission wishes to have as an exception to the "closed Register" statute are persons who perform work incidental to the movement of waterborne freight in the harbor, who are required to be registered by amendments to the Act enacted in 1969, and who are not subject to the guaranteed annual income provisions pertaining to traditional longshoremen which led to the enactment of the "closed Register" statute.  Since 1969, the Commission has administratively excluded these persons from the "closed Register" statute since the reasons for the enactment does not pertain to such registrants.  In order to clarify the status of such registrants with respect to the existing law, the Commission is now proposing that an exception be made to them in the "closed Register" statute.

*Id*.  The Commission added, "[t]he Commission also believes that those persons who have been and are being added to the Register pursuant to the 1969 amendments to the Act should also be excluded from the closed Register provisions."  *Bozzi, supra* at *11.  Accordingly, Section 5-p was amended to provide that, "[n]otwithstanding any other provision of this act, the commission may include ["A" registrants] in the longshoremen's register under such terms and conditions as the commission may prescribe."  Today, this provision is set forth at Section 5-p(5)(b).

### F. 1999 Amendment to Section 5-p – Certification by Employers that Selection is Made in a Fair and Non-Discriminatory Basis

In the late 1990's, the procedures described above pertaining to the opening of the deep-sea longshoremen's register became outdated as a result of the increased business in the Port, significant changes to the provisions of the collective bargaining agreement between management

and labor, and attrition in the waterfront labor force. (MEMORANDUM IN SUPPORT, NEW YORK STATE SENATE, reprinted in 1999 N.Y. Laws (McKinney) at 1843)  The Commission determined that changes needed to occur to then-existing provisions of Section 5-p, and initiated discussions with representatives of management and labor to develop a more expeditious manner to meet the demand for waterfront labor.  *Id.*  On April 28 and 29, 1998, the Commission held public hearings to determine whether and in what manner Section 5-p should be amended.  *Id.*  Prior to the hearing representatives of management and labor, government officials, individual dockworkers and other interested parties were provided with a draft of the proposed amendments to Section 5-p, and were invited to testify and present their views on the subject.  *Id.*

The proposed amendment permitted controlled openings of the deep-sea register through the use of an employer sponsorship procedure.  *Id.*  No longer were applications to be processed in the order that they were received by the Commission but instead, contingent on the employer sponsorship procedure.  (*Id.*)  Inasmuch as applications were no longer processed on a first-come, first-served basis, the proposed amendment contained a provision that "the sponsoring employer shall certify that the selection of the persons so sponsored was made in a fair and non-discriminatory basis in accordance with the requirements of the laws of the United States and the states of New York and New Jersey dealing with equal employment opportunities." (*Id.*)

Numerous witnesses from the Commission, ILA, NYSA, MMMCA and other interested parties testified at the hearing. (*Id.*)  There was a general consensus that the proposed amendatory language to Section 5-p was the joint product of the Commission's collaboration with the industry. (WATERFRONT COMMISSION OF NEW YORK HARBOR PUBLIC HEARING ON PROCEEDING TO DETERMINE WHETHER AND IN WHAT MANNER SECTION 5-P OF THE WATERFRONT COMMISSION ACT SHOULD BE AMENDED, April 28, 1998 Tr. 131-133, attached to SORIAL AFFIDAVIT as Exhibit B)  Indeed, James A. Capo, then president of the NYSA, testified, "[t]he legislation before us today as

8

[sic] a result of the hard work of this Commission, its staff, NYSA, its staff and its members, both carriers and terminal operators, as well as the ILA, its officers and its hardworking, dedicated members." (*Id.* at Tr. 120:20 to 121:2)

At the hearing, the Commission presented the proposed amendatory language pertaining to the certification required of employers and explained:

> [t]he proposed amendment to Section 5-p, although it shifts the emphasis of sponsorship from the Contract Board to each individual employer, still retained that which the Contract Board has continued to provide to the Commission for the past twenty years, that is, a certification that the selection of the sponsoring persons was made in a fair and nondiscriminatory basis, in accordance with the laws of the United States and the states of New York and New Jersey dealing with equal employment opportunities.

(*Id.* at Tr. 99:20-100:10) During the hearing, David J. Tolan, an NYSA director, was asked why he considered the employer sponsorship method an improvement over the 5-p system that existed at the time. (*Id.* at Tr. 179:9-17)   He testified:

> Well, I think this opportunity for the employers to have a role in the selection process and the referral of personnel really, in effect, puts the onus back on the employer to make the right selection, and to have the criteria.   You can't complaint to anyone else, because they don't have the right skills when they come into the workforce.   That's why I believe it's better.

(*Id.* at Tr. 179:18 to 180:4)   When asked how these individuals would be hired, Mr. Tolan responded:

> Well, what I would envision is that the employers will engage in the selection of personnel that they're going to refer to the Joint Committee, and that those persons that they select are going to have to be able to demonstrate certain basic skills and intelligence, and that they would have the right racial and sexual mix, and that those person would be then referred over to the Joint Committee, and the Joint Committee would ensure that the overall mix of employees, both from a skill, intelligence level, physical attribute level and equal employment opportunity requirement would be met before they come to the Commission for introduction to the workforce.

(*Id.* at Tr. 182:12 to 183:6)

Following those hearings, the Commission proposed the statutory codification of the sponsorship certification that is now at issue in this litigation. (MEMORANDUM IN SUPPORT, NEW YORK STATE SENATE, reprinted in 1999 N.Y. Laws (McKinney) at 1843) The certification provision was specifically included, "to protect against possible discrimination." *Id.* at 1841. The Commission explained:

> Any "opening" of the register will be controlled, and will not only be in full accordance with the Commission's mandate to balance the number of longshorepersons with the demand for their services but will "protect the public interest of the port of New York district." . . . Throughout the agency's history of authorizing temporary registrations pursuant to its special and emergency the Commission steadfastly made sure that all persons sponsored for temporary registration were selected on a fair and non-discriminatory basis in accordance with the laws of the United States and the States of New York and New Jersey dealing with equal employment opportunities. The proposed amendment continues this requirement.

(*Id.* at 1843-44)  Notably, the NYSA issued a statement in support of the legislation unreservedly endorsing the suggested amendatory language, particularly concerning the certification requirement that hiring be done in a fair and non-discriminatory manner. (Letter to Honorable George E. Pataki dated June 28, 1999 [attached as Exhibit 3 to the Certification of James R. Campbell, Esq., in Support of Plaintiffs' Motion for Preliminary Injunction], SORIAL AFFIDAVIT, Exhibit C)  Thereafter, the bill amending Section 5-p was passed by legislatures of the states of New York and New Jersey.

### III.   NEW YORK STATE DIVISION OF HUMAN RIGHTS CHARGES AGAINST THE NYSA, ILA AND ILA LOCALS

Notwithstanding Section 5-p's requirement that the selection of persons sponsored be made on a fair and non-discriminatory basis, it is well reported that the Commission has taken the position that there remains a lack of diversity in waterfront employment as well as an income gap among those few minorities that are employed there. The issues between the Commission and the NYSA,

ILA and ILA locals relating to this matter are well documented.[4]  (*See, e.g*., Patrick McGeehan, *Longshoreman's Union Remains Defiant Over Diversity Plan*, The New York Times, March 20, 2012,   http://www.nytimes.com/2012/03/21/nyregion/longshoremens-union-in-new-york-defiant-over-diversity-plan.html; *see also*, Patrick McGeehan, *Told to Diversify, Dock Union Offers a Nearly All-White Retort*, The New York Times, November 30, 2011, http://www.nytimes.com/2011/12/01/nyregion/told-to-diversify-dock-union-offers-nearly-all-white-list.html)

On August 7, 2012, the New York State Division of Human Rights (hereinafter, "DHR") filed a Complaint against the NYSA, MMMCA, ILA and ILA Local 1814, among others, alleging violations of New York State human rights laws for failing to employ individuals on the New York docks and for the exclusion of applicants from union membership because of their race, color, national origin or sex.  (DHR Complaint, attached to SORIAL AFFIDAVIT as Exhibit D)  The DHR Complaint alleges, *inter alia*, that with regard to New York harbor: the ILA workforce lacks racial diversity and does not reflect the racial composition of the surrounding communities; the ILA workforce lacks diversity as it relates to sex because the number of women working on the docks is minimal (DHR Compl. ¶ 39); ILA referral practices and the employer sponsorship system have caused a disproportionate number of minorities and women to be excluded from ILA membership and employment opportunities with NYSA and MMMCA (*Id.*, ¶ 40); and NYSA, ILA and various ILA locals have refused to integrate their workforce to allow minorities and women to be union members.  (*Id.* ¶¶ 45-48)  The Complaint specifically alleges:

> In March of 2011, the NYSA and ILA sent a formal "joint proposal" [to the Waterfront Commission of New York Harbor] requesting new baggage handlers for the ports of New York and New Jersey.  After negotiations, the Commission agreed in May of 2011 to open the Deep Sea Register in order to add 50 new

---

[4] Inasmuch as they are not set forth within the parameters of Plaintiffs' Amended Complaint, they will not be reiterated herein.

temporary baggage handlers.  Additionally it was agreed that the NYSA and ILA would each provide 25 individuals to the pool of candidates and ensure diversity existed among the new temporary registrants.  The Commission would select an additional 50 individuals from its prequalified candidates and all names would be submitted to a lottery.  The NYSA did not have a hiring process and as a result deferred its 25 candidates to the ILA.

In late May of 2011, the president of the NYSA, Mr. Joseph Curto, certified that the 50 candidate pool provided to the Commission was chosen in a fair and nondiscriminatory way . . .The Commission began to qualify the ILA-NYSA candidates as baggage handlers.  However, despite its agreement to provide a diverse pool of registrants the process revealed that virtually all ILA-NYSA candidates were White men, except for 3 White women and 1 African American who did not wish to proceed with the certification process.  As a result of the ILA-NYSA's failure to provide a diversified pool, the Commission stopped certifying the ILA-NYSA candidates, leaving 8 candidates uncertified and unable to work.

(Id. ¶¶ 45-48)   Among its requests for relief, the DHR has demanded outreach and advertising to local communities regarding the availability of jobs, and the requirement that respondents certify that their employment practices are done in a fair and non-discriminatory manner. (Id. ¶¶ 56, 58)

### IV.  THE COMMISSION'S AMENDMENT TO REGULATION 4.4(D)

Section 4.4(d) of the Commission's Rules and Regulations (hereinafter "Rule 4.4(d)"), which pertains to the hiring of "A" registrants, provides that "no application shall be accepted from any person seeking inclusion in the 'A' register unless that person is sponsored for employment by a stevedore or by any person, within the meaning of those terms contained in the 1969 amendments to the Act."   In May 2013, the Commission advised NYSA employers that, pursuant to their request, it would permit them to sponsor and hire "A" registrants directly to perform maintenance and other tasks incidental to cargo handling.  (Compl. ¶38)

The hiring procedures set forth in the NYSA-ILA CBA and the MMMCA-ILA CBA with regard to "A" registrants provide, in pertinent part, that "[w]ith respect to new employees, the Employer shall notify the [ILA] of the number and classifications of employees required.  It shall be

the responsibility of the [ILA] to furnish the necessary employees requested by the Employer."
(Compl. ¶39)  In short, the NYSA and MMMCA – the employers – have surrendered to the ILA the
exclusive right to initially recruit and select those individuals that are referred to the employers to
be considered for employment as "A" registrant mechanics.  Under this framework, the employers'
selection and sponsorship of individuals is only from the applicants supplied to them by the ILA.
The Commission determined that the hiring procedures set forth in those collective bargaining
agreements, reminiscent of the "shape-up" banned by the Act (as discussed below at page 22),
promote the very same deleterious conditions expressly enumerated in the Act (e.g., the lack of a
systematic method of hiring, irregularity of employment, the lack of adequate information as to the
availability of employment, and the selection of employees by those who are neither responsive nor
responsible to the employers). (Compl. ¶46; Compl. - Exh. 4 and 5)

On August 26, 2013, the Commission sent NYSA President John Nardi an email advising
that a proposed modification to Rule 4.4(d) was going to be presented to the Commissioners for
adoption at the September 9, 2013 Commission meeting.  (Compl. ¶ 40) (August 26, 2013 Email
from Jeffrey R. Schoen to John Nardi, attached to SORIAL AFFIDAVIT as Exhibit E)  Attached to that
email was the amendatory language requiring the sponsoring employer to submit a letter setting
forth the name and address of the person, and the labor service(s) to be performed, and to certify
that the selection of the persons so sponsored was made in a fair and nondiscriminatory basis in
accordance with the requirements of the laws of the United States and the States of New York and
New Jersey dealing with equal employment opportunities.  (Compl. ¶ 40)  The Commission invited
Mr. Nardi to submit any comments before or at this meeting, and asked him to advise the
Commission if he was planning on appearing.  (SORIAL AFFIDAVIT, Exhibit E)

By letter dated September 6, 2013, the NYSA opposed the certification requirement
proposed by the Commission.  (Compl. ¶41; September 6, 2013 letter attached to SORIAL AFFIDAVIT

as Exhibit F)  On September 9, 2013, the MMMCA also opposed the amendment.  (Compl. ¶ 43)(September 9, 2013 letter attached to SORIAL AFFIDAVIT as Exhibit G)[5]  Instead of the language set forth above, NYSA proposed that the employer certify that "to the extent of its involvement the hiring of the employee was fair and nondiscriminatory in accordance with the requirements of the laws of the United States and the States of New York and New Jersey dealing with equal employment opportunities."  (Compl. ¶42)  The NYSA declined the Commission's invitation to submit comments at the meeting.  After reviewing written opposition by the NYSA (which was virtually the same as the MMMCA), the Commission adopted the Resolution amending Section 4.4(d) on September 9, 2013. (Compl.¶44 - Exh. 5)

## V. REQUEST TO OPEN THE DEEP SEA LONGSHOREMEN'S REGISTER AND THE COMMISSION'S ISSUANCE OF DETERMINATION 35

By letter dated September 9, 2013, the NYSA and ILA requested that the Commission, on its own initiative pursuant to Section 5-p, add 682 employees (532 longshoremen and 150 checkers) to the deep sea register.  (Compl. ¶32; Compl. - Exh. 2)  The NYSA and ILA advised that they, along with the terminal operators, will recruit, hire, and train as per the terms of the Recruitment and Hiring Plan (hereinafter, "Hiring Plan") of the new NYSA-ILA collective bargaining agreement.  (*Id.*)  That Hiring Plan provides that "[t]he selection process for new hires will include three designated referral sources: Military Veterans (51%), ILA (25%), and NYSA/Employers (24%)."  (Compl. ¶31; Compl. - Exh. 1 at 4)  It further provides that each applicant from the three pools will be interviewed and evaluated by an Employment Screening Committee, consisting of the terminal operator employer, the ILA Director of Safety, and the NYSA Director of Workforce Development.  (Compl. - Exh. 1 at 5)  As part of their request, the ILA-NYSA Contract Board specifically requested that new employees be brought into the industry in a metered sequence of 150

---

[5] A review of these two letters, both of which are directly referenced in Plaintiffs' Amended Complaint, reveals that they are virtually identical.

longshoremen and 25 checkers per month, "to allow for proper training without creating a backlog of individuals waiting to be trained." (Compl. ¶33; Compl. - Exh. 2 at 4)

On November 6, 2013, the Commission met with the NYSA and representatives of The Port Authority of New York & New Jersey (hereinafter "PANYNJ") in order to address various port hiring issues. (Port Authority Press Release, dated November 7, 2013, http://www.panynj.gov/press-room/press-item.cfm?headLine_id=1848) A week later, on November 14, 2013, the Commission met with the NYSA, MMMCA and representatives of the PANYNJ to continue discussions on port hiring issues. (Port Authority Press Release, dated November 14, 2013 http://www.panynj.gov/press-room/press item.cfm?headLine_id=1856)

On December 3, 2013, the Commission issued Determination 35, which opened up the deep sea longshoremen's register. (Compl. ¶34; Compl. - Exh. 3) The Commission indicated that it had consulted with industry representatives of management and labor concerning their request for longshore employees, and determined that "the immediate addition of 150 longshore employees is appropriate in light of current shortages and that the future addition of 382 longshore employees is appropriate in light of expected retirements in April 2014." (*Id*. at 2-3) The Commission also found that the immediate addition of 75 checkers was appropriate, and that the future addition of checkers is appropriate in light of the expected April 2014 retirements. (*Id*.at 3) The Commission also determined that:

> the Hiring Plan is, in fact, appropriate if it is (1) implemented according to its terms; (2) not utilized as a means by which to deny particular groups of persons the opportunity to become longshore workers; and (3) not utilized as a subterfuge to permit a referral source to exceed the percentages allotted to it by the Hiring Plan through the inclusion of its referrals in other referral pools;

(*Id*. at 3) Since the Hiring Plan was promulgated and administered by the NYSA-ILA Contract Board and its representatives, the Commission required that a representative of the Board directly involved with the administration of the Hiring Plan to submit a certification that (1) he or she has

personal knowledge of the facts concerning the recruitment, referral, selection and sponsorship of that individual, and (2) the selection of the person so sponsored was made in a fair and nondiscriminatory basis in accordance with the requirements of the lase of the United States and the States of New York and New Jersey dealing with equal employment opportunities. (*Id*. at 4)  In light of Plaintiffs' demonstrated failure to take their certification obligations seriously in the past, and to caution them of the potential legal consequences of submitting a false sponsorship letter, the Commission specifically referenced the statutory prohibition of offering of a false instrument for filing, as set forth under N.Y. Penal Law § 175.35, in its determination. (*Id*. at 5)

### VI. Current Proceedings

Plaintiffs filed their Complaint on November 22, 2013 seeking declaratory, injunctive, and other relief under the Declaratory Judgment Act, 28 U.S.C.A. §§ 2201-2202 (West 2006).  On December 11, 2013, Plaintiffs filed a Motion for Preliminary Injunction, seeking an order restraining the Commission from implementing or enforcing the September 9, 2013 amendment to Rule 4.4(d), which is at issue in this litigation.  That motion was denied by this Court, in part, because of Plaintiffs' failure to demonstrate irreparable harm and a likelihood of success on the merits.  On December 16, 2013, the Commission filed a motion to dismiss the Complaint for failure to state a claim.  On January 7, 2014, Plaintiffs filed their Amended Complaint, again seeking declaratory, injunctive and other relief.  For the reasons set forth herein, it is respectfully submitted that the Amended Complaint fails to state a claim upon which relief can be granted, and must therefore be dismissed in its entirety.

### Legal Argument

### I.   Standard of Review for Motions to Dismiss for Failure to State a Claim

In deciding a motion to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), the Court must "'accept all factual allegations as true, construe the

complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief."' *Phillips v. County of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008) (citation omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The adequacy of pleadings is governed by Fed. R. Civ. P. 8(a)(2), which requires that a complaint allege "a short and plain statement of the claim showing that the pleader is entitled to relief."  Additionally, an adequate complaint "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555 (internal citations omitted)

Generally, to survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.*  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility requirement is not akin to a probability requirement and instead, asks for more than a sheer possibility that a defendant has acted unlawfully.  Where a complaint pleads facts that are "merel y consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *Iqbal*, 129 S. Ct. at 1949 (*quoting Twombly*, 550 U.S. at 556–57) (internal citations omitted).  Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 129 S. Ct. at 1950. If the "well-pleaded facts do not permit the court to infer more

than the mere possibility of misconduct," the complaint should be dismissed for failing to show that the pleader is entitled to relief, as required by Rule 8(a)(2). *Id.*

As set forth above, in reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court may consider the allegations of the complaint, as well as documents attached to or specifically referenced in the complaint, and matters of public record.  *Pittsburgh*, 147 F3d at 259; *see also* 5B Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure*: Civil 3d § 1357 (3d ed. 2007).  In this matter, for the reasons set forth below, Plaintiffs' Amended Complaint fails to state a claim upon which relief can be granted and must therefore be dismissed.

## II. COUNT I SHOULD BE DISMISSED BECAUSE THE CERTIFICATION PROVISION IN REGULATION 4.4(D) AND SECTION 5-P IS A VALID AMENDMENT OF THE COMPACT AND WAS THEREFORE MADE WITH CONGRESSIONAL CONSENT

Plaintiffs allege that the purposes of the Compact did not include requiring employers to certify that the selection of longshoremen to be registered complied with federal and state laws dealing with equal employment opportunities, nor did it include "enhancement of the diversity of the registered workforce of longshoremen."  (Compl. ¶ 57).   They contend that the certification provision in Section 5-p is therefore an invalid amendment of the Act.  These arguments are without merit.  As an initial matter, it is well settled that enactments in furtherance of the Compact, or as amendments or supplements to implement its purposes, are deemed to have been approved by Congress in advance.  *See, Waterfront Comm'n of New York Harbor v. Construction and Marine Equipment Company*, Inc., 928 F. Supp. at 1403.  In this instance, the amendatory language at issue was included in Section 5-p by the legislatures of the states of New York and New Jersey.  It is well established that "[l]egislatures are presumed to have acted constitutionally."  *See, e.g., McDonald v. Board of Election Comm'rs*, 394 U.S. 802, 809 (1969).[6]

---

[6] Notably, NYSA has introduced several bills to the New York State Legislature to repeal various sections of 5-p.  As detailed in the NYSA's 2012 annual report:

The purposes of the Act that were specifically articulated by the legislatures in 1953 included the elimination of oppressive and evil hiring practices injurious to waterfront labor in the Port.  The legislatures deemed the regulation of longshoremen and stevedores to be in the public interest, and that such regulation by the Commission was "an exercise of the police power of the two States for the protection of public safety, welfare, prosperity, health, peace and living conditions of the people of the two States."  N.J.S.A. 32:23-23-5; N.Y. UNCONSOL. 9805.   The Commission was established to remedy and rectify degrading labor conditions, corrupt hiring practices and irregularity of employment.

Discrimination in hiring based on race, color, national origin or sex clearly falls within these enumerated categories, and is well within the purview of the Act.  Thus, the enactment of 5-p clearly implements the purposes of the Act.  Plaintiffs' arguments to the contrary are completely belied by Plaintiffs' sworn testimony of before this Commission in 1999 and the written statement

---

The import of a number of stories in the local and regional press proved to be detrimental to that effort, which described workplace condition in the industry as drug infested, and the scathing findings of a special report issued by the Waterfront Commission of New York Harbor in March of 2012.  The Waterfront Commission report, which was the result of an investigation and hearings convened by the Commission between October and December of 2010, depicted conditions in the Port's maritime industry that evolved over decades as a result of "custom and practice" as an environment that fostered unfair employment practices.  The report portrayed the collective bargaining agreement between the New York Shipping Association and the International Longshoremen's Association (ILA) as an agreement which "breeds waste and favoritism and detracts from the competitiveness of the Port of New York & New Jersey," . . and also provides prime positions described as low-show and no-show jobs to members of our workforce who have a questionable or an actual history of association with organized crime figures (which is of course not permitted under the law).  After meetings with [members of the New York State Senate], it became evident that there are a number of housekeeping issues that need to be addressed by the industry before serious consideration could be given to the amending section 5-p.

(New York Shipping Association 2012 Annual Report, Governmental Affairs, *Waterfront Commission of New York Harbor – New York Legislation*, at 30-31 [Dec. 2012])(found at http://www.nysanet.org/documents/NYSA_2012%20_annual_report.pdf)   Apparently frustrated with their failed attempts, Plaintiffs instead opted to file this lawsuit.

19

of the NYSA to then Governor Pataki in support of the 1999 5-p legislation.[7]   Plaintiffs

unreservedly supported the purposes and language of the 1999 legislation amending Section 5-p,

and endorsed the suggested amendatory language, particularly concerning the certification

requirement that hiring be done in a fair and non-discriminatory manner:

> Of equal importance, this legislation makes is sure that future additions to the
> workforce contain a number of women, Blacks and Hispanics.  The amendatory
> language differs from the process required by the current law under which would-
> be longshore workers apply to the Commission, and the Commission considers
> each application on a first come, first served basis, which obviously does not
> result in a guarantee that any members of the aforementioned groups would be
> added to the workforce on a permanent basis.
>
> S.4488-B, A 7634-B requires that the applications of sponsorship by the
> prospective employers include a certification that the applicants were selected in a
> fair non-discriminatory basis, that complies with state and federal equal
> employment opportunity laws.  The parties believe that this language is more than
> adequate to assure that the persons sponsored will include a number of women,
> Blacks and Hispanics.
>
>  .  .  . NYSA and ILA wish to assure you that the industry is committed to further
> increase the representation of minority groups within its workforce.

(Emphasis added)(SORIAL AFFIDAVIT, Exhibit C).  Plaintiff's allegations to the contrary are

totally unsupportable.

Indeed, the eradication of corrupt employment practices in the Port is one of the foremost

reasons for which this Commission was created.  In addition to the Act itself, there is extensive case

law in support.  *See, e.g., Waterfront Commission of New York Harbor v. Mercedes-Benz,* 99 N. J.

402, 403 (1985) ("In accordance with its statutory mandate to eliminate the pervasive involvement

---

[7] The June 28, 1999 letter, which directly undermines every allegation by Plaintiffs pertaining to
Section 5-p, was inexplicably attached to the Certification of James R. Campbell, counsel for the
NYSA, in Support of the NYSA and ILA's Motion for Preliminary Injunction filed with this Court
on December 11, 2013.  It is certainly not for Defendant to comment on Plaintiffs' puzzling
litigation strategy, but only to observe that this document − which is fatal to several counts of
Plaintiffs' Amended Complaint − would not have otherwise been relied upon by Defendant in
support of this motion, since it was not attached to, or referenced in, the Complaint or the Amended
Complaint.  As set forth above, this Court may now properly consider this document a matter of
public record for purposes of this Rule 12(b)(6) motion to dismiss.  *See, e.g*., *Caldwell Trucking
PRP Group,* 890 F. Supp. at 1252.

of criminals in waterfront activity, the Waterfront Commission established by the Act proceeded to regulate employment practices in the Port of New York.") (*citing* N.J.S.A. 32:23-7; N.Y. UNCONSOL. 9807);  *see also Connolly v. O'Malley,* 234 N.Y.S2d 889, 896 (App. Div. 1st Dept. 1962)("The purposes of the Act were to eliminate depressing and degrading labor conditions, corrupt hiring practices and . . . to control and regulate in the public interest the occupations of longshoremen, stevedores. . . Clearly, in the administration and enforcement of the provision of the Act, paramount considerations are the public interest and orderly waterfront employment and the protection of the public health, safety and welfare of the people").

This issue was also squarely addressed in *Cernadas v. The Waterfront Commission of New York Harbor*, Index No. 22405/80, Sup. Ct. Sp. Term 1981)(aff'd)(attached to SORIAL AFFIDAVIT as Exhibit H) (holding that a business agent was required to obey a subpoena issued by the Commission pertaining to its inquiry concerning possible racial discrimination in dock employment. In that case, the Court addressed the Act's Findings and Declarations and held:

> to combat these conditions, the Commission has promulgated certain regulations . . .designed to effectuate the purposes of the Waterfront Commission Act and to prevent circumvention and evasion thereof.  The regulations are designed to further the public policies of the States of New York and New Jersey by providing fair and equal employment opportunities and by establishing a systematic method of hiring.

> To further these ends, it is necessary that the Commission conducts an investigation to determine whether racial discrimination has played a part in the hiring of longshoremen. Upon a finding that in fact racial quotas have been employed in determining which longshoremen are hired, it could, if it be so advised, revoke, suspend or reprimand the license of one or more persons governed by it . .  .Such potential disciplinary action is, of course, not covered by any collective bargaining agreement.

*Id* at 3-4. (internal citations and alteration marks omitted)  It cannot be cogently alleged, as Plaintiffs have alleged, that discrimination in hiring based on race, color, national origin or sex does not fall within these enumerated categories and within the purview of the Act.  Under this backdrop, there can be no question that Rule 4.4(d), which requires employers to certify that the selection of

21

longshoremen complied with federal and state laws dealing with equal employment opportunities, is in furtherance of, and effectuates, the purposes of the Act.

### III.   COUNT II SHOULD BE DISMISSED BECAUSE THE COMMISSION'S AMENDMENT TO RULE 4.4(D) WAS WITHIN ITS STATUTORY AUTHORITY

In general, the Commission is empowered to make and enforce such rules and regulations as the Commission may deem necessary to effectuate the purposes of the Act, "or to prevent the circumvention or evasion thereof." N.J.S.A. 32:23-10(7); N.Y. UNCONSOL. 9810. In accordance with the ordinary rules for construction of interstate compacts, the Act "shall be liberally construed to eliminate the evils described therein and to effectuate the purposes thereof." *Id.* at §32:23-72; *Id.* at § 9872)

It is well settled that "an agency's grant of authority to promulgate regulations is to be liberally construed to enable the agency to accomplish its statutory goals." *Waterfront Comm'n of New York Harbor v. Construction and Marine Equipment Co., Inc.*, 928 F. Supp. 1388, 1488 (D.N.J. 1996), *aff'd* 105 F.3d 115 (3rd Cir. 1996)(citation omitted). "A court must accord substantial deference to the regulations adopted by administrative agencies, based on our recognition that certain subjects are within the peculiar competence of that agency." *Id.* Under this framework, regulations of an agency are accorded a presumption of reasonableness, and "courts must not substitute their judgment for the expertise of the agency." *Id.* Moreover, "courts generally place considerable weight on the construction of a statute given by the agency charged with enforcing it, and understand that agencies must be flexible and responsive to changing situations in adopting regulations." *Id.*

In this matter, as described above, the NYSA and MMMCA – the employers in the Port – have completely surrendered to the ILA the exclusive right to initially recruit and select those individuals that are referred to the employers to be considered for employment as "A" registrant mechanics. These are not necessarily ILA members and indeed, rarely are. Under this framework,

22

the employers' selection and sponsorship of individuals is only from the applicants supplied to them by the ILA.

This agreed upon manner of hiring simply advances the "shape-up"[8] method of employment that is specifically prohibited by the Act, and promotes the very same deleterious conditions expressly enumerated in the Act, including the lack of a systematic method of hiring, irregularity of employment, the lack of adequate information as to the availability of employment, and the selection of employees by those who are neither responsive nor responsible to the employers. Indeed, it specifically goes against the testimony of the employers in support of the 1999 5-p amendment at the public hearings cited above, that the opportunity for the employers to have a role in the selection process and the referral of personnel "puts the onus back on the employer to make the right selection," in accordance with relevant criteria.

By amending Rule 4.4(d) to require the certification of employers that their selection was done in a fair and nondiscriminatory manner, the Commission – while not dictating to employers the manner in which employees are to be selected – is ensuring that employers will be active, accountable participants in the process.   This is particularly critical since the ILA has not been receptive to the thought of going to employment centers and other non-traditional (i.e., non-union) venues to assemble a diverse pool of potential employees.  Disturbingly, the position of the ILA was best summarized by International President and former Local 1804-1 President, Harold

---

[8] Prior to the advent of the Commission, the Crime Commission Report described the "shape up" method of hiring as a distressing condition faced by waterfront labor:

> Among the more unhealthy conditions existing on the waterfront are the present shape-up system of hiring dock workers and the practice of compelling employers to accept undesirable men as hiring foremen. . .Under the shape-up the hiring foremen holds the key position on the pier, and has the absolute right to use any method he desires and to employ anyone he wishes.  The right, therefore to select and control the hiring foreman is of vital importance to all concerned. . . The power to hire not only enables an unscrupulous hiring foreman to exact tribute from the dock worker but also makes it possible for him to dispense patronage to relatives, friends and criminal associates.

Daggett, who openly declared to Commission officials that all they get from the unemployment centers and projects is "garbage." *See*, Patrick McGeehan, *Told to Diversify, Dock Union Offers a Nearly All-White Retort*, The New York Times, November 30, 2011, http://www.nytimes.com/2011/12/01/nyregion/told-to-diversify-dock-union-offers-nearly-all-white-list.html)   The Commission's regulation is a means by which to ensure that employers will remain diligent, and accountable, in ensuring that the hiring of "A" registrants is done in a fair and discriminatory manner.

Plaintiffs contend that the Rule 4.4(d) amendment was improper because neither Section 5-p nor any other provision of law authorizes the Commission to require employers to submit a certification with respect to the hiring of "A" registrants.  Plaintiffs contend that Section 5-p does not apply to "A" registrants, and that on its face, Section 5-p applies only deep sea longshoremen who are in the closed register.  In support of their allegations, Plaintiffs cite to *Bozzi, supra*, for the proposition that the Commission "has consistently interpreted [Section 5-p] as applying only to the Deep-Sea longshoremen's register and not to the "A" Register." (Compl. ¶64)

In so arguing, Plaintiffs ignore the clear language of Section 5-p(5)(b) which provides:

> [n]otwithstanding any other provision of this act, the commission may include in the longshoremen's register **under such terms and conditions as the commission may prescribe**: . . . (b) a person defined as a longshoreman in [§ 9905(6)] of this act who is employed by a stevedore defined in [§9905(1)(b)&(c)] and whose employment is not subject to the guaranteed annual income provisions of any collective bargaining agreement relating to longshoremen."

(Emphasis added)(McK. Unconsol. Laws 9920; N.J.S.A. 32:23-114).   Plaintiffs have not, and indeed cannot, dispute that "A" registrants fall squarely within Section 5-p(5)(b) of the Act.

It is well settled that courts must defer to reasonable agency interpretations of administrative statutes.  *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  "Interpretation given a statute by an agency charged with its enforcement is, as a general matter, given great weight and judicial deference, so long as the interpretation is neither irrational,

24

unreasonable nor inconsistent with the governing statute." *Bozzi, supra* at *9 (citations omitted).  In this instance, the Act specifically empowers the Commission to prescribe the terms and conditions pursuant to which "A" registrants may be included.  The Commission's amendment to Rule 4.4(d) was therefore expressly permitted under Section 5-p(5)(b).

Plaintiffs misstate both the issue and legal holding of *Bozzi, supra*.  In that case, two longshoremen who had initially been brought in to the industry as "A" registrants under Section 5-p(4)(a) (now codified as Section 5-p(5)(a)) sought inclusion in the closed register as unrestricted deep sea longshoremen.  As set forth in the Statement of Facts, above, the court extensively reviewed the Act's legislative history and found that this provision of Section 5-p was, as the Commission contended, simply a "housekeeping" to clarify the status of "A" registrants.  (*Bozzi, supra* at *11)  The Court observed that the 1998 amendatory language with respect to "A" registrants "was proposed simply to clarify that the practice of registering the '1969' amendment longshoremen without regard to the closed register was to continue."  *Bozzi, supra* at *11. The Court therefore agreed with the Commission's position that the two "A" registrants could not be included in the closed deep-sea register. *Id.*

Plaintiffs have correctly pointed out that in *Bozzi,* the Commission maintained that it has consistently interpreted the closed register statute as applying only to the deep sea longshoremen's register and not to the "A" register, and that persons who have been and are being added to the longshoremen's register pursuant to the 1969 amendments to the Act should be excluded from the closed register provisions of Section-5p.  *Bozzi, supra* at *21.  In so arguing, the Commission was re-stating its position as presented to the legislatures in support of the bill, that "[t]hese classes of persons would not be subject to the requirement that the Register be open for their admission pursuant to [§9920] of the Act and their applications for registration would not require that they be processed on a first-come, first-served basis." *Bozzi, supra* at *25.  The Commission did not, as

Plaintiffs contend, mean that none of the provisions of Section 5-p could apply to it.  Since the Commission is best suited to interpret its administrative statute, Plaintiffs' claims must be dismissed.

### IV.   COUNTS III AND IV SHOULD BE DISMISSED BECAUSE THE COMMISSION'S AMENDMENT TO RULE 4.4(D) IS NOT AN IMPROPER INTERFERENCE WITH PLAINTIFF'S COLLECTIVE BARGAINING RIGHTS AND DOES NOT VIOLATE NATIONAL LABOR POLICY

Plaintiffs argue that by requiring employers to certify that the selection of "A" registrants was made in a fair and non-discriminatory basis, the Commission is forcing them to choose between breaching their collective bargaining agreements or seeking to renegotiate them.  (Compl. ¶72)  Plaintiffs claim that as a result of the recently amended Rule 4.4(d), NYSA and MMMCA members will have to "eschew" the union-referral systems of their labor contracts pertaining to the employment of "A" registrants.  (Compl. ¶78)  Plaintiffs generally allege that the Commission has interfered with their collective bargaining rights in violation of the Act, and that it has violated national labor policy by attempting to dictate the substantive terms of Plaintiffs' collective bargaining agreements.  These allegations are without merit.

It is well settled that, in approving the Act, Congress expressly granted the Commission the authority to infringe upon federally guaranteed collective bargaining rights traditionally reserved to Plaintiffs' exclusive control:

> If the Waterfront Commission Act were purely a creature of bi-state law, the doctrine of preemption would be applicable to remedy any existing conflicts between it and federal labor law.  State attempts to influence the substantive terms of collective-bargaining agreement may conflict with federal labor law.  It is recognized that matters of seniority classification, hiring priorities and employee transfers from section to section, are commonly matters subject to collective bargaining and generally within the exclusive province of employers and unions.  Thus, where a state law empowers a state commission to intrude into areas normally reserved to collective bargaining, federal preemption might bar such state action whenever it directly infringes upon rights guaranteed by the federal Labor Act.  However, the touchstone to finding a basis to preemption in this type of controversy must be Congressional intent to preempt.

26

Here, Congress has specifically adopted the bi-state legislation. **In approving the Act, Congress has already authorized the impairment of collective bargaining rights are provided by federal labor law. Inasmuch as the Commission was granted total control over the expansion or reduction of the workforce, the Commission's authority already "infringes" upon collective bargaining function normally reserved only to employers and unions.** Thus, Congress has already created an exception and specifically anticipated the need for future enactments and other action necessary to the carrying out and effectuation of the compact. **In vesting the Commission with the sole power to control the size and character of the labor force, Congress specifically sanctioned the Waterfront Act, with full knowledge and intention that its specific provisions would override the general polices of federal labor rights if the two came in conflict.** In contemplating the Commission's need to enact, *in futuro*, further edits to continue to effectuate the policies of the compact, Congress approved those additional interferences with federal labor law which might arise as a natural consequence thereof.

*New York Shipping Association, Inc., et al. v. Waterfront Comm'n of New York Harbor*, Civ. A. No. 78-995 (D.N.J. June 1, 1978), *aff'd* 582 F.2d 1275 (3d Cir. 1978)(Emphasis added, internal citations omitted)(attached to Sorial Affidavit as Exhibit I).

Going forward, the Commission may continue to "infringe" on such collective bargaining rights if its actions are in furtherance of the original policies and purposes of the Act. *Id.* ("If it does so, then that impairment was specifically anticipated by Congress and has its approbation, for in approving the compact Congress also put its imprimatur on future legislation in furtherance of the original policies and purposes of the compact.") As the Supreme Court noted:

It is of great significance that in approving the [Waterfront Commission] compact Congress did not merely remain silent regarding supplementary legislation by the States. Congress expressly gave its consent to such implementing legislation not formally part of the compact. This provision in the consent by Congress to a compact is so extraordinary as to be unique in the history of compacts. Of all the instances of congressional approval of state compacts – the process began in 1791, with more than one hundred compacts approved since – we have found no other in which Congress expressly gave its consent to implementing legislation. It is instructive that this unique provision has occurred in connection with approval of a compact dealing with the prevention of crime where, because of a peculiarly local nature of the problem, the inference is strongest that local polices are not to be thwarted.

*De Veau*, 363 U.S. 144 at 154. As set forth above, one of the Commission's critical statutory mandates under the Act is to ensure that longshoremen are employed using systematic hiring

methods.  While the Act safeguards the collective bargaining rights of labor and management to agree upon methods for the selection of longshoremen by way of seniority, experience, regular gangs, or otherwise, such methods cannot be in conflict with the Act.  N.J.S.A. 32:23-69(2); N.Y. UNCONSOL. 9869; *see also Waterfront Commission of New York Harbor v. Sea Land Service, Inc.,* 764 F.2d 961 (3rd Cir. 1985)(in reconciling a conflict between the Commission's registration provisions and an existing collective bargaining agreement, the court declined to adopt a proposal that would "trench upon the statutory framework of the Waterfront Commission Act.")

In this instance, the current method of hiring exclusively through ILA referrals promotes the very same deleterious conditions expressly enumerated in the Act.  Rule 4.4(d), as amended, is not only proper – it is necessary.  The Commission's regulation is consistent with, and in furtherance of, the underlying purposes of the Act, and as such, it is not an improper interference with Plaintiffs' collective bargaining rights and does not interfere with national labor law.

### V.     COUNT V SHOULD BE DISMISSED BECAUSE THE COMMISSION IS NOT PRECLUDED BY THE PRIMARY AND EXCLUSIVE JURISDICTION DOCTRINE FROM ENSURING THAT HIRING IN THE PORT IS DONE IN A FAIR AND NONDISCRIMINATORY MANNER

Plaintiffs allege that the Commission is using the Section 5-p certification as a "sword" to deny registration to new applicants chosen in a manner that the Commission believes is in violation of employment discrimination laws.  (Compl. ¶82)  Generally citing the primary and exclusive jurisdiction doctrine, Plaintiffs contend that the Commission may not determine violations of federal or state employment discrimination laws, and that the Commission should instead refer such matters to "agencies that are statutorily mandated to determine purported violations of employment-discrimination laws."  (Compl. ¶83)  Plaintiff seek injunctive relief prohibiting the Commission from using such laws, which they allege it is not authorized to enforce, to deprive them of their right to hire workers, and to a declaration that the Commission lacks jurisdiction to determine violations of federal or state employment discrimination laws.  (Compl. ¶85)

Plaintiffs have failed to plead facts sufficient to state a claim under the doctrine of exclusive primary jurisdiction, which is inapplicable in this matter.  "The doctrine of primary jurisdiction, like the rule requiring exhaustion of administrative remedies, is concerned with promoting proper relationships between the courts and administrative agencies charged with particular regulatory duties.  'Exhaustion' applies where a claim is cognizable in the first instance by an administrative agency alone; judicial interference is withheld until the administrative process has run its course.  'Primary jurisdiction,' on the other hand, applies where a claim is originally cognizable in the courts, and comes into place whenever enforcement of the claim requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views."  *United States v. Western Pacific R. Co.,* 352 U.S. 59, 77 S. CT. 161, 1 L. Ed. 2d 126 (1956).

The doctrine does not, as Plaintiffs suggest, focus on the interplay between administrative agencies but rather, between the courts and agencies.  It allows for agencies to exercise discretion "in cases raising issues of fact not within the conventional experience of judges or cases…" *United States v. Western Pac. R. Co.,* 352 U.S. 59, 64 (1956).  A court will decide whether "the controversy, in the first instance, can and should be resolved in whole or in part before an administrative tribunal, or whether it must immediately be considered by the judiciary." *Abbott v. Burke*, 100 N.J. 269 (1985)  "[W]hen the legislature provides an agency with 'exclusive primary jurisdiction,' it preempts the courts' original jurisdiction over the subject matter." *Greate Bay Hotel & Casino v. Tose,* 34 F.3d 1227, 1230 n.5. (3d Cir. 1994).  "If the legislature has vested an administrative agency with exclusive primary jurisdiction, the agency is the only forum in which complaints within that jurisdiction may be adjudicated originally." *Id.*

Here, Plaintiffs' reliance on the doctrine is misplaced.  It must be emphasized that the Commission, which is vested with the authority to insure that waterfront workers are not subjected to corrupt, depressing and degrading hiring practices, is responsible for ensuring that the stevedoring companies, who are licensed by the Commission to operate in the Port, are not engaging in discriminatory hiring practices or in a system of employment that perpetuates such practices.  As discussed above, in order to be permanently licensed as a stevedore by the Commission, the Commission must be satisfied that the applicant possesses "good character and integrity."  N.J.S.A § 32:23-21(b); N.Y. UNCONSOL. § 9821(b).  The standard of good character and integrity remains in effect at all times while licensed with the Commission, and the Commission may, in its discretion, deny applications for such licenses and revoke licenses as it deems in the public interest.

If discrimination in hiring is practiced by Commission licensees, then the Commission – and not some other agency – is in the best position to take expeditious remedial action. Those licensees would be subject to appropriate censure after notice, an administrative hearing and determination of charges.  Moreover, the Commission is empowered to turn over any evidence of discrimination to the New Jersey Division of Human Rights, the New York State Division of Human Rights, or to the Equal Employment Opportunity Commission.[9]  Advancement of the public interest through interagency cooperation was specifically contemplated by the States of New York and New Jersey during the enactment of the Waterfront Commission Act, which empowers the Commission:

> To co-operate with and receive from any department, division, bureau, board, commission, or agency of either or both States, or of any county or municipality thereof, such assistance and data as will enable it to carry out its powers and duties

_____

[9] Indeed, as discussed in detail above, there is a case currently pending by the New York State Division of Human Rights against Plaintiffs (excluding ILA Local 1804-1 which maintains a New Jersey office and operates on the New Jersey side of the Port), alleging discriminatory referral and hiring practices in the Port.

hereunder; and to request any such department, division, bureau, board, commission, or agency, with the consent thereof, to execute such of its functions and powers, as the public interest may require.

(N.J.S.A. 32:23-10, NY UNCONSOL. 9810)  Plaintiff's allegations to the contrary are without merit, and Count V must be dismissed for failure to state a claim.

### VI.   COUNT VI SHOULD BE DISMISSED BECAUSE THE COMMISSION HAS DETERMINED THAT THE INCLUSION OF 532 LONGSHOREMEN AND 150 CHECKERS IN THE DEEP SEA REGISTER IS APPROPRIATE, AND DETERMINATION 35 IS THEREFORE NOT ARBITRARY, CAPRICIOUS AND AN ABUSE OF DISCRETION

Plaintiffs allege that even though they "jointly recommended" that 532 longshoremen and 150 checkers be added to the deep sea register, the Commission issued Determination 35, announcing that it will approve "a total of 150 longshoremen and 75 checkers."  (Compl. ¶¶ 91-92). They contend that the Commission has no record and no factual basis for its decision "to reject the joint recommendation of NYSA and ILA," and therefore contend that the Commission's determination is arbitrary, capricious and an abuse of discretion.  (Compl. ¶¶ 93-94).  Plaintiffs seek injunctive relief directing the Commission to accept for inclusion in the deep sea register 532 longshoremen and 150 checkers.  For the reasons set forth below, these allegations are categorically untrue and must therefore be dismissed.

First, there was no joint recommendation.  There was a request by the NYSA-ILA Contract Board that the Commission open the register on its own initiative.[10]  (*See* Compl. - Exh. 2) [11] Second, Determination 35 did not announce that the Commission will only approve a total of 150 longshoremen and 75 checkers.  To the contrary, the Commission specifically acknowledged that

---

[10] This is specifically admitted in ¶¶ 32 and 104 of the Amended Complaint.

[11] For purposes of this litigation, the manner by which the deep sea register was opened is particularly important, because it dictates the legal framework that must be followed under Section 5-p of the Waterfront Commission Act, and directly impacts the Court's analysis with respect to the Commission's actions that are at issue.  When the Commission determines to open the deep sea longshoremen's register on its own initiative, this is done "in such manner deemed appropriate by the Commission."

"the immediate addition of 150 longshore employees is appropriate in light of current shortages and that the future addition of 382 longshore employees is appropriate in light of the expected retirements in April 2014, and  . . . the immediate addition of 75 checkers is appropriate in light of current shortages and that the future addition of checkers is appropriate in light of the expected retirements in April 2014."  (Compl. - Exh. 3 at 2-3)

As set forth in the Statement of Facts, above, the ILA-NYSA Contract Board requested that new employees be brought into the industry in a metered sequence of 150 longshoremen and 25 checkers per month to allow for proper training without creating a backlog of individuals waiting to be trained.  For that reason, Determination 35 – the first in a series of determinations to open the deep sea register to meet the industry's metered-hiring approach – opened the register to accept applications from 150 longshoremen and 75 checkers.  Notwithstanding the Commission's position that it will open the deep sea register for the inclusion of 532 longshoremen and 150 checkers, Plaintiffs allege that "the Commission has stated that it will accept a total of only 150 applications for longshore positions and only 75 applications for checker positions, compared to the requested and previously accepted numbers of 532 longshoremen and 150 checkers."   (Compl. ¶¶ 34, 92) The allegations of Count VI are without any support and must therefore be dismissed.[12]

## VII.   COUNT VII SHOULD BE DISMISSED BECAUSE PLAINTIFFS HAVE NOT ARTICULATED HOW DETERMINATION 35 LIMITS THEIR COLLECTIVE BARGAINING RIGHTS, AND BECAUSE DETERMINATION 35 IS NOT AN IMPROPER INTERFERENCE WITH PLAINTIFF'S RIGHTS

In Count VII of the Amended Complaint, Plaintiffs recite, in bullet point form, various provisions of Determination 35 and then generally allege that the provisions "dealing with interpretation, application, and implementation of the collectively bargained Hiring Plan, the

---

[12] Plaintiffs' allege that the Commission "had no record and therefore no basis for its decision to reject the joint recommendation of the NYSA and ILA."  This allegation is denied.  However, even accepting it as true for purposes of this motion, this issue is moot and need not be addressed herein since the Commission did not reject Plaintiffs' request.

assignment of seniority, and the formulation of hiring rights and priorities are matters of collective bargaining, which Article XV of the Compact prohibits the Commission from limiting in any way." (Compl. ¶¶98-99)  Plaintiffs have failed to state a claim for two reasons.

First, Plaintiffs have not articulated how, or in what manner, the cited provisions limit their collective bargaining rights.[13]  They make no reference to the collective bargaining provisions or agreements that are allegedly limited by Determination 35.  They do not even generally allege that any of their rights have been limited by the provisions at issue.  Instead, they simply indicate that the Commission is prohibited from limiting their collective bargaining rights.  As set forth above, the principle that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  *Ashcroft,* 129 S. Ct. at 1949.  For this reason alone, Plaintiffs' claim must be dismissed.

Second, notwithstanding Plaintiffs' bald recitals, the Commission (as argued at length in Section IV above) has the express authority to infringe upon federally guaranteed collective bargaining rights traditionally reserved to Plaintiffs' control.  *New York Shipping Association, Inc., et al.,* Civ. A. No. 78-995.  This includes various matters relating to hiring that are subject to collective bargaining and generally within the exclusive province of employers and unions.   *Id.* When Congress vested the Commission with "the sole power to control the size and character of the labor force," it was with the full knowledge and intention that the Act's specific provisions would override the general polices of federal labor rights if the two came in conflict.  *Id.*  The Commission may "infringe" on such collective bargaining rights if its actions are in furtherance of the policies and purposes of the Act.  *Id.*

In this instance, the provisions at issue ensure that hiring is done in a fair and systematic fashion.  They ensure that the new hires are in accordance with the goals and percentages of the

_____

[13] Notably, Plaintiffs have not even included a prayer for relief or requested any legal remedy or redress from the Court with regard to Count VII.

33

collectively bargained Hiring Plan, and that new employees are assigned the appropriate seniority level so that they are not more senior than those already in the industry.  Rather than limit their rights, the provisions challenged by Plaintiffs are for the express purpose of fulfilling their requests that (1) new employees be granted temporary registrations in order to allow employers to evaluate their job performance and replace any employees who display that they are not capable of fulfilling the job standards; (2) new employees be prevented from having priority over the existing workforce in the filling of lists; and lastly, (3) to "fulfill the section 5-p standard of assuring regularization of employment and full utilization of the existing workforce."  (Compl. – Exh. 2 at 4)  Plaintiffs' rights have not been limited in any way and therefore, Count VII must be dismissed.

### VIII.   COUNT VIII SHOULD BE DISMISSED BECAUSE THE CERTIFICATION REQUIRED BY DETERMINATION 35 DOES NOT VIOLATE SECTION 5-P OF THE ACT

Plaintiffs allege that the Commission is exceeding its statutory authority by requiring NYSA-ILA Contract Board representatives to certify that the selection of individuals – pursuant to the Hiring Plan that they promulgated in accordance with their collective bargaining agreement – was done in a fair and nondiscriminatory manner.  Plaintiffs appear to be advancing two arguments in the Amended Complaint.  First, that the Commission is prohibited by the Act from requiring any certification since it determined to open the deep sea register on its own initiative, rather than pursuant to a joint recommendation by the industry.  Second, that even if a certification was proper, the Commission cannot require that the certification come from an NYSA/ILA Contract Board representative, since neither the NYSA nor the ILA is subject to the jurisdiction.[14]  (Compl ¶¶105-106)  Both arguments are without merit.

---

[14] Plaintiffs assert two directly conflicting factual positions regarding the opening of the deep sea register.  In ¶¶91 and 93 (Count VI), they allege that they "jointly recommended" that 532 longshoremen and 150 clerks and checkers be added to the deep sea register and that the Commission rejected their "joint recommendation."  In ¶32, they allege that they "accepted the Commission's suggestion that the Commission open the register on its own initiative," and in ¶104 (Count VIII) argue that the Commission cannot require a certification "since the Act requires such

In general, the Act provides that when the Commission determines to accept applications for acceptance for inclusion in the longshoremen's register on its own initiative, as it did here, "such acceptance shall be accomplished in such manner deemed appropriate by the Commission." N.J.S.A. 32:23-114; N.Y. UNCONSOL. 9920.  In this instance, the NYSA-ILA Contract Board advised the Commission that they, along with the terminal operators, will recruit, hire, and train the new longshoremen according to the terms of their new Hiring Plan.  New hires will be interviewed and evaluated by an employment screening committee consisting of the terminal operator employer, the ILA Director of Safety, and the NYSA Dirctor of Workforce Development.

Even though the Commission may determine the appropriate manner by which to accept new applications, it advised Plaintiffs that it would accept applications pursuant to their Hiring Plan. The Commission, as it is statutorily empowered to do, issued Determination 35 to ensure that the implementation of the Hiring Plan is not done in a manner that will circumvent the purposes of the Act (i.e., that will promote the lack of a systematic method of hiring, irregularity of employment, the lack of adequate information as to the availability of employment, and the selection of employees by those who are neither responsive nor responsible to the employers).  As part of that process, the Commission determined that since the employers are not the ones who are exclusively recruiting, referring, interviewing and selecting the new hires, they could not feasibly certify that those individuals were selected in a fair and nondiscriminatory basis.  For this reason, it required that certifications come from a Contract Board representative.  This decision was well within the Commission's statutory authority and Plaintiffs' claims to the contrary are without basis.

---

certifications only when the Commission is not on its own initiative but rather upon a joint recommendation."  If the Court were to accept the factual allegations in Count VI as true, that Plaintiffs "jointly recommended" that the Commission open the register, this would defeat their legal argument in Count VIII that the Commission may not require a certification because it has opened the register on its own initiative.  Plaintiffs' September 9, 2013 letter, attached to their Amended Complaint as Exhibit 2, clarifies that they requested that the Commission open the register on its own initiative.

IX.    **C**OUNT **IX** **S**HOULD **B**E **D**ISMISSED **B**ECAUSE **T**HE **C**OMMISSION IS **W**ITHIN **I**TS **A**UTHORITY TO **C**AUTION **P**LAINTIFFS THAT THE **F**ILING OF A **F**ALSE **S**PONSORSHIP **L**ETTER **I**S **P**UNISHABLE BY **A**PPLICABLE **P**ENAL **L**AWS

In light of Plaintiffs' demonstrated failure to take their certification obligations seriously in the past, and to caution them of the potential legal consequences of submitting a false sponsorship letter,  the Commission specifically referenced the statutory prohibition of offering of a false instrument for filing, pursuant to N.Y. Penal Law § 175.35, in Determination 35.  (Compl. – Exh. 3 at 5)[15]  Plaintiffs allege that "the Commission lacks legislative authority to impose a criminal sanction for a purported violation of one of its determinations," and seek a declaration that the Commission is prohibited from imposing a criminal sanction for the submission of a false sponsorship letter.  (Compl. ¶¶114-115)  There is no basis for Plaintiffs' claims.

N.Y. Penal Law § 175.35 (McKinney 2010) provides, in pertinent part:

> A person is guilty of offering a false instrument for filing in the first degree when, knowing that a written instrument contains a false statement or false information, and with intent to defraud the state or any political subdivision, public authority or public benefit corporation of the state, he offers or presents it to a public office, public servant, public authority or public benefit corporation with the knowledge or belief that it will be filed with, registered or recorded in or otherwise become part of the records of such public office, public servant, public authority or public benefit corporation.

"Written instrument,"  is defined as "any instrument or article . . . containing written or printed matter or the equivalent thereof, used for the purpose of reciting, embodying, conveying or regarding information, or constituting a symbol or evidence of value, right, privilege or

---

[15] Section 1.23 of the Commission's Rules and Regulations provides that the Commission's records are to be made public, and available for inspection, at its main office located at 39 Broadway, New York, New York.  Pursuant to §1.23(b), requests for access to those records are to be submitted to the Commission's Secretary, also at this address.   For this reason, in accordance with the Commission's longstanding practice, Determination 35 provides that the sponsorship letters at issue are to be filed in the Commission's New York office.  If the Commission had, instead, required sponsorship letters to be filed in its New Jersey offices, those written instruments would be subject to the provisions of New Jersey equivalent statute for offering a false instrument for filing, codified at N.J.S.A.2C:21-3(b).

identification, which is capable of being used to the advantage or disadvantage of some person." N.Y. Penal Law §175.00 (McKinney 2010).

In general, the purpose of the false filing statute is "to guard against the possibility that officers of the State or its political subdivisions would act upon false or fraudulent 'instruments' that had been filed with their offices in the belief that such documents were accurate and true." *People v. John E. Headley*, 960 N.Y.S.2d 51 (Sup. Ct. 2012)(*quoting People v. Bel Air Equipment Corp.*, 39 NY 2d 48, 54 (Ct. App. 1976))   When a claim is made that a document is not an instrument within the meaning of the statute, "the character and contents of the document must be closely analyzed.  The court must not only ascertain whether the particular document falls within the literal scope of the statute but is of a character that the mischief the statute seeks to prevent would ensure if the document were filed."  *People v. Bel Air Equipment Corp.*, 39 NY 2d at 54. Where both standards are satisfied, the document is an instrument as that term is utilized in the statute.  *Id.* (payment voucher containing a certification by a contractor that he completed certain prescribed work was a written instrument); *see also People v. Armitt*, 195 Misc. 2d 879, 762 N.Y.S.2d 222 (2nd Dep't 2003)(application for a job with the District Attorney's office that falsely stated that the applicant had never been convicted of a crime was a written instrument); *People v. Jacob*, 248 AD 2d 638 (2nd Dep't, 1998)(vouchers submitted to the State Comptroller's Office were written instruments even though their content was not relief upon by the government, as the purpose of the law is to guard against even the possibility that the government would act upon false instruments filed in the belief that they were accurate).

In this matter, the sponsorship letters at issue fit within both the literal and constructive scope of the false filing statute.  They are written documents, offered to the Commission which is a public authority, with knowledge or belief that they would become part of the Commission's records, containing a certification that, *inter alia*, hiring was done in a fair and nondiscriminatory

37

manner.  Sponsorship letters are, and will continue to be, relied upon by the Commission as one of the bases for issuance of longshoremen's registrations.  Submitting a false sponsorship letter containing a certification that hiring was done in a fair and nondiscriminatory manner when, in fact, it had not been, would interfere with the Commission's legitimate function of ensuring fair hiring in the Port.

Contrary to Plaintiffs' allegations, the Commission has not imposed a criminal sanction for "a purported violation of one of its determinations."  The Commission has simply issued a reminder to Plaintiffs of the serious, potential legal consequences associated with the submission of a false written instrument.  If the Commission has reason to believe that a false sponsorship letter was filed by Plaintiffs or their members, the Commission would refer that matter to the appropriate prosecutorial agency (i.e., the New York County District Attorney's Office) for further investigation and/or prosecution.  Anyone found to have submitted a false sponsorship letter would be subject to criminal penalties, regardless of whether the Commission included the cautionary provision within Determination 35 that is at issue in this litigation.  In effect, Plaintiffs have taken the position in this litigation that it was improper for the Commission to provide them with fair warning that the filing of a false sponsorship letter is punishable by law.  Plaintiffs have failed to state a claim accordingly, Count IX should be dismissed.

## X.    COUNT X SHOULD BE DISMISSED BECAUSE THE COMMISSION'S ISSUANCE OF ITS RESOLUTION CONCERNING ITS AMENDMENT TO RULE 4.4(D) DID NOT VIOLATE PLAINTIFFS' DUE PROCESS RIGHTS

Plaintiffs aver that the procedure used by the Commission to issue the resolution amending Rule 4.4(d) failed to comport with their Fifth and Fourteenth Amendment due process rights. (Compl. ¶¶ 121-122)  They allege that since the Commission failed to hold hearings at which the

interested parties could provide evidence and argument, the resolution is therefore null and void. (Compl. ¶¶120-123)[16]

The Fourteenth Amendment provides that "[n]o state. . . shall. . .deprive any person of life, liberty or property, without due process of law." A plaintiff must establish that he has a protected property interest to which the Fourteenth Amendment's due process protection applies. *Gikas v. Washington School District,* 328 F.3d 731, 735 (3d Cir.2003).  This provision has been interpreted as having both substantive and procedural components. *See, Planned Parenthood of S.E. Pennsylvania v. Casey,* 505 U.S. 833, 846-47 (1992).

 "The basic elements of procedural due process are notice and an opportunity to be heard." *Fenning v. Materio*, 1984 U.S. Dist. LEXIS 15215, 31 (D.N.J. July 5, 1984)  However, it is well settled that a government agency has no constitutional requirement to hold a public hearing before it exercises its rule-making authority.  *Parsons v. United States Postal Service*, 380 F. Supp. (D.N.J. 1974); *see also Bowles v. Willingham*, 321 U.S. 503, 519 (1944).  Nor does the Administrative Procedures Act apply to the rule-making powers to the Commission's regulation that is now at issue. 39 U.S.C. § 410.    Thus, in this instance, the Commission did not violate Plaintiffs' due process rights in promulgating the amendment to Rule 4.4(d) without holding a hearing.[17]

To establish a claim under Section 1983, a plaintiff must demonstrate that the challenged conduct deprived him of right, privileges, or immunities secured by the Constitution or the laws of

---

[16] As an initial matter, Plaintiffs have failed to state a claim for violation of the takings clause of the Fifth Amendment.  "In order to succeed in a due process or takings case under the Fifth Amendment, a plaintiff must first show that a legally cognizable property interest is affected by the Government's action in question." *Prometheus Radio Project v. FCC*, 373 F.3d 372, 428 (3d Cir. 2004).  Here, Plaintiffs' conclusory allegations that the hiring procedures set forth in their CBA constitute a property right are without support and must therefore be dismissed.

[17] Notably, as set forth in Section IV of the Statement of Facts, the Commission provided the NYSA with notice of the pending amendment, and invited it to submit comments and to appear at a Commission meeting.  After reviewing the NYSA's written opposition (which was virtually the same as that submitted by the MMMCA), the Commission adopted the resolution at issue.

the United States.  *See Parratta v. Taylor*, 451 U.S. 527, 525 (1981).  "[T]he first step in evaluating a section 1983 claim is to identify the exact contours of the  underlying right said to have been violated and to determine whether the plaintiff has alleged a  deprivation of a constitutional right at all."  *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008)(citation omitted).  The first thread of substantive due process applies when a plaintiff challenges the validity of a legislative act. Typically, a legislative act will withstand challenge if the government identifies a legitimate state interest that the legislature could rationally conclude was served by the statute, although legislative acts that burden certain fundamental rights may be subject to stricter scrutiny.  Applying these principles in the context of a motion to dismiss, the Third Circuit has held that "to state a claim, [plaintiff's] complaint would have to allege facts that would support a finding of arbitrary or irrational legislative action by the [legislative body]."  *Pace Resources, Inc. v. Shrewsbury Township*, 808 F.2d 1023, 1035 (3d Cir. 1987).

In this instance, Rule 4.4(d), which is aimed at ensuring fair and nondiscriminatory hiring in the Port, falls within the police power of the states of New York and New Jersey.  *See, e.g., Waterfront Comm'n of New York Harbor*, 928 F. Supp. 1403 ("such power is broadly defined to include virtually any health, safety, or general welfare goal.")  As long as there is a "minimally rational relation between the means chosen and the end being pursued, courts must defer to the exercise of the state's police power.  Unless the state legislature has acted in an 'arbitrary and irrational way', there is a presumption that such regulation is constitutional."  *Waterfront Comm'n of New York Harbor*, 928 F. Supp. 1403 (citation omitted).  The Complaint states no facts which, if proven, would support a finding of irrational action.  Count X of the Complaint fails to state a valid claim and must therefore be dismissed.

<u>C</u>ONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss Plaintiffs' Amended Complaint

for failure to state a claim should be granted.

Respectfully submitted,

Waterfront Commission of New York Harbor

By:___/s/ Phoebe S. Sorial_____
Phoebe S. Sorial, General Counsel
39 Broadway, 4th Floor
New York, New York 10006
Telephone (212) 905-9202
Facsimile (212) 480-0587
psorial@wcnyh.gov

Dated:       January 21, 2014

**CERTIFICATE OF SERVICE**

I hereby certify that on January 21, 2014, I served the foregoing Brief in Support of

Defendant's Motion to Dismiss Plaintiffs' Complaint for failure to state a claim upon counsel of

record *via* the ECF filing system.

*/s/  Phoebe S. Sorial*

_____

Phoebe S. Sorial, General Counsel
Waterfront Commission of New York Harbor
39 Broadway, 4th Floor
New York, New York 10006
Telephone (212) 905-9202
Facsimile (212) 480-0587
psorial@wcnyh.gov