# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

-----------------------------------------------------------------------  x

NEW YORK SHIPPING ASSOCIATION, INC., on behalf of its members; METROPOLITAN MARINE MAINTENANCE CONTRACTORS' ASSOCIATION, INC. on behalf of its members; INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO, on behalf of its members and affiliated locals in the Port of New York and New Jersey; LOCAL 1804-1, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO, on behalf of its members; and LOCAL 1814, INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO, on behalf of its members,

Plaintiffs,

-against-

WATERFRONT COMMISSION OF NEW YORK HARBOR,

Defendant.

-----------------------------------------------------------------------  x

**Document Filed Electronically**

**Case No. 2:13-CV-07115 - SDW-MCA**

**Motion Day: March 3, 2014**

## MEMORANDUM OF LAW OF PLAINTIFFS
## NEW YORK SHIPPING ASSOCIATION, INC.,
## INTERNATIONAL LONGSHOREMEN'S ASSOCIATION,
## AFL-CIO, AND THE PLAINTIFF LOCALS IN OPPOSITION
## TO DEFENDANT'S MOTION TO DISMISS
## THE AMENDED COMPLAINT

James R. Campbell
THE LAMBOS FIRM, LLP
599 Avenue C
Bayonne, New Jersey 07002
(201) 823-1000
        and
Donato Caruso
The Lambos Firm, LLP
303 South Broadway, Suite 410
Tarrytown, New York 10591
(212) 943-2470

*Attorneys for Plaintiff*
*New York Shipping Association,*
*Inc.*

Kevin Marrinan
John Sheridan
MARRINAN &
MAZZOLA MARDON, P.C.
26 Broadway, 17th Floor
New York, New York 10004
(212) 425-3240

*Attorneys for Plaintiff*
*International Longshoremen's*
*Association, AFL-CIO and Local*
*1814, International*
*Longshoremen's Association, AFL-*
*CIO*

George T. Daggett
DAGGETT, KRAEMER & GJELSVIK
328 D Sparta Avenue
Sparta, New Jersey 07871
(973) 729-2117

*Counsel for Plaintiff*
*Local 1804, International*
*Longshoremen's Association, AFL-CIO*

**Dated:** February 21, 2014

**TABLE OF CONTENTS**                                    Page (s)

PRELIMINARY STATEMENT ...................................................................................1

FACTS ......................................................................................................................2

    Background ........................................................................................................2

    The NYSA-ILA Collective Bargaining Agreement ........................................5

    Request For An Opening Of The Deep-Sea Register ......................................6

    The Commission's Determination 35 ..............................................................7

    Interference With The Hiring Of "A" registrants ...........................................7

    The Secret Determination ................................................................................9

    Prior Proceedings ............................................................................................9

ARGUMENT ...........................................................................................................9

   STANDARDS FOR DISMISSAL MOTIONS ...........................................................9

   ANALYSIS OF COUNTS FOR LEGAL SUFFICIENCY ........................................11

    Count I .............................................................................................................11

    Count II ...........................................................................................................18

    Counts III and IV ........................................................................................... 22

    Count V ...........................................................................................................26

    Count VI..........................................................................................................28

    Count VII .........................................................................................................30

    Count VIII ...................................................................................................... 33

    Count IX.......................................................................................................... 34

    Count X ........................................................................................................... 35

CONCLUSION.........................................................................................................39

**TABLE OF AUTHORITIES**                        Page (s)

CONSTITUTION

U.S. CONST. amend XIV .................................................................................36

CASES

*Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490 (1981)....................30

*Am. Tobacco Co. v. Patterson*, 456 U.S. 63 (1982)............................. 12

*Armstrong v. Manzo*, 380 U.S. 545 (1965) ....................................36

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...........................................9

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ............................9

*Benak v. Alliance Capital Mgmt.*, 435 F.3d 396 (3d Cir. 2006) ....................10

*Bozzi v. Waterfront Comm'n of N.Y. Harbor,* No. 90 Civ. 0926 (MGC), 1994
  WL 606043 (S.D.N.Y. Nov. 3, 1994)...............................................3n

*Bowles v. Willingham*, 321 U.S. 503 (1944)....................................36, 37

*Brock v. Roadway Express, Inc.*, 481 U.S. 252 (1987)........................38

*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) ................30

*CBS Corp. v. FCC*, 663 F.3d 122 (3d Cir. 2011), *cert. denied,*
  132 S. Ct. 2677 (2012)..................................................................22

*Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc.* 467 U.S. 837 (1984) ....................19

*Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532 (1984) ................36

*Cuyler v. Adams*, 449 U.S. 433 (1981) ..........................................12n

*DeVeau v. Braisted*, 368 U.S. 144 (1960).......................................17

*Dist. of Columbia v. Heller*, 554 U.S. 570 (2008) ...........................29

*Ehrhart v. Synthes (USA)*, No. 07-01237 (SDW), 2007 WL 4591276
  (D.N.J. Dec. 21, 2007)..................................................................31

*Handley v. Phillips*, 715 F. Supp. 657 (M.D. Pa. 1989) ....................38

*Hannah v. Larche*, 363 U.S. 420 (1960).........................................37

## TABLE OF AUTHORITIES                                 Page (s)

*Hawaii v. Office of Hawaiian Affairs,* 556 U.S. 163 (2009)........................29

*Hazelton v. Murray*, 21 N.J. 115 (1956) ..........................................17

*Hemy v. Perdue Farms, Inc.*, Civ. Action No. 11-888 (FLW), 2011 WL 6002463
   (D.N.J. Nov. 30, 2011) ..........................................................10

*INS v. Cardoza-Fonseca*, 480 U.S. 421 (1987) ...................................21

*INS v. Phinpathya*, 464 U.S. 183 (1984) ..........................................12

*Johnston-Taylor v. Gannon*, 907 F.2d 1577 (6th Cir. 1990) .....................38

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991).......................10

*Kurdyla v. Pinkerton Sec.*, 197 F.R.D. 128 (D.N.J. 2000).........................11

*Lum v. Bank of Am.*, 361 F.3d 217 (3d Cir.), *cert. denied,* 543 U.S. 918 (2004) ........10

*Mackey v. Lanier Collections Agency*, 486 U.S. 825 (1988) ......................13

*Matteo v. Superintendent, SCI Albion*, 171 F.3d 877 (3d Cir. 1999), *cert. denied*,
   528 U.S. 824 (1999) ............................................................12

*Midnight Sessions Ltd v. Philadelphia*, 945 F.2d 667 (3d Cir. 1991), *cert. denied*,
   503 U.S. 924 (1992)............................................................36

*Moffitt v. Town of Brookfield*, 950 F.2d 880 (2d Cir. 1991)......................38

*Motor Vehicle Mfr. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29 (1983) ........22, 30

*Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)................36

*NAACP v. FPC,* 425 U.S. 662 (1976).............................................26, 27

*New Castle Cnty. v. Bd. of Educ.*, 569 F. Supp. 1482 (D. Del. 1983) ............38

*NOW v. Waterfront Comm'n of N.Y. Harbor*, 460 F. Supp. 84 (S.D.N.Y. 1978).........18

*N.Y. Shipping Ass'n v. Waterfront Comm'n of N.Y. Harbor*, No. 78-995 HCM,
   slip op. (D.N.J. June 11, 1978) ...............................................23, 32

*Parsons v. United States Postal Service*, 380 F. Supp. 815 (D.N.J. 1974)...................36

*PBGC v. White Consol. Indus., Inc.*, 998 F.2d 1192 (3d Cir. 1993), *cert. denied*,
   510 U.S. 1042 (1994)..........................................................10

*People v. Sutera*, 968 N.Y.S.2d 556 (N.Y. App. Div. 2013).......................................35

*Phillips v. Cnty. of Allegheny*, 515 F.3d 224 (3d Cir. 2008)..........................................10

*Pryor v. NCAA,* 288 F.3d 548 (3d Cir. 2002) ..............................................................10

*Richards v. United States,* 369 U.S. 1 (1962)................................................................ 12

*Rockefeller Ctr. Prop., Inc. Sec. Litig.*, 184 F.3d 280 (3d Cir. 1999)...........................11

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410
 (3d Cir. 1999).................................................................................................................10

*Smith v. Church St. Corp.*, Civil No. 06-966 (SRC), 2006 WL 1307714
 (D.N.J. May 8, 2006) ..................................................................................................11

*Teamsters v. United States*, 431 U.S. 324 (1977) ....................................................... 13

*Trecom Bus. Sys. v. Prasad*, 980 F. Supp. 770 (D.N.J. 1997) .....................................29

*United States v. Mead Corp.*, 533 U.S. 218 (2001) ....................................................21

*United States v. Price*, 361 U.S. 304 (1960) ............................................................... 13

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43 (1993) .........................37

*Waterfront Comm'n of N.Y. Harbor v. Sea Land Serv., Inc.*, 764 F.2d 961 (3d Cir. 1985) ....24, 25

*Wilson v. Philadelphia*, 415 Fed. App'x 434 (3d Cir. 2011) .......................................31

## Federal Law

Waterfront Commission Compact, Pub. L. No. 83-252, ch. 407,
 67 Stat. 541 (Aug. 12, 1953)...................................................................................2, 16

## Federal Rules

Fed. R. Civ. P. 8...................................................................................................30n, 31

## TABLE OF AUTHORITIES                                    Page (s)

**NEW JERSEY STATUTES**

N.J. STAT. ANN. § 32:23-5 (West 1990) ...................................................34

N.J. STAT. ANN. § 32:23-21 (West 1990) .................................................27

N.J. STAT. ANN. § 32:23-24 (West 1990) .................................................27

N.J. STAT. ANN. § 32:23-85 (West 1990) ...................................................3

N.J. STAT. ANN. § 32:23-114 (West Supp. 2013)............................... *passim*

**NEW YORK STATUTES**

N.Y. PENAL LAW § 175.35 (McKinney 2010)...........................................34

N.Y. UNCONSOL. LAWS § 9805 (McKinney 2002).................................34

N.Y. UNCONSOL. LAWS § 9821 (McKinney 2002).................................27

N.Y. UNCONSOL. LAWS § 9824 (McKinney 2002).................................27

N.Y. UNCONSOL. LAWS § 9905 (McKinney 2002) ...................................3

N.Y. UNCONSOL. LAWS § 9920 (McKinney 2002)........................... *passim*

**NEW YORK REGULATIONS**

21 N.Y.C.R.R. § 7.1 ................................................................................ 15

**LEGISLATIVE HISTORY**

Fourth Report of the N.Y. State Crime Comm'n (Port of N.Y. Waterfront)
 (May 20, 1953)........................................................................16n, 20

Summary of Waterfront Commission Act, N.Y. UNCONSOL. LAWS , vol. 65,
 at p. 477 (McKinney 2002)......................................................16, 23n

**TABLE OF AUTHORITIES**                                    **Page (s)**

MISCELLANEOUS

Matthew 26:65 (King James)...........................................................................................37

## PRELIMINARY STATEMENT

Defendant Waterfront Commission of New York Harbor (Commission) asks this Court to dismiss the ten counts that constitute the Amended Complaint. The Commission's dismissal motion is predicated upon a total disregard of the two well-settled principles that control motions to dismiss: (1) Plaintiffs' factual allegations must be accepted as true, and  (2) the analysis of the sufficiency of the challenged pleading must be confined to the pleading itself and any documents attached thereto or mentioned therein. The Commission's motion takes issue with the factual allegations in virtually every count and asks this Court to resolve these factual disputes in its favor.[1]  The Commission compounds this error by asking this Court to consider as true facts asserted in materials extraneous to the Amended Complaint.  The Commission asks the Court for dismissal not because the Amended Complaint accepted as true does not state a plausible claim for relief on its face but because in the Commission's view it will ultimately prevail on its version of the facts.  The Commission's motion is fundamentally flawed.  Factual disputes cannot be resolved at this stage of the case.

---

[1]  *See*, e.g., Defendant's Memorandum of Law dated January 21, 2014 In Support of Motion To Dismiss Plaintiffs' Amended Complaint (hereinafter "DMOL") at 19 (Count I: "Plaintiffs' arguments to the contrary are completely belied . . . ."), at 20 (Count I: "Plaintiffs' allegations to the contrary are totally unsupportable."), at 21 (Count I: "It cannot be cogently alleged, as Plaintiffs have alleged . . . ."), at 24 (Count II: "Plaintiffs contend that Section 5-p does not apply to "A" registrants . . . Plaintiffs have not, and indeed cannot, dispute that "A" registrants fall squarely within Section 5-p(5)(b) of the Act."), at 26 (Counts III and IV: "These allegations are without merit."), at 31 (Count V: "Plaintiffs' allegations to the contrary are without merit . . . ."), at 31 (Count VI: "For the reasons set forth below, these allegations are categorically untrue and must therefore be dismissed."), at 32 (Count VI: "The allegations of Count VI are without any support and must therefore be dismissed."), at 32 n. 12 (Count VI: "This allegation is denied."), at 34 (Count VII: "Plaintiffs' rights have not been limited in any way and therefore, Count VII must be dismissed."), at 35 (Count VIII: ". . . Plaintiffs' claims to the contrary are without basis."), at 38 (Count IX: "Contrary to Plaintiffs' allegations . . . ."), at 39, n. 16 (Count X: "Here, Plaintiffs' conclusory allegations that the hiring procedures set forth in their CBA constitute a property right are without support and must therefore de dismissed.")

# FACTS

**Background**

When the Waterfront Commission Compact (Compact), Pub. L. No. 83-252, ch. 407, 67 Stat. 541 (Aug. 12, 1953), was enacted, it granted the Commission authority to license workers, known as deep-sea longshoremen and checkers who load and unload cargo on and off vessels calling at the Port of New York and New Jersey (NY-NJ Port), and to maintain a list of those workers, known as the Deep-Sea Longshoremen's Register. *See* Amended Complaint (Am. Compl.) at ¶ 15.   The Compact expressly prohibited the Commission from interfering with rights of employers and their employees to bargain collectively:

> This compact is not designed and shall not be construed to limit in any way any rights granted or derived from any other statute or any rule of law for employees to organize in labor organizations, to bargain collectively and to act in any other way individually, collectively, and through labor organizations or other representatives of their own choosing.

> *         *         *

> This compact is not designed and shall not be construed to limit in any way any rights of longshoremen . . . or their employers to bargain collectively and agree upon any method for the selection of such employees by way of seniority, experience, regular gangs or otherwise . . . .

*See* 67 Stat. at 557; Am. Compl. at ¶¶ 17,18.

During the 1960's a technological advance known as containerization, which involved the use of large, reusable metal receptacles that can be loaded and off-loaded from ocean vessels unopened, eliminated the traditional piece-by-piece loading and unloading of ships. Containerization significantly reduced the number of longshoremen required to load and unload vessels, resulting in unprecedented job displacement.   The collective-bargaining parties, New York Shipping Association, Inc. (NYSA) and the International Longshoremen's Association, AFL-CIO (ILA) addressed that job displacement through the adoption of the Guaranteed Annual

Income (GAI) Program in the 1964 NYSA-ILA Collective Bargaining Agreement (NYSA-ILA CBA).  Under the GAI Program, qualified longshoremen were guaranteed wages, whether or not they actually performed any work.  *See* Am. Compl. at ¶¶ 19-21.

In 1966, the legislatures of New York and New Jersey each adopted the closed-register statute, often referred to as section 5-p in response to the GAI Program.  S*ee* N.J. STAT. ANN. § 32:23-114 (West Supp. 2013); N.Y. UNCONSOL. LAWS § 9920 (McKinney 2002).  Section 5-p gave the Commission the power to open and close the longshoremen's register, thereby controlling the size of the workforce.  The Commission closed the register that year, and except for three openings in the late 1960's, the register remained closed for more than 30 years. *See* Am. Compl. at ¶ 21.

In 1969, the state legislatures broadened the definition of longshoreman to include a new class of longshore workers, known as "A" registrants,[2] who do not load and unload ships but perform services ancillary to the loading and unloading operations.  *See* N.J. STAT. ANN. § 32:23-85(6) (West 1990); N.Y. UNCONSOL. LAWS § 9905(6) (McKinney 2002); Am. Compl. at ¶ 22. Most "A" registrants are employed by maintenance contractors that repair and maintain the containers, chassis, and cargo-handling equipment used in stevedoring operations. *See* Am. Compl. at ¶¶ 5, 36. The maintenance contractors are represented for collective-bargaining purposes by Metropolitan Marine Maintenance Contractors' Association, Inc. (MMMCA).  See Am. Compl. at ¶ 5.  From 1969 until 1982, the Commission did not apply section 5-p to "A" registrants, and in 1982, at the request of the Commission, the state legislatures amended section 5-p specifically to exclude them.  *See* Am. Compl. at ¶ 23.

---

[2]   The term "A" registrants is derived from the prefix "A" before the multi-digit number that appears on Waterfront Commission licenses issued to "A" registrants. *See Bozzi v. Waterfront Comm'n of N.Y. Harbor,* No. 90 Civ. 0926 (MGC), 1994 WL 606043, at *3 (S.D.N.Y. Nov. 3, 1994).  The Waterfront Commission licenses assigned to deep-sea longshoremen and checkers do not contain any letter designation.

The longshore industry adapted to the "A" register legislation by creating separate workforces. NYSA's members employ the deep-sea longshoremen and checkers in accordance with the NYSA-ILA CBA, and MMMCA's members employ the "A" registrants in accordance with their collective bargaining agreement (MMMCA-ILA CBA) with Plaintiffs Local 1804-1, International Longshoremen's Association, AFL-CIO (ILA Local 1804-1) and Local 1814, International Longshoremen's Association, AFL-CIO (ILA Local 1814). *See* Am. Compl. at ¶¶ 4-8, 36, 37.

Over the years labor shortages in the deep-sea longshore workforce were addressed not by the Commission's opening the Deep-Sea Register but through Commission resolutions enrolling temporary workers and subsequent legislative enactments by the states to permit those workers to be permanently added to the register. *See, e.g.,* N.J. STAT. ANN. § 32:23-114(4)(c), (d,), (e), (f), (g) (West Supp. 2013); N.Y. UNCONSOL. LAWS § 9920(5) (c), (d,), (e), (f), (g) (McKinney 2002); Am. Compl. at ¶ 24. By the 1990's this procedure had become outdated.

In 1999, the New York and New Jersey legislatures amended section 5-p to permit controlled openings of the Deep-Sea Register through the use of an employer-sponsorship procedure. *See* Am. Compl. at ¶ 24. Under this new procedure, NYSA and the ILA submit to the Commission their recommendation as to the number of new employees required by job category and the number of new employees required by each employer. *See* Am. Compl. at ¶ 25. The Commission then determines the total number of new workers needed by the industry by job category and registers the workers selected by the employers, provided they have passed the Commission's criminal-background checks. *See* Am. Compl. at ¶ 26. Included with that amendment was a provision requiring sponsoring employers to "certify that the selection of the persons so sponsored [by them] was made in a fair and non-discriminatory basis in accordance with the requirements of the laws of the United States and the states of New York and New

4

Jersey dealing with equal employment opportunities." *See* N.J. STAT. ANN. § 32:23-114(1) (West Supp. 2013); N.Y. UNCONSOL. LAWS § 9920(4) (McKinney 2002); Am. Compl. at ¶ 27.

From 2000 through 2010 there were nine openings of the Deep-Sea Register that added approximately 2,000 new employees. Virtually all those employees were referred by the ILA. Not once during that time did the Commission ever reject any of the section 5-p certifications made by sponsoring employers with respect to deep-sea workers. And until last year the Commission had never applied section 5-p to "A" registrants. *See* Am. Compl. at ¶¶ 28-29.

**The NYSA-ILA Collective Bargaining Agreement**

Last year NYSA and the ILA agreed upon a new six-year collective bargaining agreement. The contract negotiations were focused on getting the NY-NJ Port prepared to handle increased cargo volumes. The collective-bargaining parties sought to assure ocean carriers that the NY-NJ Port would be able to offer efficient and cost-effective stevedoring services, so the carriers would continue to use the NY-NJ Port as the preeminent port on the East Coast. *See* Am. Compl. at ¶ 30.

Under the auspices of the Federal Mediation and Conciliation Service, NYSA and ILA agreed upon increased productivity standards, a new relief-gang system, and the adoption of a recruitment and hiring program that would provide the additions to the workforce needed to handle the increased volumes. *See* Am. Compl. at ¶ 30, Exh. 1 at p. 5. Under the new Recruitment and Hiring Plan, 51% of new deep-sea workers to be hired during the term of the NYSA-ILA CBA will be comprised of honorably discharged military veterans, 25% of ILA referrals, and 24% of referrals from NYSA and its members. *See* Am. Compl. at ¶ 31, Exh. 1 at p. 4. To save costs, the collective-bargaining parties agreed upon an enhanced window-pension package for longshore workers with more than 25 years in the industry. To be eligible for that package, workers must cease employment in the industry by the earlier of April 1, 2014, or when

5

replacement workers have been found and they have been released from employment. Approximately 250 workers will be retiring under this window package. In addition to replacing these retirees, the industry requires another 290 replacements for workers who had retired between 2007 and 2012. *See* Am. Compl. at ¶ 30.

**Request For An Opening Of The Deep-Sea Register**

NYSA and the ILA sent the Commission a letter dated September 9, 2013, to add 682 employees to the Deep-Sea Register: 532 longshoremen and 150 checkers. *See* Am. Compl. at ¶ 32, Exh. 2. The industry's request provided an explanation of (a) the number of employees required by each employer by craft, (b) the need for new workers due to the net loss of 245 workers between 2007 and 2012 and the anticipated retirement of an additional 250 workers by April, (c) the average daily shortage of approximately 298 list employees, with an additional shortage of 68 gang positions and 16 gang-driver positions, (d) the need for the industry to hire new workers in a metered sequence of 150 longshoremen and 25 checkers per month to allow for proper training without creating a backlog of individuals waiting to be trained, and (e) the need to have the Commission grant temporary registrations to the new employees so that the employers can evaluate the job performance of the new employees and determine whether replacements are necessary. *See* Am. Compl. at ¶ 33, Exh. 2.

During discussions earlier that year between NYSA and the Commission, the Commission suggested that the request of the collective-bargaining parties seek to have the Commission open the register on its own initiative, so that there would be no need for a public hearing and the industry could hire new employees quickly. *See* Am. Compl. at ¶ 32, Exh. 2. Although NYSA and the ILA acted in accordance with that suggestion, s*ee* Am. Compl., Exh. 2 at 1, the Commission reneged by scheduling a public hearing and sought to become involved in

determining the manner in which the new workers would be recruited, referred, selected, hired, and trained.  *See* Am. Compl., Exh. 4 at 3-4.

**The Commission's Determination 35**

Later that year the Commission cancelled the public hearings and issued Determination 35 in which the Commission ordered that it will accept a total of only 150 applications for longshore positions and only 75 applications for checker positions, that the Commission will review the applicants "to determine their appropriate referral source [] and to ensure that the new hires are in accordance with the goals and percentages set forth in the Hiring Plan," that a representative of the NYSA-ILA Contract Board must "certify[] that: (1) he or she has personal knowledge of the facts concerning the recruitment, referral, selection and sponsorship of [the applicant] and (2) the selection of the person so sponsored was made in a fair and nondiscriminatory basis in accordance with the requirements of the laws of the United States and the States of New York and New Jersey dealing with equal employment opportunities," that "the offering  of a false sponsorship letter for filing shall be punishable under N.Y. Penal Law § 175.35," that the new hires "shall be assigned 'V' seniority," that no new hires "may be offered employment opportunities" until all previously registered longshoremen have been offered employment, and that a new hire "shall not be eligible for permanent inclusion in the Longshoremen's Register until such time as he or she is approved by the Commission for addition to and placement on a regular list." *See* Am. Compl. at ¶ 34, Exh. 3.

**Interference With The Hiring Of "A" Registrants**

The Commission had always maintained the separate identities of the two workforces under the two collective bargaining agreements.  That changed in May 2013, when the Commission announced that it would permit NYSA's members to hire "A" registrants. *See* Am. Compl. at ¶¶ 36, 38. In response, NYSA and the ILA informed the Commission that they had

amended their labor agreement to adopt virtually the same hiring procedure that MMMCA's members had been using for more than 40 years to hire their "A" registrants. Under that hiring procedure, which the Commission had never previously objected to, all candidates for "A" registrant positions are referred to the employers by the union. *See* Am. Compl. at ¶ 39.

On August 26, 2013, the Commission sent NYSA an e-mail advising that it would be adopting an amendment to Section 4.4(d) of its Rules and Regulations (hereinafter "Rule 4.4(d)") that would apply to employers of "A" registrants a requirement that had previously applied only to employers of deep-sea longshoremen. The Commission's amendment incorporated into Rule 4.4(d) the same certification set forth in the 1999 amendment to section 5-p, which requires an employer to certify that the selection of new employees "was made in a fair and nondiscriminatory basis in accordance with the requirements of the laws of the United States and the States of New York and New Jersey dealing with equal employment opportunities." *See* N.J. STAT. ANN. § 32:23-114(1)(e) (West Supp. 2013); N.Y. UNCONSOL. LAWS § 9920(4) (McKinney 2002); Am. Compl. at ¶ 40.

NYSA and MMMCA objected to that amendment on the grounds that the certification requirement lacks statutory authority and would alter the longstanding collectively-bargained methodology for hiring and registering "A" registrants. *See* Am. Compl. at ¶¶ 41-43. But the Commission adopted the amendment and is interpreting it in a way that prevents the employers from hiring new "A" registrants. The Commission informed employers of "A" registrants that in order to hire individuals for the "A" register they must provide a certification that does not deviate from the language of the amended regulation and for that certification to be accepted by the Commission the employers could not continue to select applicants for "A" registration through the union-referral system set forth in their collective bargaining agreements. *See* Am. Compl. at ¶¶ 44-45, Exh. 5.

**The Secret Determination**

A month after its passage, the Commission informed NYSA and the ILA of a resolution in which the Commission had determined that the union-referral provisions of their collective bargaining agreements relating to the hiring procedures for "A" registrants "promote various conditions . . . including . . . the lack of a systematic method of hiring, irregularity of employment, the lack of adequate information regarding the availability of employment, and the selection of employees by those who are neither responsive nor responsible to the employers." The Commission had never previously notified any of the Plaintiffs that it was considering such an action or that it had rendered that determination.  *See* Am. Compl. at ¶¶ 46-48, Exh. 4.

**Prior Proceedings**

The original Complaint not only focused on the Commission's amended regulation relating to the hiring of "A" registrants but also challenged on due process grounds the Commission's scheduled public hearings relating to the hiring of both "A" registrants and deep-sea registrants.  After the Commission cancelled the public hearings and issued Determination 35 concerning the hiring of deep-sea registrants, Plaintiffs filed their Amended Complaint to add counts to invalidate Determination 35.

## ARGUMENT

### STANDARDS FOR DISMISSAL MOTIONS

A motion to dismiss will fail if the challenged pleading "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When addressing a motion to dismiss, a court must "accept all factual allegations as true, construe the complaint in the light must favorable to the plaintiff, and determine whether, under

any reasonable reading of the complaint, the plaintiff may be entitled to relief." *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

"Documents that the defendant attaches to the motion to dismiss *are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to the claim*; as such, they may be considered by the court." *See Pryor* v. *NCAA,* 288 F.3d 548 (3d Cir. 2002) (emphasis in original). A court may also consider matters of public record and undisputedly authentic documents if the plaintiff's claims are based on those documents. *See PBGC v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993), *cert. denied*, 510 U.S. 1042 (1994) (public records are those to which the public has unqualified access; such records do not include documents subject to disclosure under the Freedom of Information Act).

A court is not permitted to consider for the truth of the matter asserted facts set forth in documents outside the complaint. *See S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Group, Ltd.*, 181 F.3d 410, 426-27 (3d Cir. 1999). That rule applies *inter alia* to transcripts of prior proceedings, *see id.* at 427 n.7; *Lum v. Bank of Am.*, 361 F.3d 217, 221 n.3 (3d Cir.), *cert. denied*, 543 U.S. 918 (2004); public records, *see Hemy v. Perdue Farms, Inc.*, Civ. Action No. 11-888 (FLW), 2011 WL 6002463, at *6 (D.N.J. Nov. 30, 2011); newspaper articles, *see Benak v. Alliance Capital Mgmt.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006); and press releases, *see Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

In its memorandum of law in support of its motion to dismiss the Commission improperly cites to purported facts set forth in documents that are not cited in or attached to the Amended Complaint, *see* DMOL at 8 (transcript of the April 28, 1998 public hearing before the Commission); *see* DMOL at 11 (complaint issued by the New York State Division of Human Rights); *see* DMOL at 11, 24 (articles in the New York Times); *see* DMOL at 15 (press release

issued by the Port Authority of New York and New Jersey); *see* DMOL at 19 n.6 (NYSA's 2012 Annual Report).  Each of these extraneous documents is offered for the truth of its contents.

By engaging in this improper litigation strategy the Commission dooms its motion to dismiss.  The Court may not adjudicate factual disputes on such a motion but instead must defer their resolution to a later trial or summary judgment motion after Plaintiffs have been afforded adequate discovery. *See In Re: Rockefeller Ctr. Prop., Inc. Sec. Litig.*, 184 F.3d 280, 287-89 (3d Cir. 1999); *Smith v. Church St. Corp.*, Civil No. 06-966 (SRC), 2006 WL 1307714, at *3 (D.N.J. May 8, 2006); *Kurdyla v. Pinkerton Sec.*, 197 F.R.D. 128, 131 (D.N.J. 2000).

### ANALYSIS OF COUNTS FOR LEGAL SUFFICIENCY

## Count I

The Commission concedes that the constitutionality of the 1999 certification amendment to section 5-p depends upon whether that amendment implements a purpose of the original Waterfront Commission Compact.  If the amendment fails that test, it is not valid because it lacks congressional consent. The Commission thus accepts the legal sufficiency of Count I and devotes all its energies to an attempt to refute the factual allegation in Count I that the certification does not implement or effectuate one of the original purposes of the 1953 Compact. *See* Amended Compl. at ¶¶ 57-58.

There are three contentions cobbled together by the Commission to support its attempted refutation. First, the Commission contends that the purposes of the Compact "specifically articulated by the legislatures in 1953 included the elimination of oppressive and evil hiring practices" and, in the Commission's view, discrimination in hiring based on race, color, national origin, or sex falls within this category.  *See* DMOL at 19.  Second, the Commission points to a letter submitted by Plaintiffs to the Governor of New York

supporting the 1999 certification amendment. *See* DMOL at 19-20. Finally, the Commission cites a decision of a New York court in 1981 enforcing a subpoena in a Commission investigation of possible racial discrimination by a hiring agent. *See* DMOL at 21. On the basis of this showing, the Commission concludes that Count I should be dismissed because Plaintiffs' allegation that discrimination was not a purpose of the original Compact is not true. *See* DMOL at 21.

Each of the three prongs of the Commission's formulation is untenable. In its first prong, the Commission seems to realize that the determination of what the purposes of the 1953 Compact are begins with the language of that statute. *See* DMOL at 19. After all, "in all cases involving statutory construction, 'our starting point must be the language employed by Congress,' . . . and we assume 'that the legislative purpose is expressed by the ordinary meaning of the words used.'" *INS v. Phinpathya*, 464 U.S. 183, 189 (1984) (quoting *Am. Tobacco Co. v. Patterson*, 456 U.S. 63, 68 (1982), in turn quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)); *see also Matteo v. Superintendent, SCI Albion*, 171 F.3d 877, 888 (3d Cir.), *cert. denied*, 528 U.S. 824 (1999).[3]

The Commission would have this Court believe that the purposes of the Compact were "specifically articulated" to include the "elimination of oppressive and evil hiring practices." The problem with this formulation is that the words chosen by the Commission are nowhere to be found in the original Compact. Nor does the Compact contain any language concerning discrimination in hiring based on race, color, national origin, or sex. The Commission cannot win the day by simply trumpeting the importance of the elimination of unlawful discrimination or of enhancing diversity — ends which none of the Plaintiffs

---

[3] An interstate compact approved by Congress is a federal law subject to federal rather than state construction principles. *See Cuyler v. Adams*, 449 U.S. 433, 438 (1981).

12

oppose.  The question that determines the constitutionality of the section 5-p certification provision is whether these ends were included within the original purposes of the 1953 Compact.  The language of that enactment shows that they were not.

The Commission's second prong is based upon a letter that is part of the legislative history of the 1999 legislation amending section 5-p.  The Commission somehow believes that this letter refutes the allegation in the Amended Complaint that the certification provision in this 1999 amendment does not implement the original purposes of the 1953 Compact.  But the Commission's brief fails to explain how something said in 1999 sheds light on what the purposes were of a Compact enacted 46 years earlier. This lacuna is understandable because fundamental principles of statutory construction caution against using the views of a subsequent legislature to infer the intent of an earlier one.  *See Mackey v. Lanier Collections Agency*, 486 U.S. 825, 840 (1988) (quoting *United States v. Price*, 361 U.S. 304, 313 (1960)). It is the intent of the Congress that passed the enactment that controls.  *See id.* at 840 (quoting *Teamsters v. United States,* 431 U.S. 324, 354 n. 39 (1977)).  The Commission's formulation is devoid of any authority that would substantiate the proposition seemingly advocated by the Commission that Plaintiffs' support for the 1999 certification amendment immunizes that provision from a constitutional challenge. The certification provision is constitutional only if it implements or furthers the purposes of the original Compact.  Support given to an amendment adopted almost half a century later has no probative value in answering that question.

The Commission's method for determining the Compact's original purpose is not to examine the provisions of that enactment or its legislative history because that approach will not yield the result the Commission wants.  Instead, the Commission selectively cherry-picks words and phrases from the Compact and other sources to try to create a purpose that

13

did not exist in the 1953 Compact.  This tactic of juridical alchemy is exposed in the third prong of the Commission's formulation, when the Commission goes to great lengths to doctor a quote from a 1981 lower court decision in New York to create the false impression that the elimination of discrimination was one of the original purposes of the Compact.  The Commission states, "In that case, the Court addressed the Act's Findings and Declarations . . ."  *See* DMOL at 21. Actually, the Court was not addressing the Act's Findings and Declarations at all.  It was examining section 7.1 of the Waterfront Commission's Rules and Regulations.  The Commission's brief deliberately fails to include in its quotation from the case the citation to these Rules and  Regulations that appears in the Court's decision, *viz.* "(21 N.Y.C.R.R. § 7.1(a))," nor does it insert ellipsis marks to indicate the omission. The deception does not end there. The so called quote in the Commission's brief differs from that in the decision and once again ellipsis marks and a bracket are conveniently omitted. The New York court's actual quote is as follows:

> To combat these conditions, the Commission has promulgated certain regulations (McKinney's Unconsolidated Laws, § 9810 [7]) and required that various port personnel be licensed or registered (McKinney's Unconsolidated Laws, §§ 7812-7848). The regulations are designed to effectuate the purposes of the Waterfront Commission Act and to prevent circumvention and evasion thereof.  The regulations are designed to further " * * * the public policies of the States of New York and New Jersey * * * [by] provid[ing] fair and equal employment opportunities [and] by establishing a systematic method of hiring * * *." (21 N.Y.C.R.R. § 7.1[a]).

The regulation itself fills in the court's ellipses and provides the complete picture:

>  (a)        This Part is designed to effectuate the purposes of the Act, as amended and supplemented, and to prevent the circumvention and evasion thereof.  In particular it is designed to improve the conditions under which waterfront labor is employed, to eliminate irregularity of employment, fear and insecurity, and, in accordance with the public policies of the States of New York and New Jersey, to provide fair and equal employment opportunities, by establishing a systematic method of hiring and providing adequate information to waterfront workers as to the availability of

employment opportunities and to waterfront employers as to the available labor supply within the port.

See 21 N.Y.C.R.R. § 7.1(a).

When the ellipses are removed, it is clear why the Commission declined to quote the regulation itself *in toto*. The purpose of the Compact was not to provide fair and equal employment opportunities (a clause that does not even appear in the Compact itself) within the meaning of the civil rights acts but to eliminate the "shape-up" method of daily hiring by establishing a systematic method of hiring that provides adequate information to employees and employers alike of the availability of employment opportunities and of the available labor supply.[4]

One wonders why the Commission refuses to read the words of the Compact. The answer becomes readily apparent when it is examined. Article I, which consists of four paragraphs, contains the legislative findings and declarations which reveal the original purposes of the Compact. These findings and declarations reflect the conclusions derived from the Report of the New York State Crime Commission on the Port of New York Waterfront, a companion report of the New Jersey Law Enforcement Council, and the record of public hearings held in 1953 by New York Governor Thomas E. Dewey. *See*

---

[4]   This is not the first time the Commission has engaged in sharp practices. On the motion for a preliminary injunction the Commission submitted only 34 of the 249 pages of a transcript of a 1998 Waterfront Commission proceeding. Its counsel represented that the Commission is a big fan of the environment and thus "only attached relevant portions." *See* Transcript of Dec. 19, 2013 Court Proceeding at 99. These same relevant pages are again submitted as Exhibit B to the Sorial Declaration submitted on this motion. Not surprisingly, the missing pages dispel certain positions taken by the Commission in this case. *See infra* at 20-21, 33 n. 11. It seems that the Commission's definition of relevant pages means only those that support the Commission's case. Indeed, the Commission mocks Plaintiffs for their "puzzling litigation strategy" of providing the Court with the entire legislative history of the 1999 amendment, including a letter that the Commission would have withheld had it been in Plaintiffs' shoes. *See* DMOL at 20 n.7. Plaintiffs' counsel take seriously their duty as officers of the Court to provide the full legislative record for the Court's informed consideration.

Summary of Waterfront Commission Act, N.Y. Unconsol. Laws, vol. 65, at p. 477 (McKinney 2002) (hereinafter "Summary").[5]  Paragraphs 2, 3, and 4 of Article I find and declare that the evils described in paragraph 1 are caused by the system of public loaders and by the lack of regulation of the occupations of longshoremen, stevedores, pier superintendents, hiring agents, and port watchmen.  Paragraph 1 sets forth the specific evils that the Compact is designed to eradicate as follows:

> The states of New York and New Jersey hereby find and declare that the conditions under which waterfront labor is employed within the Port of New York district are depressing and degrading to such labor, resulting from the lack of any systematic method of hiring, the lack of adequate information as to the availability of employment, corrupt hiring practices and the fact that persons conducting such hiring are frequently criminals and persons notoriously lacking in moral character and integrity and neither responsive or responsible to the employers nor to the uncoerced will of the majority of the members of the labor organizations of the employees; that as a result waterfront laborers suffer from irregularity of employment, fear and insecurity, inadequate earnings, an unduly high accident rate, subjection to borrowing at usurious rates of interest, exploitation and extortion as the price of securing employment and a loss of respect for the law; that not only does there result a destruction of the dignity of an important segment of American labor, but a direct encouragement of crime which imposes a levy of greatly increased costs on food, fuel and other necessaries handled in and through the Port of New York district.

*See* Pub. L. No. 83-252, ch. 407, 67 Stat. 541, 541-42 (Aug. 12, 1953).[6]

The operative provisions of the Compact implement the legislative plan to improve waterfront labor conditions by establishing the Waterfront Commission to (1) license pier superintendents, hiring agents, stevedores, and port watchmen, (2) outlaw public loading, (3) register longshoremen and remove from the register casual workers, thus providing more and steadier work and higher earning capacity for longshore employees who depend on waterfront

---

[5]  A copy of the entire Summary is attached to this brief for the Court's convenience.

[6]  The term "corrupt hiring practices" has a distinct meaning: "kickbacks, connections that are used, facilities of his friends," which hiring bosses indulged in 60 years ago when hiring at the daily shape-ups.  *See* Fourth Report of the N.Y. State Crime Comm'n (Port of New York Waterfront), 38 (May 20, 1953).

work for their livelihood, and (4) replace the shape-up hiring system by operating employment information centers at which information on available employment would be disseminated and hiring facilitated but "without interference with employer-employee freedom of selection or with provisions of collective bargaining agreements." *See* Summary at 478.

Nowhere in the Findings and Declarations or in any of the operative provisions of the 1953 Compact is there any mention of diversity, discrimination in employment or hiring on the basis of race, color, national origin or sex or that one of the purposes of the Compact was to combat these concerns. Cases decided shortly after the Compact was enacted and approved by Congress exhaustively reviewed the provisions of the Compact and its legislative history. These cases disclose that the purposes of the Compact involved the eradication of crime, corruption, and racketeering on the New York/New Jersey waterfront, not the enhancement of diversity in the workforce or the elimination of race-, sex-, or ethnicity-based discrimination in employment. *See DeVeau v. Braisted*, 363 U.S. 144, 147-51 (1960); *Hazelton v. Murray*, 21 N.J. 115, 120-27 (1956). The Commission itself has already confirmed this fact. In an affidavit submitted in opposition to a motion for a preliminary injunction sought by the National Organization for Women (NOW) in an action against the Commission for race- and sex-based employment discrimination relating to the exercise of its section 5-p authority, the Commission's then Executive Director, after itemizing virtually all the reports and hearings that constitute the legislative history of the Compact, summarized its purposes as follows:

> The Waterfront Commission Act was enacted by the States of New York and New Jersey in 1953 . . . for the purpose of eliminating racketeering and other various evils on the waterfront in the port of New York Harbor, which had been publicly exposed by the New York State Crime Commission, the New Jersey Law Enforcement Council and other investigative bodies . . . .
>
> The Waterfront Commission Compact embodies a series of remedial measures designed to eliminate the waterfront evils that had been publicly exposed. These measures include the creation of a bi-state regulatory body, the Waterfront

> Commission of New York Harbor; the registration of longshoremen and checkers; the licensing of stevedores, pier superintendents, hiring agents and port watchmen; the outlawing of "public loading"; the elimination of the "shape-up" method of hiring longshoremen by the establishment of employment information centers for the employment of longshoremen; and the regularization of employment of longshoremen through the elimination of excess casual labor from the Longshoremen's Register.

*See* Affidavit of Leonard Newman at ¶¶ 3-4, *NOW v. Waterfront Comm'n of N.Y. Harbor,* 460 F. Supp. 84 (S.D.N.Y. filed Sept. 19, 1978). What is telling in Mr. Newman's affidavit is what he did not say. In an employment-discrimination case where the statement would be highly relevant, he did not say that the Commission's mission as set forth in the purposes of the Compact was the elimination of racial, ethnic, or sex discrimination in hiring or employment on the waterfront.

The constitutionality of a provision in a statute is a serious question that does not lend itself to summary disposition on a motion to dismiss. The Court should have the benefit of a complete record of the legislative history of the 1953 Compact, which in light of the Newman affidavit would appear to be in the possession of the Commission, as well as all other documents that bear upon the question of the Compact's purposes and the Commission's understanding over the years as to what they were. In light of the Commission's proven litigation strategy, *see supra* note 4, full-blown discovery on this issue is essential to assure that the Court has before it a complete record so that it can reach an informed decision of Count I's constitutional challenge to the certification provision of the 1999 amendment of section 5-p.

**Count II**

In the 44 years that "A" registrants have been added to the longshoremen's register, the Commission has never required employers to submit a section 5-p certification. That changed on September 9, 2013, when the Commission revised Section 4.4(d) of its Rules and Regulations to require it. *See* Am. Compl. at ¶¶ 43, 44. The legal deficiency in the amendment to Rule 4.4(d) is

that the statutory derivative for the amendment is section 5-p, and that section applies only to the Deep-Sea Register. *See* Am. Compl. at ¶¶ 61, 62. The resolution adopting the amendment contained a "Secret Determination" made without notice to any of the Plaintiffs and without any opportunity for them to be heard, s*ee* Am. Compl. at ¶¶ 46-47, that concluded that the collectively-bargained hiring procedures for "A" registrants promote various conditions "reminiscent of the "shape-up banned by the Act." *See* Am. Compl. at ¶ 46, Exh. 5 at 2; *see also* DMOL at 13.[7]

The Commission advances two arguments in support of the amended regulation. First, the Commission contends that the resolution is entitled to deference under *Chevron, U.S.A., Inc. v. Nat'l Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Second, the Commission argues that section 5-p(5)(b) of the Act authorizes the regulation. Both arguments are flawed.

The Commission, while still refusing to produce the factual record for the Secret-Determination resolution, tries to set forth the factual reasons for the resolution through the argument of counsel. The Commission argues that employers in the Port "have completely surrendered to the ILA the exclusive right to initially recruit and select those individuals that are referred to the employers to be considered for employment as 'A' registrant mechanics." *See* DMOL at 22. The Commission then contends that this union-referral system advances the "shape up" method of employment and that this union-referral method "specifically goes against the testimony of the employers in support of the 1999 5-p amendment at the public hearings." *See*

---

[7] Plaintiffs have made requests under the applicable freedom-of-information law (FOIL) for copies of the Commission's record concerning the amendment to Rule 4.4(d). In addition, Plaintiffs have made a FOIL request for copies of the Commission's record with respect to Determination 35. The Commission has not provided copies of the Determination 35 record and has refused to provide the record for the amendment to Rule 4.4(d) at all, invoking a putative litigation exception to FOIL because of this pending case. The Commission's motion to dismiss, thus, appears at best to be a rush to judgment and at worst an attempt to conceal the factual record to the extent there is one.

*id.* at 23.  Having filled this lacuna to its liking, the Commission argues that its resolution, which led to the amendment to the regulation, is entitled to deference under *Chevron*.  These issues are hotly contested and this is why this Court should not rule until the Commission produces the actual record documents underlying the Secret Determination and amendment to Rule 4.4(d).

Not surprisingly the Commission fails to set forth how the hiring of "A" registrants constitutes a shape-up.  Nor can it.   Union-referral systems are a perfectly lawful method of hiring.  The argument of counsel that the hiring of "A" registrants is a "shape-up" is based on a deliberate distortion of the actual facts that the Commission has been aware of since 1966.  The "shape-up" involved daily hiring of unskilled labor off the street.  *See* Fourth Report of the N.Y. State Crime Comm'n (Port of N.Y. Waterfront), 37 (May 20, 1953).  Prior to 1953 individuals were hired from day to day by different employers for guaranteed periods of four hours only. *See id.* at 37.  Now the overwhelming majority of "A" registrants are skilled mechanics hired by a single employer for a 40-hour-a-week job.

The Commission's representation to this Court that this method of hiring goes against the employers' testimony in 1998 is belied by the factual record.  The Commission is very cavalier with its citation to the portions of the legislative record.  The testimony that the Commission references, s*ee* DMOL at 23, did not involve the hiring of "A" registrants.  The portion of the testimony that the Commission did not produce, *see supra* note 4**,** establishes that the Commission understood that the union-referral system was in place for the hiring of "A" registrants and the Commission sought to expand this referral method to the Deep-Sea Register. Based on the testimony that was presented to the Waterfront Commission during the April 28, 1998 public hearing, there is no question that the employer-sponsorship program contemplated by both the industry and the Commission in the 1999 amendment to section 5-p involved the union's referral of employees.

The first reference to "employer sponsorship" was made during a question-and-answer period between Gerald P. Lally (then the Commission's General Counsel) and Howard Zuckerman (then the Commission's Director of Licensing and Employment Information Centers). Zuckerman stated that the concept of employer sponsorship, which was an important element in the proposed amendment to 5-p, had been successfully used by the Commission in connection with "A" registrants since 1966. *See* Transcript of Apr. 28, 1998 Commission Hearing, at 32-37. (A copy of which is attached hereto).

The second reference occurred during the questioning of the president of Howland Hook Container Terminal, when he was asked about his experience with employer sponsorship with his maintenance-contracting subsidiary, Island Securing, which was an employer of "A" registrants. He told the Commission that Island Securing contacts the union, tells the union what "A" Register workers it is looking for, the union refers new applicants for employment, and Island Securing selects some for sponsorship. The president of Howland Hook affirmatively endorsed this union-referral program for his deep-sea operations. *See* Commission Transcript, at 230-31.

The amendment to Rule 4.4(d) does not qualify for *Chevron* deference for two reasons. First, this deference applies only if Congress delegated interpretative authority to the agency with respect to the provision in question and the agency exercised its formal rulemaking or adjudicatory authority. *See United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). Here, the Commission, while purporting to be engaged in rulemaking, gave no notice of the shape issue, afforded no opportunity for comment thereon, heard from no witnesses, and has yet to produce an underlying record for its Secret Determination on that issue. Second, the Commission's resolution is not entitled to deference because the Commission revised a 45-year old rule with no explanation of why it was doing so. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 446-48

& n. 30  (1987); c*f. Motor Vehicle Mfr. Ass'n v. State Farm Mut. Ins. Co.*, 463 U.S. 29, 41-44
(1983) (an agency's change in interpretation is arbitrary and capricious when it fails to provide a
reasoned explanation for that change); *CBS Corp. v. FCC*, 663 F.3d 122, 138, 145-57, 151-52
(3d Cir. 2011), *cert. denied*, 132 S. Ct. 2677 (2012) (an administrative agency "cannot change a
well-established course of action without supplying notice of and a reasoned explanation for its
policy departure.")

The second argument advanced by the Commission is that Plaintiffs ignore the language
of section 5-p(5)(b), which authorizes the resolution amending Rule 4.4(b).  *See* DMOL at 24.
The resolution never discusses, let alone bases its finding on, section 5-p(5)(b). *See* Am. Compl.
at Exh. 5.  Moreover, the Commission states this section "specifically empowers the Commission
to prescribe the terms and conditions pursuant to which "A" registrants "may be included," s*ee*
DMOL at 25, but conveniently fails to tell the Court where they are to be included. The statute
states that they may be included "in the longshoremen's register."  Plaintiffs have alleged that the
1999 legislation amending and restating section 5-p specifically stated that that section applies
only to the Deep-Sea Register. *See* Am. Compl. at ¶ 63. Thus, the term "longshoremen's
register" throughout that  section  means the Deep-Sea Register. While section 5-p(5)(b)
authorizes the Commission to include existing "A" registrants in the Deep-Sea Register on such
terms and conditions as the Commission shall determine, it does not empower the Commission
to do so when new employees are being added to the "A" Register.

**Counts III AND IV**

The Commission attempts to refute the legal sufficiency of these two counts by
concocting a legal theory that ignores the terms of article XV of the Compact, a relevant
provision in section 5-p itself, and the legislative history of the Compact and by misstating

relevant court decisions that upon closer scrutiny establish the legal merits of the claims set forth in Counts III and IV.

The Commission's main point consists of block quotes from an unpublished decision issued by Judge H. Curtis Meanor in *N.Y. Shipping Ass'n, Inc. v. Waterfront Comm'n of N.Y. Harbor*, Civ. No. 78-995 (D.N.J. 1978), in support of its argument that Congress granted the Commission authority to infringe upon Plaintiffs' collective bargaining rights. *See* DMOL at 26, 27. In setting forth that proposition, the Commission ignores language in the immediate vicinity of those quotes, which undermine the Commission's argument. In connection with the first quote, the Commission ignores the following sentence, which is just one sentence down from the quoted material:

> [The Commission's determination] does not interfere with plaintiffs' rights to ". . . bargain collectively and agree upon any method for the selection of such employees by way of seniority, experience, regular gangs or otherwise . . . *because it does not attempt to dictate to the employers and unions the manner in which employees are to be selected for employment*."

*See N.Y. Shipping Ass'n*, at 12 (emphasis added). Since Counts III and IV challenge the Commission's use of its amended rule to dictate to the industry the manner in which the employees are to be selected for employment, Judge Meanor's decision actually supports those claims.[8]

The second quote from Judge Meanor's decision does not include its lead-in sentence, which states, "It is doubtful that [the Commission's determination] infringes plaintiffs' collective bargaining rights to a degree greater than did the compact as originally written and approved by Congress." *See id.* at 13. Plaintiffs have alleged that the certification provision that the

---

[8]  A summary prepared by all the government entities of New York and New Jersey involved in the drafting and passage of the Waterfront Commission Compact unequivocally reveals that the collective-bargaining safeguards in article XV of the Compact granted the industry "freedom of choice in the selection of employees." *See* Summary at 483, 484.

Commission has imposed on them does not further the purposes of the Compact as originally written and approved by Congress. *See* Am. Compl. at ¶¶ 57-58. That allegation is controlling at this stage of the proceeding.

The focus of Judge Meanor's decision was whether or not the Commission's determination was in conflict with the plaintiffs' collective-bargaining rights and preempted by federal labor law. That decision did not mention, let alone discuss, the collective-bargaining safeguards in Article XV or in section 5-p itself, the very provisions that form the basis for Counts III and IV.

Finally, the Commission argues that Plaintiffs' right to agree upon a method for the selection of employees cannot conflict with the Commission's method for enforcing the Waterfront Commission Act. *See* DMOL at 28. But the United States Court of Appeals for the Third Circuit held just the opposite in *Waterfront Comm'n of N.Y. Harbor v. Sea Land Serv., Inc.*, 764 F.2d 961 (3d Cir. 1985).

In that case, the court of appeals addressed an apparent conflict between the collective-bargaining rights protected by article XV and the Commission's powers under section 5-p. A collective bargaining agreement required the employer to obtain labor from a union hiring hall. The Commission determined that these employees had to be registered, which could not be done because the Commission had closed the section 5-p register. The employer, therefore, was placed in the conundrum of having to hire registered workers who were members of another union, which would undermine the hiring-hall provisions in its collective bargaining agreement.

The Third Circuit determined that there were two interpretive guides in the Compact that governed the resolution of this conflict. The first was the collective-bargaining safeguards of article XV, and the second was section 5-p itself. *See id.* at 965-66. The latter declares that "nothing in [section 5-p] shall be construed to modify, limit or restrict in any way any of the

24

rights protected" by the former.[9]   The court of appeals remarked, "This express reference to article XV dictates that the closed-register provision must be interpreted so as not to modify, limit or restrict collectively bargained hiring rights."  *See id*. at 966.  The court of appeals, therefore, concluded that article XV trumped section 5-p and required that section 5-p "be construed as not precluding registration of otherwise eligible [union] members" both those currently working for the employer and those currently on the hiring-hall list.  *See id*. at 966.  The Third Circuit summed up its holding as follows:

> Although this modification may appear at first glance to go beyond the literal language of the statute, in fact it ensures that the district court's order is faithful to the requirement that no restriction be placed on current collectively-bargained hiring rights.
>
> \*       \*       \*
>
> This result would appear to be not only consistent with but actually required by the statutory language respecting collective bargaining agreements.

*See id*. at 966-67 (footnote omitted).

The *Sea Land* case is dispositive of the validity of the Commission's interpretation of the section 5-p certification it embodied in amended Rule 4.4(d).  The Commission's interpretation limits and restricts a collectively-bargained union-referral process that had been until now accepted without challenge by the Commission for 40 years.  As in *Sea Land*, this action by the Commission violates article XV of the Compact and the section 5-p provision that states, "Nothing in this section shall be construed to modify, limit or restrict in any way any of the rights protected by article fifteen of this act."  N.J. STAT. ANN. § 32:23-114(3) (West Supp. 2013); N.Y. UNCONSOL. LAWS § 9920(3) (McKinney 2002).

---

[9]  This exact provision remains in the current version of section 5-p.  *See* N.J. STAT. ANN. § 32:23-114(3) (West Supp. 2013); N.Y. UNCONSOL. LAWS § 9920(3) (McKinney 2002).

**Count V**

Count V challenges the Commission's assertion of authority to decide without a hearing whether federal and state employment-discrimination laws have been violated and to use that determination to prevent the industry's hiring of new employees.  The Commission does not dispute that it intends to engage in this activity. Indeed, the Commission announces its intent to go even further and remedy its perceived violation of these employment-discrimination laws by revoking the licenses of employers to engage in business in the Port.  *See* DMOL at 30.

The Commission's sole opposition to Count V rests upon the proposition that the "doctrine of primary jurisdiction" concerns only the relationship between a court and an administrative agency.  *See* DMOL at 29.  In the Commission's view, just because it is not a court, it can encroach upon the jurisdiction of those agencies that occupy this field of the law. But the doctrine of primary jurisdiction is not the only legal obstacle to this usurpation of another agency's authority.

The Supreme Court of the United States has warned about the inappropriateness of an agency's becoming involved in the employment-discrimination realm without having statutory authority to do so.  In *NAACP v. FPC*, 425 U.S. 662 (1976), the National Association for the Advancement of Colored People (NAACP) sought to have the Federal Power Commission (FPC) impose a rule "requiring equal employment opportunity and nondiscrimination in the employment practices of its regulatees."  *See id*. at 664.  The NAACP's proposed rule would have required the FPC's regulated companies to adopt affirmative-action programs to combat discrimination. *See id*. at 664.

The Court stated that the key issue was whether Congress had given the FPC the authority to combat discrimination.  *See id.* at 665.  The NAACP argued that the Power and Gas Acts charged the FPC with advancing the public interest and that ending discrimination is in the

public interest.  *See id.* at 666.  The Court ruled that "[t]he use of the words 'public interest' in a regulatory statute is not a broad license to promote the general public welfare.  Rather, the words take meaning from the purposes of the regulatory legislation."  *See id.* at 669.

The Court ruled that the use of the words "public interest" in the governing statute was not a directive to the FPC to seek to eradicate discrimination but instead was a charge to promote the orderly production of plentiful supplies of electric energy and natural gas at just and reasonable rates.  *See id.* at 670.  The concurring opinion admonished, "To suggest . . . that the FPC could deny a license on account of a regulatee's discriminatory employment practices . . . is to thrust the Commission into a complex, volatile area for which Congress has already assigned authority to the EEOC."  *See id.* at 674.

In an argument that is directly contrary to the Supreme Court's opinion in *NAACP*, the Commission posits that it can deny or revoke a stevedore's license in the public interest based on its opinion that the stevedore has engaged in discriminatory conduct.  *See* DMOL at 30.  The Commission argues that it has the power to do that because it has been assigned the task of determining whether a stevedore possesses "good character and integrity."  *See id.* at 30 (citing N.J. Stat. Ann. § 32:23-21(b) (West 1990); N.Y. Unconsol. Laws § 9821(b) (McKinney 2002)).  But the Compact sets forth the specific factors that the Commission must consider in making that determination, and a possible violation of one of the employment-discrimination laws is not one of them.  *See* N.J. Stat. Ann. § 32:23-24 (West 1990); N.Y. Unconsol. Laws § 9824 (McKinney 2002).

The Commission then seeks to justify its conduct by stating that it alone is in the "best position to take expeditious remedial action."  *See* DMOL at 30.  While it may be able to quickly impose the business equivalent of the death penalty by revoking a stevedore's license, a remedy not available under the very laws it assumes the power to enforce, its intended involvement is not

authorized by its enabling Compact or by the very laws it seeks to administer. Indeed, its involvement could wreak mischief in the administration of those laws because any determination it may reach could be at odds with conflicting decisions by the tribunals Congress and state legislatures have entrusted with the administration of those laws.   The Commission should refrain from an *ultra vires* excursion into the field of employment-discrimination laws and refer any perceived violations of those laws to the agencies charged with their enforcement.

**Count VI**

Determination 35 could not be clearer: the Commission has authorized NYSA's members to hire only 150 longshoremen and 75 checkers, *see* Am. Compl. at ¶ 92, Exh. 3 at 4, even though the industry has requested permission to hire 532 longshoremen and 150 checkers, *see* Am. Compl. at ¶ 91, Exh. 2 at 1, Exh. 3 at 2.  Count VI of the Amended Complaint seeks judicial review of the underlying administrative record to determine if the Commission's refusal to grant the underlying request *in toto* is arbitrary and capricious and without factual support.

The Commission seeks dismissal of Count VI on the ground that Determination 35 does not mean what it says. Rather than basing its objections to Count VI upon the factual allegations in the Amended Complaint, as it is required to do, the Commission states that those allegations are "categorically untrue" and "without any support" and points to two nonsubstantive "whereas" clauses in Determination 35 and a *post hoc* rationale that is neither contained in nor supported by the four corners of that determination to support its assertion that "it will open the deep sea register for the inclusion of 532 longshoremen and 150 checkers."  *See* DMOL at 31-32.  Of course, by stating that it will eventually open the register for the requested numbers, the Commission has necessarily conceded that it has not already done so.

Despite the allegations in the Amended Complaint, the Commission bases its position upon two prefatory provisions in Determination 35, which state that the Commission has

determined that the immediate addition of 150 longshore employees and 75 checkers is appropriate and the addition at some unspecified future time of 382 longshore employees and an unstated number of checkers is appropriate.  *See* DMOL at 31-32 (citing Am. Compl., Exh. 3 at 2-3). These "whereas" clauses do not refute the allegations in the Amended Complaint.  Even the most tortured reading of the second "whereas" clause cannot support the Commission's assertion that it has granted Plaintiffs' request to open the register for 150 checkers.

The operative decretal orders in Determination 35, however, limit the number to be included in the Deep-Sea Register to a total of 150 longshore employees and 75 checkers. *See* Am. Compl., Exh. 3 at 4 (emphasis supplied).  The Commission tries to convert the prefatory provisions into substantive operative provisions, but a prefatory provision cannot limit or expand the scope of an operative provision.  One can look to a prefatory provision only when seeking to resolve an ambiguity in an operative provision; it cannot be used to create one.  *See Dist. of Columbia v. Heller*, 554 U.S. 570, 577-78 (2008); *see also Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163 (2009); *Trecom Bus. Sys. v. Prasad*, 980 F.Supp. 770, 773 (D.N.J. 1997).  Since there is no ambiguity in the two decretal provisions, it is inappropriate for the Commission to rely upon the two "whereas" clauses.

The Commission then seeks to justify its reliance on the prefatory provisions by stating in its brief that Determination 35 contains language that it does not.  Not only does Determination 35 not order the opening of the Deep-Sea Register for the inclusion of 532 longshoremen and 150 checkers, it does not state that it is the first in a series of determinations to open that register. *Compare* DMOL at 32 *with* Am. Compl., Exh. 3, at 4-6.  The Commission seeks to substitute defense counsel's *post hoc* rationalizations for the plain language of Determination 35.  In doing so, not only does the Commission violate the standard of review on a motion to dismiss but it also violates the well-established principle of law that an agency's action will be upheld only

when the basis for that action has been articulated by the agency itself, not by post-decision statements of its counsel.  *See Motor Vehicle Mfrs. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983); *Am. Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 539 (1981); *Burlington Truck Lines v. United States*, 371 U.S. 156, 168-69 (1962).  After all, some agencies have been known to change their minds and disregard the actions of prior Commissioners, let alone Commission counsel.

The Commission's reference to the issue of whether the register was opened as a result of a joint recommendation of the collective-bargaining parties or on the Commission's own initiative, *see* DMOL at 31, is a red herring.[10]  Whatever the manner by which the register was opened, the law does not require Plaintiffs to have to look to statements in "whereas" clauses and documents other than Determination 35 to determine exactly what the Commission is permitting them to do.  If the Commission agrees with its counsel's story, all it need do is issue an unequivocal amended determination.

**Count VII**

The Commission's opposition to Count VII is riddled with holes.  First, the Commission asserts that Plaintiffs have failed to state how their collective-bargaining rights have been limited by Determination 35, *see* DMOL at 33, but Count VII plainly and simply lays out factual allegations that demonstrate the Commission's impermissible interference with Plaintiffs' collective-bargaining rights. Plaintiffs list in bullet-point format the four orders from Determination 35 that interfere with their collective-bargaining rights, s*ee* Am. Compl. at ¶ 98, and then explain how those orders interfere with their collective-bargaining rights,  s*ee* Am.

---

[10]   Later in its brief, the Commission takes issue with the manner in which Plaintiffs pleaded their claims.  *See* DMOL at 34 n. 14.  To the extent that Plaintiffs' pleading is inconsistent, a point that Plaintiffs do not concede, Rule 8(d)(3) of the Federal Rules of Civil Procedure permits a party to "state as many separate claims . . . as it has, regardless of consistency."  *See* Fed. R. Civ. P. 8(d)(3).

Compl. at ¶ 99.  The order in the first bullet point interferes with the interpretation, application, and implementation of Plaintiffs' collectively-bargained Hiring Plan.  The order in the second bullet point interferes with Plaintiffs' right to assign seniority.  And the orders in the third and fourth bullet points interfere with the manner and order in which employees are hired (hiring rights and hiring priorities).  Accordingly, Count VII properly asserts Plaintiffs' claim for relief in a short and plain statement that satisfies the notice-pleading requirements of Fed. R. Civ. P. 8(a).  *See Wilson v. Philadelphia*, 415 Fed. App'x 434, 435 (3d Cir. 2011); *Ehrhart v. Synthes (USA)*, No. 07-01237 (SDW), 2007 WL 4591276, at *6 (D.N.J. Dec. 28, 2007).

Second, the Commission states that Plaintiffs have not referred to the collective-bargaining agreements or provisions that have been limited by Determination 35.  *See* DMOL at 33.  Since Determination 35 was issued in response to a request from NYSA and the ILA for permission to hire new employees, it should be obvious to the Commission that the NYSA-ILA CBA is the collective-bargaining agreement that has been affected by Determination 35.  Even if somehow it were not obvious to the Commission, the allegations in and attachments to the Amended Complaint make that clear.  *See* Am. Compl. at ¶¶ 4, 6, 30-35, 87-96, 98; Exh. 1-3.  As for the particular collective-bargaining provisions that have been limited, Count VII clearly states that the Hiring Plan and the seniority and hiring provisions of the collective-bargaining agreement have been affected.  *See* Am. Compl. at ¶ 99.  In a nutshell, the Commission in Determination 35 has taken it upon itself to dictate the very terms that the Commission mandates have to be included in the NYSA-ILA CBA.  One cannot conceive of a more direct and blatant violation of article XV of the Compact.  A conflict with an existing provision of the labor contract is not the only way article XV is violated.  The Commission's arrogant belief that it has the power to tell Plaintiffs what their collective bargaining agreement shall provide is equally contemptuous of article XV's express prohibition.

Third, after asserting that Plaintiffs have failed to state the manner in which their collective-bargaining rights have been infringed, the Commission cites Judge Meanor's decision in *N.Y. Shipping Ass'n v. Waterfront Comm'n of N.Y. Harbor*, Civ. No 78-995 (HCM) (D.N.J. June 11, 1978) in support of its own improperly included allegations that it is permitted to "infringe upon federally guaranteed collective bargaining rights traditionally reserved to Plaintiffs' control." *See* DMOL at 33. In essence, the Commission contends that it can interfere with all of Plaintiffs' collective-bargaining rights with impunity. That contention, however, is expressly rejected by the very court decision upon which it relies:

> The Commission's solution does not interfere with the plaintiffs' ability to determine the seniority status of the transferred workers. Nor does it create a new <u>hiring</u> priority which the employers must follow in selecting employees. Once workers have been transferred into the checker register, the unions are free to negotiate and establish whatever seniority provisions they wish. And employers are still compelled to hire from the register based upon the collectively bargained priority and seniority provisions.

> Determination 15 does not interfere with plaintiffs' rights to ". . . bargain collectively and agree upon any method for the selection of such employees by way of seniority, experience, regular gangs or otherwise . . . " because it does not attempt to dictate to employers or unions the manner in which employees are to be selected for employment. . . . Plaintiffs are still free to determine the seniority, order of hiring, etc. of the new checkers once they enter the register. . . . Once the registers have been filled, plaintiffs are not the least bit impaired from collectively bargaining on the issues of seniority, hiring priority, etc.

*See id.* at 9, 12 (emphasis in original). Judge Meanor's decision debunks the Commission's contention that it can interfere in collective bargaining so long as it does not conflict with existing terms of the labor contract.

Finally, the Commission seeks to justify the challenged provisions of Determination 35 by introducing factual allegations that are not contained in the Amended Complaint. *See* DMOL at 33-34. Whatever its rationale may be, Determination 35 constitutes an impermissible effort by the Commission to impose upon the collective-bargaining parties the manner in which new

employees will be recruited, referred, selected, hired, and trained.  The Commission has made no secret of its intention to become involved in these matters.  *See* Am. Compl., Exh. 4 at 4.  Not only is the Commission statutorily prohibited from doing so, but the Commission lacks the requisite knowledge to do so.  Ironically, while the Commission touts the necessity for its involvement to assure "new employees are assigned the appropriate seniority level so that they are not more senior than those already in the industry," *see* DMOL at 34, Determination 35 fails in this regard.  It assigns "V" seniority to all employees hired pursuant to Determination 35.  *See* Am. Compl., Exh. 3 at 5.  But checkers currently employed under the NYSA-ILA CBA have already been assigned seniority levels "V" through "Y."  Thus, even Cookie Monster would know that the Commission's determination actually gives new checkers higher seniority than checkers who are already in the workforce.  This is precisely why article XV, Judge Meanor, and the Commission itself over the years have left matters relating to seniority and hiring to the collective-bargaining parties.[11]

**Count VIII**

Count VIII challenges the Commission's *ultra vires* attempt to require a representative of the Contract Board over which the Commission has no regulatory jurisdiction to submit a certification concerning the selection of an individual sponsored for employment. The Commission provides no authority to refute the allegation in the Amended Complaint that it lacks jurisdiction over NYSA and ILA, the constituent entities that comprise the Contract Board. Nor does it challenge the allegation that the only certification provision in section 5-p imposes the obligation to submit a certification upon the employers *i.e.* (the stevedores) that are subject to

---

[11] The missing pages from the Commission Transcript, which the Commission determined were irrelevant, show that the Commission's prior administrations honored article XV's admonition to refrain from intruding into seniority issues.  The Commission during that hearing repeatedly acknowledged that the seniority level of longshore workers is determined by the industry.  *See* Commission Transcript at 50, 55-56, 74, 78, 80, 86, 88, 89, and 94.

the Commission's jurisdiction.  Rather, it devotes all its energies in its brief to explaining the reasons why it chose a Contract Board representative to sign the certification.  Whatever the reasonableness of the choice, it does not undermine the legal sufficiency of Count V.  Good intentions do not cure the lack of jurisdiction.

Even if somehow the register can be deemed to have been opened on the Commission's own initiative, the Commission still cannot compel a Contract Board representative to submit a certification because of the Commission's lack of regulatory jurisdiction.  *See* N.J. STAT. ANN. § 32:23-5 (West 1990); N.Y. UNCONSOL. LAWS § 9805 (McKinney 2002).  Under the Compact, the Commission has jurisdiction over pier superintendents, hiring agents, longshoremen, and port watchmen only.  S*ee* N.J. STAT. ANN. §§ 32:23-5 (West 1990); N.Y. UNCONSOL. LAWS § 9805 (McKinney 2002).  The Compact does not grant the Commission jurisdiction over bargaining associations, like NYSA, unions, like the ILA, or any constituent bodies established under collective bargaining agreements, like the Contract Board, and the Commission does not have legislative authority to expand its regulatory jurisdiction over these entities simply by pretending that it is opening the register on its own initiative.

**Count IX**

The fifth decretal paragraph of Determination 35 states "that the offering of a false sponsorship letter for filing shall be punishable under N.Y. Penal Law §175.35 . . . ."  *See* Am. Compl., Exh. 3 at 5.  That penal statute outlaws false information to a public authority.  Count IX challenges the Commission's authority to issue this decretal order.

The Commission tries to defend its determination by arguing that it does not mean what it says.  In the view of Commission's counsel, it is only a reminder of the serious legal consequences that will result from the filing of a false sponsorship letter. *See* DMOL at 38. One is perplexed by the Commission's inclusion in a section 5-p determination of an advisory opinion

concerning a penal law of the State of New York.  There is nothing in section 5-p that provides authority for this type of public-service message.[12]  What is particularly disturbing is that the Commission's opinion is inaccurate because this penal law does not apply to submissions to the Commission.  In its brief the Commission represents to this Court that the Commission is a public authority.  S*ee* DMOL at 37.  But the Appellate Division of the New York Supreme Court has held otherwise. *See People v. Sutera*, 968 N.Y.S.2d 442, 443 (N.Y. App. Div. 2013).  The revision or withdrawal of the Commission's public-service announcement is warranted.

**Count X**

Count X of the Amended Complaint states a viable claim against the Commission for the violation of Plaintiffs' procedural due process rights.  It alleges that the Commission issued a regulation that invalidated key provisions of the Plaintiffs' collective bargaining agreements without allowing the Plaintiffs an opportunity to be heard.  The Commission argues that this count should be dismissed because the Commission is not required to comply with the requirements of due process when it promulgates new regulations and that the rights created by the collective bargaining agreement are not protected property interests.[13]

The Fourteenth Amendment to the United States Constitution specifies, in relevant part, as follows: "nor shall any State deprive any person of life, liberty, or property, without due

---

[12] If the Commission truly intended it to be just a warning, why does that same order require all sponsorship letters be filed with the Commission's office in New York City, rather than with its office in New Jersey?  Clearly, the Commission was seeking to obtain a basis for applying the New York law to entities located in New Jersey.

[13] As a preliminary matter, the Commission's memorandum conflates the two different types of due-process claims.  The Commission's memorandum spends a great deal of time arguing that Count X of the Amended Complaint does not state a substantive due-process claim.  *See* DMOL at 39-40.  That is a non-issue, however, because Plaintiffs never alleged such a claim. The Commission's entire discussion of legitimate state interests, fundamental rights, and strict scrutiny relate to a substantive due-process analysis and, consequently, have no bearing on the Plaintiffs' procedural due-process claim.

process of law." U.S. CONST. amend. XIV, § 1. In the procedural context, "due process of law" requires that "a deprivation of life, liberty or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 542 (1984) (quoting *Mullane v. Cent. Hanover Bank & Trust Co*., 339 U.S. 306, 313 (1950)). Put simply, the fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965).

Therefore, in order to state a claim for the violation of procedural-due-process claim, the plaintiff must allege that (1) it has been deprived of some liberty interest or property interest, and (2) the procedure accompanying the deprivation did not satisfy the requirements for procedural due process. *See, e.g.*, *Midnight Sessions Ltd v. Philadelphia*, 945 F.2d 667 (3d Cir. 1991). These elements have been specifically alleged in the Amended Complaint. *See* Am. Compl. at ¶¶ 118-122.

The Commission concedes that Plaintiffs received no hearing before the Commission promulgated the regulation that invalidated the hiring provisions in Plaintiffs' collective bargaining agreements but argues that when it issues regulations, it can ignore procedural due process altogether and hold no hearings at all. *See* DMOL at 39. For this contention, the Commission cites a forty-year old case: *Parsons v. United States Postal Service*, 380 F. Supp. 815 (D.N.J. 1974). In this case, the plaintiffs were purchasers in a new residential development and were complaining that the Post Office's new regulations required mail delivery to curbside mailboxes instead of mailboxes on the house. This Court dismissed the due process claim, noting that the Post Office was not required to hold a hearing before issuing the mailbox regulation. The Court did not analyze the plaintiffs' due process claim in any detail but instead relied on the Supreme Court's decision in *Bowles v. Willingham*, 321 U.S. 503, 519 (1944). The

*Bowles* case involved federal rent control during World War II. When discussing the *Bowles* case fifty years later, the Supreme Court noted that the decision arose out of an "executive urgency" that had long since "dissipated." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 59-61 (1993) (questioning relevance of older cases that had allowed post-deprivation hearings). Moreover, even in *Bowles*, hearings were provided *after* the rent control was imposed. *Bowles*, 321 U.S. at 520. In this case, however, the Commission has provided no avenue for review at all, reminiscent of High Priest Caiaphas' declaration, "What further need have we of witnesses –" Matthew 26:65 (King James).

Moreover, the Commission is doing a great deal more than changing the location of mailboxes. The Commission secretly investigated the Plaintiffs' contractual hiring procedure and then issued findings of fact and conclusions of law that resulted in a legal adjudication that the procedure contravened the Waterfront Commission Act. This adjudication resulted in the Commission's imposing the new regulation, which prevents the Plaintiffs from using the hiring procedure that they have used for decades and that still is legally binding on them in their current collective bargaining agreements. The Plaintiffs' contractual rights have, therefore, been completely abrogated by the Commission's unilateral Secret Determination. The Supreme Court of the United States has stated, "When governmental agencies adjudicate or make binding determinations which directly affect the legal rights of individuals, it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process." *Hannah v. Larche*, 363 U.S. 420, 442 (1960).

The Commission also argues that rights created under a collective bargaining agreement cannot constitute a property interest. *See* DMOL at 39 n. 16. The Commission offers absolutely no legal support for this assertion. Nor can it because contractual rights and obligations created by collective bargaining agreements constitute property rights (for both employees and

employers) under a due-process analysis.  *See, e.g.*, *Brock v. Roadway Express, Inc.*, 481 U.S. 252, 260 (1987) (right to discharge an employee for cause is an employer's property right under a due-process analysis); *Moffitt v. Town of Brookfield*, 950 F.2d 880 (2d Cir. 1991) (collective bargaining agreement providing that employee could not be fired without just cause creates property right for employee under due process clause); *Johnston-Taylor v. Gannon*, 907 F.2d 1577, 1581 (6th Cir. 1990) (collective bargaining agreement providing professor with right to "continuing employment" created protected property interest which could only be terminated in accordance with due process); *Handley v. Phillips*, 715 F. Supp. 657, 671 (M.D. Pa. 1989) (plaintiff's expectation of continued employment based on a collective bargaining agreement constitutes a property interest); *see also New Castle Cnty. v. Bd. of Educ.*, 569 F. Supp. 1482, 1485 (D. Del. 1983) ("language in a collective bargaining agreement can create a property interest which implicates due process"). In this case, Plaintiffs and their individual members have longstanding  contractual rights and expectations based upon the hiring procedure set forth in their collective bargaining agreements. Now that the procedure has been nullified by the Commission, Plaintiffs have a viable due-process claim.

## CONCLUSION

For the reasons set forth above, Defendant's Motion to Dismiss should be denied.

**Dated:  February 21, 2014**

Respectfully submitted,

THE LAMBOS FIRM, LLP                MARRINAN & MAZZOLA MARDON, P.C.


By:____s/ James R. Campbell_____        By:____s/ John Sheridan_____
James R. Campbell                        Kevin Marrinan
599 Avenue C                             John P. Sheridan
Bayonne, New Jersey 07002                26 Broadway, 17th Floor
(201) 823-1000                           New York, New York 10004
           and                           (212) 425-3240
Donato Caruso
The Lambos Firm, LLP                     *Attorneys for Plaintiff*
303 South Broadway, Suite 410            *International Longshoremen's*
Tarrytown, New York 10591                *Association, AFL-CIO and Local 1814,*
(212) 943-2470                           *International Longshoremen's*
                                         *Association, AFL-CIO*

*Attorneys for Plaintiff*
*New York Shipping Association, Inc.,*

                                         DAGGETT, KRAEMER & GJELSVIK


                                         By:____s/ George T. Daggett_____
                                         George T. Daggett
                                         328 D Sparta Avenue
                                         Sparta, New Jersey 07871
                                         (973) 729-2117

                                         Counsel *for Plaintiff*
                                         *Local 1804, International*
                                         *Longshoremen's Association, AFL-CIO*

26084